EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Senado de Puerto Rico, representado por su Presidente, Hon. José Luis Dalmau Santiago<br><br>Peticionario<br><br>v.<br><br>Tribunal Supremo de Puerto Rico, por conducto de su Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez; Gobierno de Puerto Rico, por conducto de su Secretario de Justicia, Hon. Domingo Emanuelli Hernández<br><br>Recurridos | 2021 TSPR 141<br><br>208 DPR ____ |

Número del Caso:  CT-2021-12


Fecha: 15 de octubre de 2021

**Abogados de la parte peticionaria**
**Senado de Puerto Rico:**

> Lcdo. Víctor Candelario Vega
> Lcda. Alejandra M. Arnaldy Figueroa


**Oficina del Procurador General:**

> Lcdo. Fernando Figueroa Santiago
> Procurador General
>
> Lcdo. Omar Andino Figueroa
> Subprocurador General
>
> Lcda. Mabel Sotomayor Hernández
> Subprocuradora General
>
> Lcda. Mariola Abreu Acevedo
> Procuradora General Auxiliar


**Abogados de las partes interventoras:**

Comisionado Electoral del Partido Popular Democrático

> Lcda. Naomy N. Ruiz Ruiz
> Lcdo. Ramón A. Torres Cruz

Comisionado Electoral del Partido Nuevo Progresista

> Lcdo. Ramón L. Rosario Cortés
> Lcdo. Francisco J. González Magaz

**Abogados de los *Amicus Curiae:***

Comisionado Electoral del Movimiento Victoria Ciudadana

    Lcdo. Jorge Farinacci Fernós
    Lcda. Yanisse P. Cuadrado-Ruiz

Cámara de Representantes de Puerto Rico

    Lcdo. Jorge Martínez Luciano
    Lcdo. Emil Rodríguez Escudero

Materia: Derecho Constitucional – Inconstitucionalidad del inciso (3) del Art. 3.7 del Código Electoral de Puerto Rico de 2020.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Senado de Puerto Rico, representado por su Presidente, Hon. José Luis Dalmau Santiago<br><br>    Peticionario<br><br>        v.<br><br>Tribunal Supremo de Puerto Rico, por conducto de su Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez; Gobierno de Puerto Rico, por conducto de su Secretario de Justicia, Hon. Domingo Emanuelli Hernández<br><br>    Recurridos | CT-2021-0012 |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 15 de octubre de 2021.

Nos corresponde pasar juicio —únicamente— sobre la constitucionalidad de la disposición del inciso (3) del Art. 3.7 del Código Electoral de Puerto Rico de 2020, infra, que establece que en ausencia de los nombramientos del Gobernador o del consejo y consentimiento de ambas cámaras de la Asamblea Legislativa, el Pleno del Tribunal Supremo de Puerto Rico deberá elegir al Presidente y Presidente Alterno de la Comisión Estatal de Elecciones (CEE). Es decir, debemos resolver si nuestro sistema constitucional permite que se delegue al Tribunal Supremo el nombramiento de las personas que dirigirán la CEE. Tras un análisis detenido del derecho

aplicable, concluimos que esa disposición es inconstitucional ya que contraviene la doctrina de separación de poderes.

I

El inciso (3) del Art. 3.7 del Código Electoral de Puerto Rico de 2020, conocido como Código Electoral de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4517 (3), dispone una serie de fases para la selección del Presidente y el Presidente Alterno de la CEE. Específicamente la ley establece:

> Corresponderá al Comisionado Electoral del Partido Estatal de Mayoría, cuyo partido hubiere obtenido en la anterior Elección General la mayor cantidad de votos íntegros en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta, proponer a los restantes Comisionados propietarios el o los nombres de los candidatos a los cargos de Presidente y de Alterno al Presidente. Si al término de treinta (30) días naturales de haber surgido una vacante en el cargo de Presidente y/o del Alterno del Presidente no se lograra la unanimidad de los comisionados electorales propietarios para cubrir la vacante, entonces el Gobernador deberá hacer el nombramiento del o los candidatos para cubrir el o los cargos vacantes. El Gobernador deberá hacer estos nombramientos no más tarde de los quince (15) días naturales a partir del vencimiento del término anterior. Tales nombramientos requerirán el consejo y consentimiento de dos terceras partes (2/3) del total de los miembros de ambas cámaras en la Asamblea Legislativa, no más tarde de los quince (15) días naturales a partir del recibo del o los nombramientos otorgados por el Gobernador, según corresponda. Íd.

Ahora bien, si esto no sucede, la ley dispone que la responsabilidad de los nombramientos recaerá sobre el Pleno de este Tribunal. Íd.

> **En ausencia de los nombramientos del Gobernador y/o del consejo y consentimiento legislativo, el pleno de los miembros del Tribunal Supremo de Puerto Rico deberá elegir por mayoría de sus votos a un juez o**

**jueza para ocupar el cargo de Presidente o Alterno del Presidente en la Comisión, según corresponda.** Esta votación del pleno del Tribunal Supremo deberá realizarse no más tarde de los quince (15) días naturales a partir de la ausencia de los nombramientos por parte del Gobernador o de la ausencia del consejo y consentimiento de las cámaras legislativas al cierre de la sesión ordinaria o extraordinaria en que recibieron el o los nombramientos. Dentro de los ciento (120) veinte días previos a una Elección General, plebiscito, referéndum o primaria, todos los anteriores términos se reducirán a la mitad. (Énfasis suplido). <u>Íd</u>.

El 30 de junio de 2021, vencieron los términos de los nombramientos de los actuales Presidente y Presidenta Alterna de la CEE, Hon. Francisco Rosado Colomer y Hon. Jessika Padilla Rivera. Por ello, conforme a la ley, los comisionados electorales propietarios contaban con un término de treinta días para llegar a un acuerdo unánime para cubrir esas vacantes. Eso no ocurrió. En vista de eso, el 7 de septiembre de 2021, el Gobernador de Puerto Rico, Hon. Pedro Pierluisi Urrutia, sometió para el consejo y consentimiento del Senado y la Cámara de Representantes las nominaciones de los jueces superiores, Hon. Jorge Rivera Rueda y Hon. Edgardo Figueroa Vázquez, para Presidente y Presidente Alterno, respectivamente. Conforme a la ley, cada cámara legislativa tenía quince días a partir del recibo de los nombramientos para actuar sobre ellos.

Entonces, el 23 de septiembre de 2021, el Senado de Puerto Rico presentó una demanda ante el Tribunal de Primera Instancia. Mediante el mecanismo procesal de sentencia declaratoria, el Senado solicitó lo siguiente: (1) que se resuelva que el nombramiento del Presidente y Presidente

Alterno de la CEE requiere el consejo y consentimiento del Senado; (2) se declare inconstitucional la disposición del inciso (3) del Artículo 3.7 del Código Electoral de 2020, supra, en lo que respecta únicamente a la facultad del Pleno del Tribunal Supremo de escoger al Presidente y Presidente Alterno de la CEE, y (3) se disponga que cualquier nombramiento para los cargos de Presidente y Presidente Alterno de la CEE que realice el Tribunal Supremo violenta la doctrina de separación de poderes y, por consiguiente, sería inconstitucional.

El Senado también solicitó que se emitiera un interdicto preliminar contra este Tribunal para que nos abstuviéramos de realizar los nombramientos hasta que se resolvieran las controversias planteadas. Además, incoó una causa de acción de interdicto permanente para impedir que este Tribunal realizara los nombramientos en controversia por ser inconstitucionales. Ese mismo día, el Senado presentó una petición de certificación intrajurisdiccional ante nosotros. Al día siguiente, el Gobierno de Puerto Rico compareció y se expresó a favor de la expedición del auto.

Ese mismo día emitimos una Resolución en la que, tras invocar la Regla de Necesidad,[1] certificamos el pleito por tratarse de una controversia constitucional de estricto

---

[1] "[E]sta norma jurisprudencial de antigua estirpe permite, como excepción a las normas sobre inhibición, [...] que los jueces participen en la decisión de un pleito en cuyo resultado tengan interés, cuando no sea posible sustituirlos o su participación sea necesaria para constituir quórum en un tribunal colegiado". Brau, Linares v. ELA et als., 189 DPR 1068, 1071 (2013) (Resolución), citando a J.J. Álvarez González, La Asamblea Legislativa de Puerto Rico y las pensiones de los Jueces del Tribunal Supremo: Reseña de un conflicto con la independencia judicial, 56 (Núms. 2-3) Rev. Jur. UPR 265, 273 (1987).

derecho y alto interés público. Al respecto, indicamos que como norma general, un juez debe inhibirse en casos en que tenga conflicto de interés o sea afectado por la controversia ante sí. No obstante, descargamos nuestra responsabilidad y señalamos que no claudicaríamos a nuestro deber como máximos intérpretes de la Constitución de Puerto Rico. Por imperativo de la Regla de Necesidad, todos los jueces y juezas de este Tribunal participamos en la consideración de este caso.

El Senado demandó y emplazó al Tribunal Supremo a través de la Jueza Presidenta, Hon. Maite Oronoz Rodríguez. Sin embargo, el Tribunal Supremo no tiene personalidad jurídica propia por lo que el Senado debió demandar y emplazar a cada uno de sus miembros. Véase por analogía: Fred y otros v. E.L.A., 150 DPR 599 (2000). Como esto no ocurrió, el caso prosiguió únicamente contra el Estado Libre Asociado de Puerto Rico, denominado en la demanda como Gobierno de Puerto Rico, mediante el mecanismo de sentencia declaratoria. Por eso, en la Resolución que emitimos especificamos que el Senado y el Gobierno de Puerto Rico eran las partes que debían comparecer mediante alegatos. Véase: Resolución de este Tribunal de 24 de septiembre de 2021.

También comparecieron el Lcdo. Ramón A. Torres Cruz, Comisionado Electoral del Partido Popular Democrático, y la Lcda. Vanessa Santo Domingo Cruz, Comisionada Electoral del Partido Nuevo Progresista, como interventores. A su vez, Lillian Aponte Dones, Comisionada Electoral del Movimiento

Victoria Ciudadana, y la Cámara de Representantes de Puerto Rico comparecieron como amigos de la corte.

Con el beneficio de la comparecencia de todas las partes y de los amigos de la corte, cuya comparecencia aceptamos aquí, atendemos el recurso de epígrafe sin trámite ulterior, como nos autoriza la Regla 50 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-B.

II

A. La certificación intrajurisdiccional es un mecanismo procesal discrecional, que podemos expedir por iniciativa propia o a solicitud de parte, para elevar inmediatamente a la consideración de este Tribunal cualquier asunto pendiente ante los foros inferiores cuando, entre otros factores, se plantean cuestiones de alto interés público que incluyen un asunto constitucional sustancial al amparo de la Constitución de Puerto Rico o de Estados Unidos. Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V; Art. 3.002 de la Ley Núm. 201-2003, 4 LPRA sec. 24s(f), conocida como la Ley de la Judicatura de Puerto Rico de 2003. Véase, además: Senado de PR v. ELA, 203 DPR 62, 69 (2019). Este mecanismo procesal adquiere particular importancia "cuando la legitimidad de los procesos democráticos y de nuestras instituciones está en disputa". Senado de PR v. ELA, supra, citando a Torres Montalvo v. Gobernador ELA, 194 DPR 760 (2016). Véase, además: Pierluisi et al. v. CEE et al., 204 DPR 841, 853 (2020).

Por su carácter excepcional, al evaluar una certificación intrajurisdiccional, debemos considerar la: (1) urgencia, (2) etapa en que se encuentran los procedimientos, (3) necesidad que puede presentarse de recibir prueba, y (4) complejidad de la controversia. Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 849 (2014).

En esta ocasión, el Senado cuestiona la constitucionalidad de una disposición del Código Electoral de 2020, supra, que le confiere a esta Curia la facultad de nombrar al Presidente y Presidente Alterno de la CEE. Es inescapable concluir que esta situación es novel y requiere una determinación final con urgencia. Más aún, la controversia presenta un asunto que nos corresponde resolver como últimos intérpretes de la Constitución de Puerto Rico. Además, aunque la controversia se encuentra en una etapa inicial, no hay necesidad de recibir prueba.

B. La sentencia declaratoria es un recurso remedial y profiláctico que permite que se anticipe la dilucidación en los méritos de una reclamación cuando existe un peligro potencial contra quien la solicita. Beltrán Cintrón v. ELA, 204 DPR 89, 109 (2020); Senado de PR v. ELA, supra, pág. 71. Se trata de un recurso discrecional que tiene la eficacia y vigor de una sentencia o resolución. Regla 59.1 de Procedimiento Civil, supra. Mediante esta, el Tribunal puede declarar derechos, estados y otras relaciones jurídicas aunque se inste o pueda instarse otro remedio. Íd.

Su propósito es despejar una incertidumbre o poner fin a una controversia. J. A. Echevarría Vargas, Procedimiento Civil puertorriqueño, 1ra ed. rev., Colombia, [s. Ed.], 2011, pág. 345. Una vez se impugna oportunamente la interpretación de un estatuto mediante un recurso de sentencia declaratoria y se establece la legitimación activa del promovente, la función del tribunal se remite a su alcance e interpretación. Romero Barceló v. ELA, 169 DPR 460, 475-476 (2006).

C.   Un legislador que se designa como representante oficial del cuerpo legislativo ante el foro judicial puede vindicar derechos y prerrogativas de esa cámara. Hernández Torres v. Hernández Colón, 1209 DPR 824, 838 (1992). "Los legisladores tienen legitimación activa para, entre otras cosas, hacer valer sus prerrogativas legislativas". Senado de PR v. ELA, supra, pág. 70. Véanse, además: Bhatia Gautier v. Gobernador, 199 DPR 59, 70-71 (2017); Acevedo Vilá v. Meléndez, 164 DPR 875, 885 (2005); Hernández Agosto v. Romero Barceló, 112 DPR 407, 415 (1982). La Sec. 6.1(p) del Reglamento del Senado de Puerto Rico faculta a su Presidente a presentar "a nombre del Senado o interven[ir] en aquellas acciones judiciales en las cuales él estime que puedan afectarse los derechos, facultades y prerrogativas del Senado, sus funcionarios, Comisiones y los funcionarios de éstas, en el desempeño de sus gestiones legislativas". R. del S. 13 de 9 de enero de 2017.  Por lo tanto, "el Presidente del Senado tiene legitimación para comparecer a nombre del cuerpo legislativo que preside". Senado de PR v. ELA, supra, pág. 70.

Para impugnar la validez de una ley los legisladores tienen que demostrar que han sufrido un daño claro y palpable. Hernández Torres v. Hernández Colón, supra, págs. 837-838. Pero, "[c]uando la causa de acción se presenta en contra de agencias y funcionarios gubernamentales, los tribunales interpretarán los criterios de la legitimación activa de manera flexible y liberal, y el análisis de las alegaciones se debe hacer de la manera más favorable y liberal para el promovente del litigio". Ramos Rivera v. García García, 203 DPR 379, 395 (2019).

Hemos reconocido que un legislador posee legitimación activa si:

> (1) defiende un interés individual tradicional vinculado con el proceso legislativo e invocado frente a funcionarios del Cuerpo tanto en su carácter particular como en representación de un grupo de ese Cuerpo, (2) impugna una actuación ilegal del ejecutivo, (3) las reglas senatoriales coartan su derecho constitucional de participar en las etapas esenciales y significativas en las comisiones del Cuerpo, (4) cuestiona las reglas senatoriales que impugna el intento del Senado de excluir a un senador de su escaño mientras se determina la validez de su elección, (5) para "solicitar un injunction y sentencia declaratoria con el objetivo de cuestionar que una persona está ocupando un cargo en detrimento de su poder de confirmación", y (6) para vindicar su prerrogativa y función constitucional como lo es la participación en el proceso de confirmación de consejo y consentimiento de un nombramiento de un funcionario público. (Cita depurada) Íd., págs. 395-396.

En este caso se cumple con el sexto escenario. En Hernández Agosto v. Romero Barceló, supra, atendimos una controversia respecto "a la función del Senado de impartir su consejo y consentimiento a la nominación de los funcionarios concernidos". Allí razonamos que se trataba de "una facultad

reconocida específicamente por el Art. IV, Sec. 5 de la Constitución en la que el Senado tiene interés legítimo en ventilar y vindicar en este Tribunal". Íd. Por consiguiente, validamos que los miembros del Senado tienen un interés legítimo en participar en el proceso constitucional de impartir consejo y consentimiento a las nominaciones de funcionarios públicos. Íd.

El Gobierno planteó que la controversia de autos no es justiciable porque el Senado carece de legitimación activa. Esto se basa en que, a su entender, la facultad de consejo y consentimiento es de la Asamblea Legislativa como cuerpo y no del Senado por sí solo. Indicó que el Senado no particularizó de qué forma la disposición impugnada le afectaba como cuerpo separado y distinto de la Cámara de Representantes. No le asiste la razón.

Recientemente, en Virginia House of Delegates v. Bethune-Hill, 139 S. Ct. 1945 (2019), el máximo foro federal determinó que la Cámara de Representantes de Virginia no tenía legitimación para representar al estado ni para impugnar por sí misma la creación de una comisión independiente para la redistribución electoral. Íd. Allí era un hecho que la Constitución de Virginia asignaba la autoridad de redistribución de distritos a la Asamblea General, de la que la Cámara de Representantes constituía solo una parte. Íd. En lo pertinente, el Tribunal razonó que una cámara de una legislatura bicameral no puede basarse únicamente en su papel en el proceso legislativo para recurrir de una sentencia que

invalide una ley estatal. Íd., pág. 1953. Específicamente, indicó que una sola cámara de una legislatura bicameral carecía de capacidad para hacer valer los intereses que son propios de la legislatura en conjunto. Íd., págs. 1953-1954.

Así, la conclusión del Tribunal de falta de legitimación se basó en que la Cámara no demostró un daño como cuerpo ni un interés particular e individualizado que le concediera legitimación. Esta decisión no precluye que una cámara pudiera tener legitimación basada en un daño concreto a sus intereses institucionales. Véase: Íd., pág. 1959 esc. 2. (Opinión disidente del Juez Asociado Alito, citando a Spokeo, Inc. v. Robins, 578 U.S. 330, 1548, n. 7 (2016)).

En el recurso de autos, el Senado tiene un interés legítimo en participar en el ejercicio de su función constitucional de consejo y consentimiento. Esto es parte del esquema del Código Electoral de 2020, supra, para la confirmación de los nombramientos. El Art. 3.7(3) del Código Electoral de 2020, supra, especifica que los nombramientos "requerirán el consejo y consentimiento de dos terceras partes del total de los miembros de ambas cámaras en la Asamblea Legislativa…" y que el Pleno del Tribunal intervendrá en "ausencia del consejo y consentimiento de las cámaras legislativas…".

Como se percibe, el Código Electoral de 2020, supra, establece la facultad de ambas cámaras de la legislatura de brindar consejo y consentimiento. No se trata de una facultad general de la Asamblea Legislativa como un todo, sino una

prerrogativa individual de cada cuerpo que se ejerce por separado. El consejo y consentimiento se da en ambos cuerpos mediante dos procesos independientes pero simultáneos.

Es cierto que el Senado no ostenta la representación del Poder Legislativo, pero eso no es lo que se pretende en este caso. Hemos reconocido que el Senado puede comparecer ante nosotros para defender **sus propias prerrogativas** constitucionales, como aquí hace. Hernández Agosto v. Romero Barceló, supra. Así quedó plasmado en el Alegato del Senado, cuando especificó que

> **el Senado de Puerto Rico se ha visto afectado de manera irreparable en sus prerrogativas constitucionales de consejo y consentimiento** en el sentido de que por no haberse obtenido el consejo legislativo que requiere dicho Código en un determinado y corto término, es ahora la Rama Judicial a quien únicamente le corresponde nombrar y confirmar, **sin el aval del Senado, a los funcionarios ejecutivos que ocuparán los cargos de Presidente y Presidente Alterno de la CEE.** (Énfasis suplido). Alegato del Senado, pág. 24.

Incluso, el Senado señaló que no "se puede plantear que el Senado y/o la Rama Legislativa han renunciado a su prerrogativa constitucional de consejo y consentimiento…". Íd, pág. 15. El Senado alegó consistentemente que el nombramiento al cargo de Presidente y Alterno "requiere el consejo y consentimiento del Senado". Certificación, pág. 12.

No es incompatible que el Senado solicite que se resuelva la demanda a su favor y que esto tenga el resultado de que nuestra determinación también pueda ser aplicable a la Cámara

de Representantes, quien no es ajena al proceso.[2] Eso no quiere decir que el Senado esté representando a la Cámara o que sea necesaria la comparecencia conjunta de ambos cuerpos.

Hemos reconocido que un legislador tiene legitimación para vindicar un interés personal en el ejercicio de sus prerrogativas y funciones constitucionales afectadas por el Poder Ejecutivo. Noriega v. Hernández Colón, 135 DPR 406, 428 (1994). Asimismo, una cámara de la legislatura puede vindicar por sí misma sus intereses particulares como cuerpo. Es decir, así como un legislador puede defender sus prerrogativas individuales aunque coincidan con las del cuerpo al que pertenece, una cámara puede vindicar sus prerrogativas individuales aunque coincidan con las de la otra.

Al igual que en Senado de PR v. ELA, supra, donde el consejo y consentimiento correspondía a ambos cuerpos, el Senado tiene legitimación activa para hacer valer sus prerrogativas individuales como cuerpo. Allí, la Cámara de Representantes sí ejerció su prerrogativa, lo que demuestra que se trataba de prerrogativas separadas y no de una general de ambos cuerpos. En aquel momento, hubiera sido un absurdo requerir que ambos cuerpos comparecieran en conjunto. Por eso, no lo hicimos entonces ni lo haremos ahora.

Aquí, el Senado tiene un interés institucional inherente en la controversia. El Senado posee legitimación para hacer

---

[2] La Cámara de Representantes compareció como amigo de la corte. En su escrito solicitó que este Tribunal "dicte sentencia decretando que el Artículo 3.7(3) es inconstitucional en la medida en la que pretende delegar el nombramiento del Presidente de la CEE en la Rama Judicial en violación del principio de separación de poderes". Véase: Alegato de la Cámara de Representantes, pág. 9.

valer su interés individual como cuerpo. En vista de que el consejo y consentimiento de cada cámara no es una facultad general de la Asamblea Legislativa, el daño alegado por el Senado es independiente del que pudiera experimentar la Cámara de Representantes. Por lo tanto, el Presidente del Senado, Hon. José Luis Dalmau Santiago, tiene legitimación activa para comparecer a nombre de ese Cuerpo y solicitar una sentencia declaratoria.

D. La persona que presenta una solicitud de sentencia declaratoria debe cumplir con los criterios de legitimación activa, es decir, la existencia o inminencia de un daño claro y real, no imaginario o hipotético. Senado de PR v. ELA, supra, pág. 70. Esto es así, ya que los tribunales solo podemos evaluar aquellos casos que sean justiciables. Resulta determinante que la controversia se encuentre concretamente definida, de forma que el tribunal pueda justipreciarla en sus méritos. Clases A, B y C v. PRTC, 183 DPR 666, 692 (2011). Así, "todo lo que se necesita para asegurar que un caso está maduro es que el evento contemplado [...] con toda probabilidad va a ocurrir". J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 203 esc. 8. Según establece el inciso (3) del Art. 3.7 del Código Electoral de 2020, supra, la intervención de este Tribunal es un evento con fecha cierta, programado por una ley que se aprobó válidamente. Véase: Aponte Rosario et al. v. Pres. CEE II, 205 DPR 407, 452

(2020). Por lo tanto, el pleito está maduro para su adjudicación.

E. Nuestra función "grave y delicada" como últimos intérpretes de la ley está limitada por la doctrina de autolimitación judicial. E.L.A. v. Aguayo, 80 DPR 552, 595 (1958). "La doctrina de autolimitación judicial aplica en aquellas situaciones en las que un tribunal es llamado a evaluar la validez constitucional de una pieza legislativa". Brau, Linares v. ELA et als., 190 DPR 315, 337 (2014). Las leyes se presumen constitucionales hasta tanto un tribunal declare lo contrario. Íd. pág. 337. Por ello, cuando se cuestiona la validez de una ley o se arroja dudas sobre su constitucionalidad, primero debemos determinar si hay una interpretación razonable que permita soslayar la cuestión constitucional. Íd. pág. 338. Así, se propicia que los tribunales se esfuercen por lograr interpretaciones que adelanten la constitucionalidad de las leyes. Nadal v. Depto. Rec. Nat., 150 DPR 715, 720-721 (2000). De igual forma, "no se considerará el aspecto constitucional de una medida legislativa cuando se pueda resolver el asunto mediante un análisis estatutario". Íd., pág. 721. Establecido lo anterior, procedemos a resolver los méritos de la controversia.

## III

A. Separación de Poderes

El principio de separación de poderes se encuentra expresamente consagrado en nuestra Constitución. Art. 1, Sec. 2, LPRA, Tomo 1. Este principio aspira a establecer las

responsabilidades y enmarca el ámbito de acción de las ramas constitucionales de gobierno. Además, busca asegurar que ninguna de las tres ramas domine o interfiera indebidamente con la otra. Rodríguez Casillas et al. v. Colegio, 202 DPR 428, 450 (2019); Clases A, B y C v. PRTC, supra, pág. 681. El éxito de nuestro sistema de poderes depende de que cada una de las ramas acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Silva v. Hernández Agosto, 118 DPR 45, 57 (1986). Esto va de la mano con que se garantice la independencia de cada rama. Díaz Carrasquillo v. García Padilla, 191 DPR 97, 110 (2014). Se trata de un sistema de pesos y contrapesos, que evita que las actuaciones de una rama causen detrimento a otra. Íd.

Hemos señalado que al resolver una controversia que requiere un pronunciamiento sobre la aplicabilidad de la doctrina de separación de poderes debemos analizar si "en la operación real del sistema y en un contexto histórico determinado **el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución**". (Énfasis suplido). Nogueras v. Hernández Colón I, 127 DPR 405, 426 (1990).

La cláusula de nombramientos está estrechamente vinculada a la doctrina de separación de poderes. Sobre este particular, el constitucionalista Raúl Serrano Geyls nos dice:

> [l]a distribución entre el Congreso y el Ejecutivo del poder para efectuar nombramientos es uno de los

ejemplos más claros de los esfuerzos de los forjadores de la Constitución por incorporar a ese documento un delicado sistema de frenos y contrapesos consecuente con su particular visión de la teoría de separación de poderes. Raúl Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 605.

El poder de nombramientos del Primer Ejecutivo surge de la Sec. 4 del Art. IV de la Constitución de Puerto Rico. Art. IV, Sec. 4, Const. PR, supra. Específicamente, nuestra Constitución dispone que el Gobernador de Puerto Rico tendrá la facultad de

> [N]ombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado. El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión. Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria. Art. IV, Sec. 4, Const. PR, supra, págs. 417-418.

Asimismo, la Constitución establece que: "**[p]ara el ejercicio del Poder Ejecutivo el Gobernador estará asistido por Secretarios de Gobierno que nombrará con el consejo y consentimiento del Senado**". (Énfasis suplido). Art. IV, Sec. 5, Const. PR, supra, pág. 422. Además, reconoce "la facultad de la Asamblea Legislativa para crear, reorganizar y consolidar departamentos ejecutivos de gobierno". Art. IV, Sec. 6, Const. PR, supra, pág. 423.

El texto diáfano de estas secciones plasma la conceptualización de la facultad de nombramientos de los funcionarios de gobierno dividida entre las ramas políticas: las Ramas Ejecutiva y Legislativa. **La Cláusula de**

**Nombramientos de nuestra Constitución no contempla de forma alguna la participación de la Rama Judicial en el proceso de nombramientos.**

El debate de la Convención Constituyente es parco en cuanto al poder de nombramiento del gobernador. Las facultades y deberes del Primer Ejecutivo no dieron pie a controversias mayores. W. Vázquez Irizarry, Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas, 76 Rev. Jur. UPR 951, 986 (2007). "[P]arecía haber un consenso bastante amplio en cuanto al rol central que tendría el Gobernador como cabeza de la rama ejecutiva y director de todos sus componentes". Íd.

Por su parte, la Cláusula de Nombramientos o *Appointments Clause* de la Constitución de Estados Unidos establece, en lo pertinente, que el Presidente,

> con el consejo y consentimiento del Senado, nombrará embajadores, otros ministros públicos y cónsules, los jueces del Tribunal Supremo y todos los demás funcionarios de los Estados Unidos cuyos cargos se establezcan por ley y cuyos nombramientos esta constitución no prescriba. Pero el Congreso podrá por ley, confiar el nombramiento de aquellos funcionarios subalternos que creyere

> prudente, al Presidente únicamente, a los tribunales de justicia o a los jefes de departamento. Art. II, Sec. 2, Const. EE.UU., LPRA, Tomo 1, ed. 2016, pág. 173.

Se reconoce que, en nuestro ordenamiento constitucional, "la autoridad del Gobernador para efectuar nombramientos es análoga a la del Presidente". Op. Sec. Just. Núm. 3-1985, pág. 4. Sobre esto, el Secretario de Justicia, al analizar la discusión de la Convención Constituyente, explicó que

un análisis detenido de las fuentes de información existentes y disponibles, en particular del Diario de Sesiones de la Convención Constituyente, demuestra que [. . .] existen criterios suficientes para entender que el propósito final de la Convención Constituyente, al aprobar la disposición constitucional que examinamos, lo fue el de incorporar a nuestra organización gubernamental el mecanismo completo del sistema de nombramientos que prevalece en el ámbito de la jurisdicción federal. Op. Sec. Just. Núm. 25-1967, pág. 3.

El alcance de esta cláusula federal fue objeto de análisis por el Tribunal Supremo de Estados Unidos en Buckley v. Valeo, 424 US 1 (1976). Ahí, el Tribunal abordó varios aspectos constitucionales sobre la *Federal Election Campaign Act of 1971* (FECA), 8 Stat. 3, enmendado en 1974. FECA creaba una comisión especial con amplias facultades de reglamentación y adjudicación, así como con extensos poderes para poner en vigor la ley. Esto incluía, la facultad para iniciar acciones civiles en los tribunales y para descalificar candidatos. Buckley v. Valeo, supra. Esa comisión debía estar compuesta por: dos miembros nombrados por el Presidente *pro tempore* del Senado, dos por el Presidente de la Cámara y dos por el Presidente de los Estados Unidos. Todos estaban sujetos a la confirmación de ambos cuerpos legislativos. Los secretarios del Senado y de la Cámara eran miembros *ex officio* sin derecho a voto. Íd., pág. 113.

En ese caso, el Tribunal Supremo federal concluyó que como la comisión realizaba funciones ejecutivas y cuasijudiciales sus miembros debían considerarse funcionarios de Estados Unidos. Por lo tanto, la composición de la comisión violaba el principio de separación de poderes y el requisito

de que todos los funcionarios de Estados Unidos sean nombrados conforme a las disposiciones de la Cláusula de Nombramientos. Íd. pág. 140. Véase, además: Serrano Geyls, op. cit., pág. 606.

Además, el Tribunal rehusó aceptar el argumento de que la creación y composición de la comisión descansaba en los amplios poderes que disfrutaba el Congreso para reglamentar las elecciones al amparo de la Sec. 4 del Art. I de la Constitución. Buckley v. Valeo, supra, pág. 132. También se negó a avalar que la cláusula de poderes "necesarios y apropiados" autorizaba esa acción del Congreso. Íd. págs. 134-135. Explicó que el Congreso no podía abrogarse la facultad de efectuar nombramientos de funcionarios con poderes ejecutivos en clara infracción de la Cláusula de Nombramientos. Íd. Véase, además: Serrano Geyls, op. cit., pág. 606. Podemos concluir que el Tribunal Supremo federal entendió que "el Congreso no puede colocar en sus líderes el poder de nombrar miembros de una agencia independiente [con poderes ejecutivos] que reglamenta las elecciones federales". Álvarez González, op. cit., pág. 309.

En años más recientes, el Tribunal Supremo federal ha tenido la oportunidad de analizar y delimitar el alcance del poder de nombramiento respecto a la separación de poderes. En Freytag v. C.I.R., 501 U.S. 868 (1991), resolvió que el Juez Presidente del *Tax Court* podía nombrar y asignar jueces especiales de primera instancia ya que eran funcionarios inferiores. Explicó que incluso con respecto a los

funcionarios inferiores, la Cláusula brinda al Congreso una autoridad limitada para delegar el poder de nombramiento. Íd. "The **Tax Court exercises judicial, rather than executive, legislative, or administrative, power**. It was established by Congress to interpret and apply the Internal Revenue Code in disputes between taxpayers and the Government… **The Tax Court exercises judicial power to the exclusion of any other function**." (Énfasis suplido). Íd. págs. 890-891. En Ryder v. United States, 515 U.S. 177, 182 (1995), el Tribunal explicó que la Cláusula de Nombramientos "es un baluarte contra el engrandecimiento del poder de una rama a expensas de otra, pero es [aún] más: 'preserva otro aspecto de la integridad estructural de la Constitución al impedir la difusión del poder de nombramiento'".[3] (Traducción nuestra y citas omitidas).

Este mismo año, en United States v. Arthrex, Inc., 141 S. Ct. 1970, 1980 (2021), se cuestionó la validez de los nombramientos de los miembros de un tribunal ejecutivo dentro de la Oficina de Patentes y Marcas. Estos eran nombrados por el Secretario de Comercio. El máximo foro federal resolvió que si un funcionario tiene la facultad de dictar una decisión definitiva en nombre de los Estados Unidos sobre derechos públicos de partes privadas sin ninguna revisión por parte de un superior nominal o de cualquier otro funcionario principal del Poder Ejecutivo, ese nombramiento corresponde al Presidente. Esto se debe a que solo un funcionario debidamente

---

[3] "The Clause is a bulwark against one branch aggrandizing its power at the expense of another branch, but it is more: it 'preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power'."

designado puede emitir una decisión definitiva que vincule al Poder Ejecutivo. Íd. Véase, además: Lucia v. SEC, 138 S. Ct. 2044 (2018).

En Puerto Rico existe, desde incluso antes de nuestra Constitución, una tradición similar a la del sistema federal en cuanto a la Cláusula de Nombramientos y separación de poderes. En Tugwell v. Corte, 64 DPR 220 (1944), resolvimos que una ley que disponía que los presidentes de las cámaras legislativas serían miembros del comité que formaba parte de la Rama Ejecutiva violaba la separación de poderes y constituía una invasión legislativa de las funciones del Ejecutivo. Para llegar a esta decisión nos basamos en Springer v. Philippine Islands, 277 US 189 (1928) —que también fue citado por el Tribunal Supremo Federal en Buckley v. Valeo, supra— donde se resolvió que el poder legislativo de Filipinas no podía retener la facultad de nombrar funcionarios de las agencias ejecutivas. Véanse: Álvarez González, op. cit., pág. 309; Serrano Geyls, op. cit., pág. 626. "Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions". Noriega v. Hernández Colón, supra, pág. 460 citando a Springer v. Philippine Islands, supra, pág. 202.

Al respecto, el profesor José Julián Álvarez indica que "[l]a función del Senado en cuanto a nombramientos es la de consejo y consentimiento. Ello no puede extenderse a la nominación del candidato ni, mucho menos, a su nombramiento.

En el plano federal está reiteradamente resuelto que el Congreso carece de poder para nombrar funcionarios o empleados de instrumentalidades que no son parte de esa rama". Álvarez González, op. cit., pág. 309.

Por otro lado, en Morrison v. Olson, 487 US 654 (1988), el máximo foro federal determinó que cierto fiscal especial independiente era un funcionario inferior que podía ser nombrado por un panel de jueces. Ahora bien, el asunto principal del caso era si se podía limitar el poder de destitución del Presidente. Nótese que en Díaz Carrasquillo v. García Padilla, supra, Santana v. Gobernadora, 165 DPR 28 (2005) y Guzmán v. Calderón, 164 DPR 220 (2005), adoptamos los pronunciamientos de Morrison para atender lo relacionado a los límites al poder del Gobernador para destituir a los funcionarios nombrados por este. En ninguno de esos casos estaba en controversia el poder de nombramiento del Gobernador.

B. Ley Electoral en Puerto Rico

En Puerto Rico, al igual que en otras jurisdicciones, el sistema electoral opera de forma centralizada. Por ello, se han creado estructuras administrativas con la encomienda de salvaguardar la pureza del sistema. Véase: Informe de la Comisión Especial para la Revisión para el Proceso Electoral de Puerto Rico, 1982, pág. 11 (Informe de la Comisión Especial de 1982).

La Sec. 13 de la Ley de 8 de marzo de 1906, 1906 Leyes de Puerto Rico 33, establecía que el Consejo Ejecutivo nombraría a un Superintendente de Elecciones con el deber de dirigir los comicios en la isla.[4] Desde 1919 hasta 1977, el funcionario que dirigía el organismo encargado de administrar los procesos electorales en Puerto Rico era designado por el Gobernador con el consejo y consentimiento del Senado o de ambas cámaras legislativas. Véanse: Sec. 1 de la Ley Núm. 79 de 25 de junio de 1919, 1919 Leyes de Puerto Rico 531; Ley Núm. 1 de 13 de febrero de 1974, 1974 Leyes de Puerto Rico 3; Ley Núm. 4 de 20 de diciembre de 1977, 1977 Leyes de Puerto Rico 639.

Ahora bien, en 1983 se dispuso que los comisionados electorales nombrarían por unanimidad a un Presidente y Presidente Alterno. Art. 1.009 de la Ley Núm. 3 de 10 de enero de 1983, 1983 Leyes de Puerto Rico 397 (Ley Núm. 3-1983). Esa enmienda fue el resultado del trabajo de la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico (Comisión Especial) que se creó tras la aprobación de la R. C. de la C. 615 de 2 de julio de 1981. La Comisión Especial recomendó un esquema parecido al de Venezuela en el que los principales funcionarios electorales eran nombrados por un cuerpo legislativo por el voto de tres cuartas partes de sus miembros, ya que "[e]sta solución obligaría al consenso tan vital en

---

[4] El Consejo Ejecutivo fue una institución creada por el Acta Orgánica de 1900, conocida como la Ley Foraker, 31 Stat. 811, 1 LPRA, sec. 18, que tenía funciones legislativas y ejecutivas. Sus miembros eran nombrados por el Presidente de los Estados Unidos con el consejo y consentimiento del Senado federal.

estos nombramientos claves". Informe de la Comisión Especial de 1982, supra, pág. 13.

En Venezuela se eximía al poder ejecutivo del proceso de nombramiento de los dirigentes del sistema electoral. Ante esa realidad, la Comisión Especial recibió una opinión legal de sus asesores que advertía que se "**requeriría una enmienda constitucional para su implementación**". (Énfasis suplido). Íd., pág. 13. La Comisión Especial expresó que "debido a que la aprobación de dicha enmienda constitucional tomaría un tiempo vital, **se hizo necesario elaborar otras alternativas que estuvieran al alcance del poder legislativo según delegado en nuestra Constitución**". (Énfasis suplido). Íd.

A esos efectos, la Comisión Especial propuso que contrario al esquema entonces vigente en el Art. 1.005 de la Ley Electoral de 1977, supra, en que el Gobernador nombraba al presidente de la CEE con el consejo y consentimiento de la mayoría de ambas cámaras legislativas, se delegara esa facultad a los comisionados electorales. Estos debían escoger al presidente por unanimidad. De no lograrse un acuerdo entre los comisionados electorales, el Gobernador, con el consejo y consentimiento de tres cuartas partes de los cuerpos legislativos, nombraría al Presidente de la CEE. Informe de la Comisión Especial de 1982, supra, pág. 14. Este esquema fue el que se adoptó con la Ley Núm. 3-1983, supra. La Comisión Especial explicó que este nuevo mecanismo garantizaba "un mínimo de confianza en el Presidente al requerirse su aprobación por los partidos participantes o al menos por los

dos partidos principales de conformidad con la composición de la legislatura...". Informe de la Comisión Especial de 1982, supra, pág. 14.

Desde la enmienda de 1983, el procedimiento para escoger al Presidente de la CEE se mantuvo prácticamente inalterado. Prueba de esto es el Art. 3.007 de la Ley Núm. 78 de 1 de junio de 2011, según enmendada, conocida como Código Electoral de Puerto Rico para el Sigo XXI. Esto cambió tras la adopción del Código Electoral de 2020, supra, que insertó a este Tribunal en la tercera etapa del proceso de selección del Presidente y Presidente Alterno de la CEE.

Ahora bien, cuando estudiamos el historial legislativo del Código Electoral de 2020, supra, vemos que el mecanismo de selección sufrió cambios significativos durante el trámite legislativo. Originalmente, la medida proponía que el Pleno del Tribunal Supremo designaría un Comité Evaluador integrado por un panel de tres jueces del Tribunal de Apelaciones para nombrar al Presidente de la CEE. Informe Positivo de la Cámara de Representantes, P. del S. 1314, 14 de noviembre de 2019, pág. 16.

Ese Comité debía preparar una lista de ocho jueces del Tribunal de Primera Instancia disponibles para ocupar los cargos de Presidente y Presidente Alterno de la CEE. Íd. También añadía que "el Tribunal deberá escoger al Presidente de la CEE usando el mismo método aleatorio que usan para seleccionar los integrantes de los Paneles del Tribunal de Apelaciones y los Presidentes de Comisiones Locales". Íd.,

págs. 16-17. Véase, además: H. Santaella Carlo, *Análisis constitucional del proceso de nombramiento del presidente de la Comisión Estatal de Elecciones por el Tribunal Supremo*, 4 Rev. Jur. AAPR 211 (2019). Sin embargo, ante varios señalamientos sobre la posible inconstitucionalidad de ese método, la medida se enmendó. Informe Positivo de la Cámara de Representantes, *supra*, pág. 18. Finalmente se aprobó el proceso que consta en el inciso (3) del Art. 3.7 del Código Electoral de 2020, *supra*.

C. Naturaleza de la Comisión Estatal de Elecciones

Cuando se busca conocer la naturaleza y definición de una entidad, la hermenéutica jurídica dicta acudir primero a la ley orgánica o habilitadora del ente u organismo en cuestión. *Alonzo Reyes v. ASC*, 185 DPR 861, 877 (2012). La definición de la entidad que proveyó expresamente el legislador es una parte necesaria del análisis, en conjunto con las funciones que le autorizaron. *Íd.* pág. 878.

La CEE tiene la estructura institucional de una agencia pública, con operaciones administrativas y electorales. Art. 3.1. (5)(b) del Código Electoral de 2020, *supra*. El Art. 3.2 del Código Electoral de 2020, *supra*, establece que la CEE "será responsable de planificar, organizar, dirigir y supervisar el organismo electoral y los procedimientos de naturaleza electoral que, conforme a esta Ley, y a leyes federales aplicables, rijan en cualquier Votación a realizarse en Puerto Rico". Algunos de los deberes de la CEE son: (1) cumplir y hacer cumplir la ley electoral; (2) aprobar reglas y

reglamentos; (3) aprobar planes de trabajo, adoptar reglas y normas de funcionamiento interno para la conducción de los asuntos bajo su jurisdicción, y (4) atender, investigar y resolver los asuntos o controversias bajo su jurisdicción. Íd.

En cuanto a su composición la ley dispone que es un "organismo colegiado, deliberativo y adjudicativo" y que "los miembros propietarios de la Comisión, con voz y voto serán un Presidente; un mínimo de dos (2) y hasta un máximo de tres (3) Comisionados Electorales...". Art. 3.1 (2)(a) del Código Electoral de 2020, supra. A su vez, el Art. 3.8 del Código Electoral de 2020, supra, establece que el Presidente "será la **máxima autoridad ejecutiva y administrativa de la Comisión y será responsable de supervisar los servicios, los procesos y los eventos electorales**…". (Énfasis suplido). Este tiene, entre otras, las funciones de: cumplir y hacer cumplir ciertas leyes; representar a la CEE y ser su principal portavoz institucional; aprobar reglas y reglamentos; administrar, restructurar, consolidar o eliminar oficinas y dependencias de la CEE; seleccionar, reclutar y nombrar el personal; contratar la utilización de instalaciones, equipos y materiales e imponer multas administrativas. Íd.

Por otra parte, la Sec. 1.3 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), 3 LPRA sec. 9603, expresamente excluye a la CEE de la definición de agencia. Como se señaló en la Opinión del Secretario de Justicia, Núm. 9-2010, pág. 2, "la CEE es un organismo *sui generis* con un alto grado de autonomía legal, funcional y

administrativa que, por su propósito y la naturaleza de sus funciones no puede ser considerada como un organismo ordinario de la Rama Ejecutiva". Igualmente menciona que la CEE se creó como un "administrador individual" por las disposiciones de la entonces vigente ley electoral sobre la administración de su personal. Íd. "[L]a CEE no puede considerarse como una agencia gubernamental ordinaria de la Rama Ejecutiva". Íd., pág. 4. Añade que "[e]n cualquier caso, y aun presumiendo que la misma constituye parte del Ejecutivo en su pleno sentido […], por su autonomía, puede ser comparada a una corporación pública…". Íd., pág. 3. A esos efectos, el Secretario de Justicia expresó:

> Efectivamente, la peculiar naturaleza de este organismo electoral y la necesidad de que éste goce de la credibilidad y la confianza del pueblo, garantizando la legitimidad de los gobiernos electos, requieren el reconocimiento de una autonomía suficiente respecto al poder ejecutivo, para poder desempeñar su labor sin impedimentos burocráticos, administrativos, fiscales o funcionales ajenos al proceso electoral que pudieran poner en riesgo su desempeño y la credibilidad del organismo encargado de viabilizar la democracia de nuestro Pueblo. Íd.

A eso agregamos que el trámite apelativo de los asuntos de la CEE se aleja de lo ordinario en sus términos y procesos. Merle Feliciano v. CEE y otros, 204 DPR 264, 275 (2020). Como se percibe, la CEE posee ciertas particularidades y algunos atributos de autonomía. La LPAU la excluye de su aplicación. Ahora bien, el propio Código Electoral establece que es una agencia pública. Esto tiene el efecto de que, aunque se trata de una agencia pública, sus procedimientos

administrativos están expresamente exceptuados de la aplicación de la LPAU. J. Echevarría Vargas, <u>Derecho administrativo puertorriqueño</u>, 4ta ed. rev., San Juan, Ed. SITUM, 2017, pág. 50. Ante esto, es meritorio tomar en consideración dónde ubica la agencia dentro del sistema gubernamental. Esa ubicación es reveladora porque el control que ejercerá el Gobernador dependerá de si la agencia forma parte de su gabinete o si es una agencia, comisión o junta reguladora independiente. D. Fernández Quiñones, <u>Derecho administrativo y Ley de Procedimiento Administrativo Uniforme</u>, 3ra ed., Colombia, Ed. Forum, 2013, pág. 15.

En cuanto a esto, el presupuesto certificado para el año fiscal 2020-2021 ubica a la CEE dentro de la categoría de agencias independientes.[5] Esto se mantiene inalterado en el presupuesto aprobado por la legislatura y firmado por el Gobernador para el año fiscal 2021-2022.[6] A su vez, el *Esquema de la estructura funcional del Gobierno de Puerto Rico* preparado por la Oficina de Gerencia y Presupuesto (OGP), que se incorporó a los documentos disponibles sobre el Presupuesto General 2020-2021, sitúa a la CEE entre los departamentos y oficinas ejecutivas.[7] **De modo que la CEE es**

---

[5] Junta de Supervisión y Administración Financiera para Puerto Rico, <u>Presupuesto Certificado del AF2021 para el Estado Libre Asociado</u>, en <u>JSF-Gobierno de PR Presupuesto AF2021 (General-Fondos Especiales-Federal) Certificado por JSF 30 de junio de 2020.pdf</u> (última visita, 15 de octubre de 2021).

[6] Resolución Conjunta de la Cámara de 18 de mayo de 2021 sobre el Presupuesto General 2021-2022, en <u>https://presupuesto.pr.gov/PresupuestoPropuesto20212022/Resumen%20del%20Presupuesto/RC%20Presupuesto%20Propuesto%20Gobernador%20FY22-A-21-24-Camara.pdf</u> (última visita, 15 de octubre de 2021).

[7] OGP, Estructura funcional del Gobierno de Puerto Rico en, <u>https://presupuesto.pr.gov/PresupuestoAprobado2020-2021/Certificaciones%20y%20Estructura%20Gubernamental/Estructura%20Funcio</u>

**una agencia independiente que forma parte de la Rama Ejecutiva**. Esto se aprecia al examinar los presupuestos gubernamentales, así como las prerrogativas específicas que posee por virtud de su ley habilitadora.

En lo pertinente a la controversia, el profesor Fernández Quiñones expone:

> La concepción de las agencias independientes presupone que se distinga de las agencias ejecutivas funcional y estructuralmente. Se concibe que éstas funcionen como juntas o comisiones. Sus decisiones son producto de un aparato colegiado. Los componentes sirven por un período de tiempo, según lo haya fijado la ley. La distinción desde la perspectiva del ejercicio de control sobre la agencia es de vital importancia. Fernández Quiñones, op. cit., pág. 15.

El término agencia independiente se define como "una agencia, comisión o consejo federal que esté bajo la dirección del ejecutivo[...]". (Traducción nuestra). Black's Law Dictionary, (Bryan A. Garner, editor), 9na ed., Minnesota, Ed. Thomson Reuters, 2009, págs. 71-72, independent agency. Este tipo de agencias está aislado del control del Primer Ejecutivo en una o varias maneras. 1 Pierce, Administrative Law Treatise Sec. 2.5, pág. 75 (2010).

Cabe destacar que en estas "se le reconocerá al gobernador la facultad de nombrar el jefe o los comisionados de las agencias con el consejo y consentimiento del Senado". Fernández Quiñones, op. cit., pág. 15. Esto es compatible con el esquema federal y la Cláusula de Nombramientos que reproducimos en la Constitución de Puerto Rico. "Ciertamente,

---

nal%20del%20Gobierno%20de%20Puerto%20Rico.pdf (última visita, 15 de octubre de 2021).

la facultad para designar y remover los funcionarios a cargo de implementar la política pública constituye parte fundamental del ejercicio de autoridad del Presidente de los Estados Unidos". Echevarría Vargas, op. cit., pág. 46.

Adviértase que, aunque una agencia se conciba como independiente en sus operaciones del día a día, esto no excluye que corresponde al Primer Ejecutivo nombrar a sus funcionarios ejecutivos. "If Congress delegates the power to make policy to someone other than the President, that individual must be subject to the President's control". Pierce, supra, pág. 85.

En nuestra jurisdicción algunos ejemplos de agencias independientes son la Comisión Industrial, la Comisión de Servicio Público y la Junta de Calidad Ambiental. Véase: R. Rosado Anazagasty, Las agencias independientes en Puerto Rico: Hacia un balance entre "accountability" y eficiencia, 76 Rev. Jur. UPR, 1327, 1339 (2007). De las leyes habilitadoras de esas agencias se desprende que el Gobernador es quien nombra a los directivos según el principio constitucional de separación de poderes. Véanse: Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 LPRA 1 et seq.; Ley de Servicio Público, Ley Núm. 109 de 28 de junio de 1962, según enmendada, 27 LPRA sec. 1001 et seq.; Ley sobre Política Pública Ambiental, Ley Núm. 416-2004, 12 LPRA sec. 8001 et seq.

De ese modo, si bien la Rama Ejecutiva está compuesta de varios tipos de entidades que se relacionan en múltiples grados

y formas con el Gobernador, esto "no puede servir de excusa para evadir el claro historial constitucional que reconoce la autoridad del Gobernador para supervisar a las corporaciones públicas y organismos autónomos". W. Vázquez Irizarry, supra, págs. 992-993.

Sin lugar a duda, en la Rama Ejecutiva hay organismos con cierta autonomía, pero aun en la concepción más liberal de las agencias independientes, todos los jefes de esas agencias deben ser nombrados por el Primer Ejecutivo. Véase: Pierce, supra, pág. 93. La estructura de dirección de la CEE no configura una excepción a esa norma. Aunque la CEE posee características singulares, *sui generis*, con autonomía, esta se concibió como una agencia gubernamental. Incluso, el Código Electoral de 2020, supra, amplió los poderes del Presidente de la CEE, evidenciando que es un jefe de agencia de la Rama Ejecutiva.

Sin duda, la CEE no es una agencia más. Pero de ninguna manera se contempla a la CEE como una instrumentalidad de la Rama Judicial. Sería un contrasentido suponer que nos corresponde nombrar a la principal autoridad ejecutiva y administrativa de un brazo de otra rama. Como atributo exclusivo nuestro sí nos corresponde resolver que determinada facultad le corresponde únicamente a otra rama. Colón Cortés v. Pesquera, 150 DPR 724, 756 (2000). Así debemos hacerlo en este asunto. No debemos dar paso a una delegación indebida al Poder Judicial.

IV

El Gobierno planteó que la Constitución delegó a la Asamblea Legislativa todo lo concerniente al proceso electoral, incluyendo la forma de nombrar al Presidente de la CEE.

El Art. VI, Sección 4 de nuestra Constitución, Art. VI, Sec. 4, Const. PR, supra, preceptúa que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Así, en asuntos de materia electoral, la legislatura posee un amplio margen de autoridad para legislar. P.S.P., P.P.D., P.I.P. v. Romero Barceló, 110 DPR 248, 256 (1980). Sin embargo, esa autoridad para regular y ordenar el ejercicio de la franquicia electoral no es absoluta. Íd., pág. 257. "We see no reason to believe that the authority of Congress over federal election practices is of such a wholly different nature from the other grants of authority to Congress that it may be employed in such manner as to offend well-established constitutional restrictions stemming from the separation of powers". Buckley v. Valeo, supra, pág. 132.

Por otra parte, nuestra Constitución, inspirada por el modelo de gobierno federal, dispone que el Poder Judicial se ejercerá por este Tribunal Supremo. Art. V, Secs. 1 y 2, Const. PR, supra. Queda claro que este Tribunal es el custodio y guardián máximo de la Constitución. Colón Cortés v. Pesquera, supra, págs. 755-756. Nuestra tarea es ser los

intérpretes finales de esta y de las leyes ordinarias. San Gerónimo Caribe Project v. Registradora, 189 DPR 849, 867 (2013); P.P.D. v. Gobernador I, supra, pág. 678.

Sin embargo, el Poder Judicial es limitado. Esto surge de dos realidades medulares: (1) los tribunales solo pueden decidir cuestiones en un contexto adversativo, y (2) **la restricción de un gobierno tripartita de forma republicana se diseñó para asegurar que la Rama Judicial no intervenga en áreas que corresponden al criterio de otras ramas.** Brau, Linares v. ELA, supra, pág. 337. Consecuentemente, la doctrina de caso o controversia denota la realidad de que los tribunales existen únicamente para resolver controversias genuinas entre partes opuestas que tienen interés real en obtener un remedio. ELA v. Aguayo, supra, 558-559. Incluso, "[e]l 'interés público' no justifica por sí solo el ejercicio de la función judicial si no está presente un 'caso o controversia' del tipo tradicionalmente encomendado al poder judicial". Álvarez González, op. cit., pág. 99.

"The power conferred on [the judiciary] is exclusively judicial and it cannot be required or authorized to exercise any other [power]". Muskrat v. United States, 219 US 346 (1911). La independencia judicial es un ingrediente esencial para garantizar la imparcialidad y un componente ínsito de la separación de poderes. In Solicitud Hon. Samuel Cepeda García, 130 DPR 18, 23 (1992). Este atributo imprescindible implica que la función judicial se circunscribe a la Rama Judicial, mientras que las funciones no judiciales corresponden a las

otras dos ramas constitucionales. <u>Rivera Schatz v. ELA y C. Abo. PR II</u>, <u>supra</u>, pág. 802; <u>Colón Cortés v. Pesquera</u>, <u>supra</u>, pág. 752. Al respecto, hemos expresado:

> [E]s incuestionable que la Doctrina de Separación de Poderes es parte esencial del sistema de gobierno que hemos adoptado como comunidad política. **Como Tribunal de última instancia, no podemos ceder a la tentación de obviar ese sagrado principio**, o utilizarlo a la ligera como un estribillo jurídico. Debemos ser siempre conscientes de las delicadas fronteras constitucionales que existen entre las tres (3) ramas del gobierno. Es nuestra obligación velar por el rol de la Rama Judicial en aras de evitar trastocar los principios de la separación de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama como la menos peligrosa de las tres (3). Debemos ser conscientes que, al igual que las ramas hermanas, la Rama Judicial no está exenta de violaciones a los principios de separación de poderes. Después de todo, la desconfianza en la naturaleza humana que yace en los cimientos de la Doctrina de Separación de Poderes también debe ser de aplicación a esta Rama. (Énfasis suplido) (Cita depurada). <u>A.A.R., Ex parte</u>, 187 DPR 835, 855 (2013).

Cimentándonos en estos principios, los tribunales no podemos intervenir en las decisiones que corresponden a otra rama de gobierno, así como tampoco nos atañe establecer la política pública que debe regir en ellas. <u>Lozada Sánchez v. JCA</u>, 184 DPR 898, 925-926 (2012). Nuestro texto constitucional impide que actuemos en sustitución de otra rama. Sostener lo contrario sería una concentración indebida de poder en la Rama Judicial. Si bien debemos actuar con prudencia y deferencia a la voluntad legislativa, esto es así siempre que la voluntad legislativa esté enmarcada dentro del esquema constitucional, distinto a cuando se trata de atribuciones

impermisibles. Rodríguez Casillas et al. v. Colegio, supra, págs. 450-451; P.P.D. v. Gobernador I, supra, pág. 685.

Este caso trata sobre dos ramas de gobierno que quieren abdicar su deber constitucional e insertar al Tribunal Supremo en un proceso político. **"La doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno"**. (Énfasis suplido). Hernández Agosto v. López Nieves, 114 DPR 601, 620 (1983). "The independent judiciary was assigned the task of keeping the two politically accountable Branches within the boundaries established by the Constitution, but policy decisions were to be made by politically accountable officers and institutions". Pierce, supra, pág. 83.

La Rama Judicial no existe para hacer el trabajo de las otras ramas del gobierno. Dottin v. Rigo & Co., 22 DPR 405, 409 (1915). Esto tiene una razón de ser. Hamilton lo explicó en El Federalista Núm. 77:

> …En caso de una mala propuesta culparán única y exclusivamente al presidente. La censura por rechazar una propuesta adecuada recaerá completamente sobre el Senado, con el añadido de que este contravino las buenas intenciones del ejecutivo. Si llegara a producirse un nombramiento desafortunado, participan del oprobio y la reprobación correspondientes tanto el ejecutivo por proponerlo, como el Senado por aprobarlo, aunque cada uno en distinta medida. A. Hamilton, J. Madison y J. Jay, El Federalista (R. Maíz, trad.) Madrid, Ed. Akal, 2015, págs. 543-544.

El Poder Judicial, a diferencia de las ramas hermanas, no se encuentra a la merced del escrutinio electoral. Es por eso que el Pueblo, al adoptar su Constitución, le confirió unas funciones específicas: decidir casos y controversias. Por su parte, a las ramas políticas se le confirió el deber de canalizar las necesidades del Pueblo y velar por su desarrollo y bienestar. Si los regentes de los poderes políticos se apartan del buen ejercicio de sus deberes, el Pueblo tiene un mecanismo para remediarlo: su derecho al voto. "By 'limiting the appointment power' in this fashion, the Clause helps to 'ensure that those who wielded [the appointments power] were accountable to political force and the will of the people'." Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC, 140 S. Ct. 1649, 1657 (2020), citando a Freytag v. Commissioner, 501 U.S. 868, 884 (1991).

"**El hecho de que la falta de dirección en un departamento del gobierno puede resultar altamente perjudicial para el país, no es sino razón para el ejercicio responsable de los deberes que la Constitución impone a los poderes políticos con relación a estos nombramientos**". (Énfasis suplido). Hernández Agosto v. López Nieves, supra, pág. 622. Por lo tanto, eso no es un fundamento constitucional válido para decir que nos corresponde nombrar a los funcionarios de otra rama.

Hemos señalado que la Rama Legislativa no puede "usurpar el poder de nominación del señor Gobernador mediante afirmaciones indicativas de que confirmará a determinado candidato". Hernández Agosto v. Lopez Nieves, supra, pág. 10

citado en Nogueras v. Hernández Colón, 127 DPR 638, 651 (1991). La controversia de autos amerita que añadamos a esta norma que tampoco lo puede usurpar mediante una ley que adjudique ese poder a la Rama Judicial. Nuestra intervención en el proceso de nombramientos es improcedente y atenta contra el equilibrio necesario para las tareas gubernamentales. Nombrar al Presidente y Presidente Alterno de la CEE sería imponer nuestro criterio al Ejecutivo, y a la Cámara y al Senado. A manera de ejemplo, una mayoría de este Tribunal podría nombrar a alguien que el Primer Ejecutivo en su sana discreción decidió no nominar, así como a alguien que el Senado o la Cámara rechazaron expresa o implícitamente. En tales casos, los poderes que le corresponden al Ejecutivo y a cada cámara legislativa, incluyendo el Senado, se verían socavados.

El Gobierno y la Comisionada Electoral del Partido Nuevo Progresista sostienen que históricamente hemos validado la intervención del Poder Judicial en el proceso eleccionario. Específicamente, traen a nuestra atención la designación de jueces como Presidentes de Comisiones Locales.

Sobre este particular, el Art. 4.2 del Código Electoral de 2020, supra, establece que las Comisiones Locales de Elecciones estarán integradas por un Presidente que será juez del Tribunal de Primera Instancia, designado a solicitud de la Comisión, por el Tribunal Supremo de Puerto Rico. El inciso (3) del Art. 4.4 del Código Electoral de 2020, supra, dispone que el Presidente de la Comisión Local, como representante del interés público, tiene el deber de velar que los Comisionados

Locales realicen sus funciones y que los acuerdos cumplan con la ley, la moral y el orden público. Además, ante la presentación de querellas de delitos electorales debe hacer los referidos de investigación y presidir todas las vistas de recusación. Íd. Como vemos, ese juez ejerce funciones de árbitro. Vela que se cumpla con la ley y, además, tramita y resuelve controversias legales dentro del proceso electoral. Se trata, entonces, de una designación de carácter no continuo para realizar tareas cuasijudiciales.

También es cierto que el Art. 3.7 (4) del Código Electoral de 2020, supra, dispone que el Presidente y el Presidente Alterno de la CEE deben ser jueces del Tribunal de Primera Instancia. Pero, contrario al juez que preside una Comisión Local, el nombramiento del Presidente de la CEE conlleva "**un relevo total y absoluto y un impedimento en la realización de cualesquiera funciones judiciales o de otra índole correspondiente al cargo de juez o jueza**". (Énfasis suplido). Art. 3.7. (5) del Código Electoral de 2020, supra. La razón para eso es que el Presidente y Presidente Alterno de la CEE ejercen funciones administrativas y no solamente cuasijudiciales a tiempo completo, a diferencia de los jueces que presiden Comisiones Locales. Por eso, que el Presidente de la CEE sea juez no nos da injerencia en el proceso de nombramiento.

Madison, analizando a Montesquieu, explicó que la separación de poderes "[n]o quería expresar una ausencia total de *intervención parcial* en los actos de las otras ramas, o

de *control* sobre ellas"; en cambio se infringen "los principios fundamentales de una Constitución libre cuando *todo* el poder de una rama es ejercid[o] por las mismas manos que poseen *todo* el poder de otra rama". (Énfasis en el original). El Federalista Núm. 47, A. Hamilton, J. Madison y J. Jay, op. cit., págs. 377-378. Por otro lado, el máximo foro federal reconoció que la Rama Judicial podría asumir funciones ejecutivas, legislativas y hasta administrativas solo si son incidentales al ejercicio del Poder Judicial y si son necesarias para el buen funcionamiento de los procesos judiciales. United States v. Mistretta, 488 US 361, 388 (1989).

En In re Richardson, 247 N.Y. 401 (1928), el Juez Cardozo explicó que "[d]esde los comienzos de nuestra historia, se ha hecho valer el principio de que no existe un poder inherente en el Ejecutivo o la Legislatura para asignar al poder judicial funciones administrativas, **excepto cuando son razonablemente incidentales al cumplimiento de sus deberes judiciales**". Añadió que "[l]a elasticidad [del principio de separación de poderes] no significa que la esencia de la función judicial pueda ser destruida, convirtiendo el poder para decidir en una débil oportunidad para consultar y recomendar". Íd. pág. 410. (Traducción nuestra). Véase, además: Álvarez González, op. cit., pág. 236.

La CEE no es una entidad adscrita al Poder Judicial. Las funciones del Presidente y Presidente Alterno de la CEE en su mayoría son de carácter administrativo, operacional y

presupuestario. Sus funciones de carácter adjudicativo son excepcionales e incidentales, solamente cuando los Comisionados Electorales no se pongan de acuerdo. Art. 3.4(2) del Código Electoral de 2020, supra. Esto de ninguna forma nos autoriza a realizar ese nombramiento.

Por último, la Jueza Presidenta del Tribunal Supremo tiene un rol en la Junta Constitucional de Revisión de los distritos electorales. Art. V, Sec., Const. PR, supra. Esto es así porque está explícitamente dispuesto en nuestra Constitución. En cambio, la Constitución de Puerto Rico no otorga rol alguno a los tribunales en el nombramiento de funcionarios de la Rama Ejecutiva.

V

Nuestro sistema de pesos y contrapesos impide que la Rama Judicial realice el nombramiento de un funcionario -que no es parte de sí misma- de forma **unilateral y permanente**. En conclusión, no se puede concentrar de manera absoluta en este Tribunal el poder para nominar y confirmar a un funcionario de otra rama. Aún así, el inciso (3) del Art. 3.7 del Código Electoral de 2002, supra, concentra en la Rama Judicial el poder absoluto de **nominar, prestar consejo y consentimiento y nombrar** a un funcionario de otra instrumentalidad. Esto atenta contra el equilibrio necesario para las tareas gubernamentales.

La CEE es la agencia pública encargada de canalizar la voluntad del Pueblo en las urnas. Aunque como ciudadanos estemos preocupados por su estabilidad gerencial y su futuro,

no podemos por conveniencia y altruismo, extralimitarnos en nuestras facultades constitucionales. "La norma constitucional no se establece por la conveniencia del momento". _Senado de PR v. ELA_, _supra_, pág. 85.

Por último, esta decisión no crea problema alguno en la administración de la CEE. Nuestra intervención nunca ha sido necesaria. Mientras los Poderes Ejecutivo y Legislativo no lleguen a un acuerdo, los incumbentes permanecerán en el cargo hasta que los sucesores sean nombrados y tomen posesión. Véase: Art. 3.7 (2) del Código Electoral de 2020, _supra_.

Por todo lo expuesto, la disposición del inciso (3) del Art. 3.7 del Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4517, que establece que el Tribunal Supremo debe nombrar al Presidente y Presidente Alterno de la Comisión Estatal de Elecciones, es inconstitucional por infringir la separación de poderes. Ahora bien, el resto del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4501 _et seq._, no está en disputa en este caso y permanece en vigor. Por ende, las ramas políticas deberán descargar sus deberes constitucionales para cubrir las vacantes del Presidente y Presidente Alterno de la Comisión Estatal de Elecciones.

Se emitirá Sentencia de conformidad.


                                        RAFAEL L. MARTÍNEZ TORRES
                                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Senado de Puerto Rico, representado por su Presidente, Hon. José Luis Dalmau Santiago<br><br>        Peticionario<br><br>           v.<br><br>Tribunal Supremo de Puerto Rico, por conducto de su Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez; Gobierno de Puerto Rico, por conducto de su Secretario de Justicia, Hon. Domingo Emanuelli Hernández<br><br>        Recurridos | CT-2021-0012 | |

SENTENCIA

En San Juan, Puerto Rico, a 15 de octubre de 2021.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, la disposición del inciso (3) del Art. 3.7 del Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4517, que establece que el Tribunal Supremo debe nombrar al Presidente y Presidente Alterno de la Comisión Estatal de Elecciones, es inconstitucional por infringir la separación de poderes. Ahora bien, el resto del Código Electoral de Puerto Rico de 2020, Ley Núm. 58-2020, 16 LPRA sec. 4501 et seq., no está en disputa en este caso y permanece en vigor. Por ende, las ramas políticas deberán descargar sus deberes constitucionales para cubrir las vacantes del Presidente y Presidente Alterno de la Comisión Estatal de Elecciones.

Notifíquese inmediatamente.

Lo acordó y ordena el Tribunal y lo certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emitió una Opinión de conformidad, a la que se unieron los Jueces Asociados señor Martínez Torres y señor Feliberti Cintrón. El Juez Asociado señor Colón Pérez emitió una Opinión de conformidad. El Juez Asociado señor Kolthoff

Caraballo emitió una Opinión disidente, a la que se unieron la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Rivera García.


                    Javier O. Sepúlveda Rodríguez
                    Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Senado de Puerto Rico, representado por su Presidente, Hon. José Luis Dalmau Santiago<br><br>Peticionario<br><br>v.<br><br>Tribunal Supremo de Puerto Rico, por conducto de su Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez; Gobierno de Puerto Rico, por conducto de su Secretario de Justicia, Hon. Domingo Emanuelli Hernández<br><br>Recurridos | CT-2021-0012 | Certificación intrajurisdiccional |

Opinión de conformidad emitida por el Juez Asociado señor ESTRELLA MARTÍNEZ a la cual se unen los Jueces Asociados señores MARTÍNEZ TORRES y FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 15 de octubre de 2021.

> En última instancia, la pregunta que subyace muchos de los problemas constitucionales es: ¿quién tiene el poder para qué?[1]
>
> - Raúl Serrano Geyls

---

[1]Raúl Serrano Geyls, _Derecho Constitucional de Estados Unidos y de Puerto Rico_, Vol. I, Universidad Interamericana de Puerto Rico, 1997, pág. 571.

La interpretación responsable que hoy alcanza este Tribunal, sostenida en el respeto a la separación de poderes, pone punto final a la pretensión de que sea este Foro quien nomine y confirme unilateralmente al Presidente y Presidente Alterno de la Comisión Estatal de Elecciones (CEE o Comisión). Una actuación contraria, provocaría que uno de los poderes del Gobierno amplíe inconstitucionalmente su autoridad a expensa de los otros, creando así un desbalance intolerable en el equilibrio dinámico que debe reinar entre éstos.

Es por ello que, ante el reconocimiento de que la interacción entre las normas constitucionales impide que el poder de nombramiento del jefe de una agencia de la Rama Ejecutiva recaiga sobre el Poder Judicial, estoy conforme con la fundamentada Opinión mayoritaria que hoy emite este Tribunal. De esta forma, aclaramos una serie de interrogantes jurídicas que han desembocado en la necesidad de que este Tribunal exprese su rechazo formal, público y contundente a ejercer la facultad inconstitucional pretendida. No menos importante, ejercemos el indelegable rol de pautar el derecho en un momento oportuno, para evitar futuros choques constitucionales adicionales entre las Ramas del Gobierno de Puerto Rico, al delinearse un mapa claro de los contornos de las responsabilidades impuestas a cada una, en lo que atañe a los nombramientos que nos ocupan. Veamos.

## I

### A.

De entrada, expreso mi conformidad con la facultad ejercida por este Tribunal al certificar intrajurisdiccionalmente la controversia aquí planteada. La Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, Ley Núm. 201-2003, 4 LPRA sec. 24 et seq., reconoce los recursos de certificación como parte de la competencia de este Tribunal.

Consecuentemente he favorecido la expedición de recursos de certificación en casos de alto interés público que ameriten la intervención oportuna y eficaz de este Tribunal. Particularmente, cuando nos hemos enfrentado a controversias de índole electoral que requieren brindar certeza a nuestro estado de Derecho. Véanse, Rodríguez Ramos v. CEE et al., 2021 TSPR 03 (Estrella Martínez, J., Opinión de conformidad); Com. Elect. PPD v. CEE et al., 205 DPR 724, 765 (2020) (Estrella Martínez, J., Opinión de conformidad); Pierluisi et al. v. CEE et al., 204 DPR 841, 914 (2020) (Estrella Martínez, J., Opinión de conformidad); Com. PNP v. CEE, 196 DPR 651, 654 (2016) (Estrella Martínez, J., Voto particular de conformidad).

Ciertamente, nos encontramos ante una controversia de alto interés público, por lo que, mediante el mecanismo de la certificación, proveemos un remedio adecuado, completo y oportuno que brindará un mapa certero a las otras Ramas de

Gobierno. Asimismo, fomentamos la estabilidad jurídica necesaria, máxime en la discusión de estos asuntos de naturaleza constitucional y electoral.

Ahora bien, previo a determinar cómo y a quién le corresponde nominar y eventualmente confirmar al funcionario que ocupará la presidencia y la presidencia alterna de la CEE, considero apropiado auscultar **"cuándo"** debe iniciarse tal proceso.

**B.**

Cuando se presentó el proyecto para la creación de la nueva ley electoral, el proceso de nombramiento propuesto para los cargos de Presidente y Presidente Alterno de la Comisión se configuró de una manera distinta al que fue finalmente aprobado y codificado en el Código Electoral de Puerto Rico, Ley Núm. 58-2020, 16 LPRA sec. 4501, et seq. (Código Electoral). Según surge del Proyecto del Senado 1314, la propuesta inicial transfería el poder de nombramiento exclusivamente a una mayoría de los jueces y juezas del Pleno del Tribunal Supremo.[9] El propósito argüido, para la inclusión del Poder Judicial como único ente nominador, fue crear "un nuevo procedimiento transparente, no político partidista y libre de conflicto de intereses, para los nombramientos puntuales del Presidente y del Presidente Alterno. . .".[10]

---

[9] P. del S. 1314 del 10 de junio de 2019, 5ta Sesión Ordinaria, 18va Asamblea Legislativa.

[10] Íd., pág. 9.

Para ello, la Asamblea Legislativa delineó el procedimiento en cuanto a la nominación, evaluación, votación y nombramiento por este Tribunal.[11] No obstante, del historial legislativo surge una fuerte oposición al procedimiento propuesto debido a que, según se alegó, quebrantaba lo dispuesto en la Cláusula de Nombramientos de la Constitución federal y la Constitución de Puerto Rico.[12] En específico, los opositores arguyeron que tal facultad de nombramiento, así conferida a este Foro, era inconstitucional por infringir la doctrina de la separación de poderes.[13]

---

[11]Íd., págs. 88-90.

[12]Véanse las ponencias en el P. del S. 1314 del 10 de junio de 2019, 5ta Sesión Ordinaria, 18va Asamblea Legislativa, presentadas por:

   a) Lcdo. Héctor Luis Acevedo, Ponencia ante las comisiones del Senado y la Cámara de Representantes sobre el Código Electoral propuesto, 19 de junio de 2019, pág. 4, https://sutra.oslpr.org/osl/SUTRA/anejos/129908/Hector%20Luis%20Acevedo.%2019%20junio%202019.pdf;

   b) Hon. Ana Irma Rivera Lassen, Movimiento Victoria Ciudadana; 19 de junio de 2019, pág. 6, https://sutra.oslpr.org/osl/SUTRA/anejos/129908/Movimiento%20Victoria%20Ciudadana.%2019%20junio%202019.pdf;

   c) Hon. Aníbal José Torres, Ponencia sobre el Proyecto del Senado 1314, 19 de junio de 2019, págs. 3-4, https://sutra.oslpr.org/osl/SUTRA/anejos/129908/Partido%20Popular%20Democrático.%2019%20junio%202019.pdf.

[13]Íd.

Ante ello, el proyecto de ley reestructuró la facultad de nombramiento y, en su lugar, diseñó una serie de fases procesales para la selección de los cargos de Presidente y Presidente Alterno de la Comisión que integró como etapa final un esquema similar al inicialmente propuesto.

Así, con la aprobación del Código Electoral y de conformidad con el Artículo 3.7 de la ley precitada, tal facultad, primeramente, fue delegada en los Comisionados Electorales propietarios. Al surgir una vacante, éstos contarían con treinta (30) días para elegir unánimemente a los designados a la presidencia y la presidencia alterna de la CEE.[14]

---

[14]El texto íntegro del Artículo 3.7(3) del Código Electoral, supra, dispone lo siguiente:

> Corresponderá al Comisionado Electoral del Partido Estatal de Mayoría, cuyo partido hubiere obtenido en la anterior Elección General la mayor cantidad de votos íntegros en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta, proponer a los restantes Comisionados propietarios el o los nombres de los candidatos a los cargos de Presidente y de Alterno al Presidente. Si al término de treinta (30) días naturales de haber surgido una vacante en el cargo de Presidente y/o del Alterno del Presidente no se lograra la unanimidad de los comisionados electorales propietarios para cubrir la vacante, entonces el Gobernador deberá hacer el nombramiento del o los candidatos para cubrir el o los cargos vacantes. El Gobernador deberá hacer estos nombramientos no más tarde de los quince (15) días naturales a partir del vencimiento del término anterior. Tales

En caso de que éstos no alcanzaran un consenso en la nominación al vencerse el término asignado, se activaría la segunda fase, la cual dispone que, dentro del término de quince (15) días, el Gobernador deberá remitir los nominados a la Asamblea Legislativa para su consejo y consentimiento. Si el Gobernador ejerciera tal facultad, ambas cámaras contarían con quince (15) días adicionales para, con el voto de dos tercios (2/3) del total de sus miembros, confirmar o rechazar los nombramientos. **Adviértase que, tras la falta de consentimiento entre los comisionados, la intervención**

---

nombramientos requerirán el consejo y consentimiento de dos terceras partes (2/3) del total de los miembros de ambas cámaras en la Asamblea Legislativa, no más tarde de los quince (15) días naturales a partir del recibo del o los nombramientos otorgados por el Gobernador, según corresponda. En ausencia de los nombramientos del Gobernador y/o del consejo y consentimiento legislativo, el pleno de los miembros del Tribunal Supremo de Puerto Rico deberá elegir por mayoría de sus votos a un juez o jueza para ocupar el cargo de Presidente o Alterno del Presidente en la Comisión, según corresponda. Esta votación del pleno del Tribunal Supremo deberá realizarse no más tarde de los quince (15) días naturales a partir de la ausencia de los nombramientos por parte del Gobernador o de la ausencia del consejo y consentimiento de las cámaras legislativas al cierre de la sesión ordinaria o extraordinaria en que recibieron el o los nombramientos. Dentro de los ciento veinte (120) días previos a una Elección General, plebiscito, referéndum o primaria, todos los anteriores términos se reducirán a la mitad.

**de la Asamblea Legislativa ocurriría de manera automática luego de recibir las nominaciones por parte del Gobernador.**

En cambio, la ley dispone que la intervención designada a este Tribunal en la próxima fase, la tercera, está sujeta a que ocurra una de dos (2) condiciones. El Artículo 3.7(3) del Código Electoral, supra, en lo pertinente, expresamente establece que:

> En ausencia de los nombramientos del Gobernador y/o del consejo y consentimiento legislativo, el pleno de los miembros del Tribunal Supremo de Puerto Rico deberá elegir por mayoría de sus votos a un juez o jueza para ocupar el cargo de Presidente o Alterno del Presidente en la Comisión, según corresponda.
>
> **Esta votación del pleno del Tribunal Supremo deberá realizarse** no más tarde de los quince (15) días naturales **a partir de la ausencia de los nombramientos** por parte del Gobernador **o** de la ausencia del consejo y consentimiento de las cámaras legislativas al cierre de la sesión ordinaria o extraordinaria en que recibieron el o los nombramientos. . . . (Énfasis suplido).[15]

De la primera oración surge que la tercera fase cobra eficacia como consecuencia de (1) la ausencia de los nombramientos del gobernador o (2) la falta del consejo y consentimiento legislativo. Art. 3.7(3), Código Electoral, supra. No obstante, **apréciese cómo la segunda oración decreta que la votación del Tribunal podrá ocurrir en dos**

---

[15]Se advierte que se optó por separar las dos (2) oraciones pertinentes del artículo precitado con el propósito exclusivo de ilustrar una mejor comprensión de lo expuesto.

**(2) tiempos distintos.** Ello queda denotado por el uso del disyuntivo "o" en la segunda oración del artículo precitado como indicativo de cuándo comenzará el término directivo de quince (15) días para la votación del Pleno bajo cualesquiera de los dos (2) escenarios.

Es decir, bajo el primer escenario, la facultad de intervención de este Tribunal se activaría "a partir de la ausencia de los nombramientos por parte del Gobernador". Art. 3.7(3), Código Electoral, supra.

Por otra parte, la segunda instancia regiría cuando el Gobernador efectuara sus nominaciones, tal y como ocurrió en la controversia ante nos, y prevalezca "la ausencia del consejo y consentimiento de las cámaras legislativas **al cierre de la sesión** . . . en que recibieron el o los nombramientos". (Énfasis suplido). Art. 3.7(3), Código Electoral, supra. Destáquese que, en este último escenario, la ley dispone que nuestra injerencia como ente nominador cobraría eficacia al cierre de la sesión legislativa.

No obstante, según adelanté, **la controversia ante nuestra consideración**, más que "cuándo", **versa sobre "cómo" y sobre "quién" puede recaer la facultad de nombramiento del Presidente y Presidente Alterno de la CEE.** Veamos.

## II

El poder de nombramiento que ostenta el Gobernador con el consejo y consentimiento legislativo es parte esencial de nuestro derecho constitucional. Las Secciones 4 y 5 del Artículo IV de la Constitución de Puerto Rico habilitan el

esquema constitucional que atribuye al Gobernador el poder de designar, con la anuencia de la Rama Legislativa, todos los nombramientos para los cuales está facultado por ley. Const. PR, LPRA, Tomo 1.

A esos efectos, la Sección 4 del Artículo IV dispone que el Gobernador podrá:

> **Nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado.** El Gobernador podrá hacer nombramientos cuando la Asamblea Legislativa no esté en sesión. Todo nombramiento que requiera el consejo y consentimiento del Senado o de ambas cámaras quedará sin efecto al levantarse la siguiente sesión ordinaria. (Énfasis suplido). Íd., Art. IV, Sec. 4.

Asimismo, la Sección 5 del Artículo IV establece que:

> **Para el ejercicio del Poder Ejecutivo el Gobernador estará asistido de Secretarios de Gobierno que nombrará con el consejo y consentimiento del Senado.** El nombramiento del Secretario de Estado requerirá, además, el consejo y consentimiento de la Cámara de Representantes, y la persona nombrada deberá reunir los requisitos establecidos en la sección 3 de este Artículo. . .. (Énfasis suplido). Íd., Art. IV, Sec. 5.

El texto diáfano de los preceptos constitucionales aludidos hace referencia al proceso de nominación y confirmación de nombramientos, la facultad y el deber que compete exclusivamente al Gobernador de forma compartida con el Legislativo, en cuanto a los principales oficiales de la Rama Ejecutiva.

De particular importancia, nótese que la Sección 5 del Artículo IV de nuestra Constitución dispone que el Gobernador, para el ejercicio del Poder Ejecutivo, estará **"asistido de Secretarios de Gobierno que nombrará con el consejo y consentimiento del Senado"**. (Énfasis suplido). Íd. Es decir, por mandato constitucional, si se trata del nombramiento de un Secretario de Gobierno, éste estará sujeto al consejo y consentimiento del Senado.

Más adelante, específicamente la Sección 6 del artículo precitado, establece lo siguiente:

> Sin perjuicio de **la facultad de la Asamblea Legislativa** para **crear**, reorganizar y consolidar **departamentos ejecutivos de gobierno, y para definir sus funciones**, se establecen los siguientes: de Estado, de Justicia, de Instrucción Pública, de Salud, de Hacienda, de Trabajo, de Agricultura y Comercio y de Obras Públicas. **Cada departamento ejecutivo estará a cargo de un Secretario de Gobierno.** (Énfasis suplido). Íd., Art. IV, Sec. 6.

Según se desprende de tal disposición constitucional, estos **"departamentos ejecutivos de gobierno . . . estará[n] a cargo de un Secretario de Gobierno"**. (Énfasis suplido). Íd. De manera cónsona, es en virtud de la Sección 5 del Artículo IV que se impone el requisito de que el nombramiento de cada uno de los Secretarios de Gobierno esté supeditado al consejo y consentimiento del Senado.

No obstante, ello no es óbice para concluir que sólo los departamentos establecidos o enumerados constitucionalmente están sujetos al poder de nominación del

Gobernador y la confirmación del Senado. Máxime, cuando la Constitución facultó a la Asamblea Legislativa para "**crear . . . departamentos ejecutivos de gobierno, y para definir sus funciones**". (Énfasis suplido). Íd.

Bajo este marco, la creación de una nueva agencia del Ejecutivo implica necesariamente que éste oficial sea nombrado por el Gobernador con el consejo y consentimiento legislativo. Dicho de otro modo, el poder de nombramiento del Gobernador sujeto al consejo y consentimiento legislativo no se circunscribe exclusivamente a los Secretarios de Gobierno de los departamentos ejecutivos establecidos constitucionalmente, sino que es extensivo a todo aquel otro departamento ejecutivo creado en virtud de ley.

Por su gran similitud, resulta altamente persuasivo cómo ha sido el trato de la Cláusula de Nombramientos en el ámbito federal, en lo que atañe a esta controversia. Lo anterior, principalmente, debido a que el sistema de nombramiento **finalmente** contemplado en nuestra Constitución emuló en gran medida el sistema de nombramientos que rige en el ámbito federal.[16] Es por ello que, "bajo nuestro

_____

[16]Al analizar la extrapolación del sistema de nombramientos federal a nuestra jurisdicción, el Secretario de Justicia concluyó lo siguiente:

> [U]n análisis detenido de las fuentes de información existentes y disponibles, en particular del Diario de Sesiones de la Convención Constituyente, demuestra que . . . existen criterios suficientes para

ordenamiento constitucional, la autoridad del Gobernador

para efectuar nombramientos es análoga a la del Presidente

[de Estados Unidos]".[17] Veamos, pues, la normativa a nivel

federal.

La Cláusula de Nombramientos de la Constitución de

Estados Unidos dispone, en lo pertinente, lo siguiente:

> [The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; **and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint** Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and **all other Officers of the United States**, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of **such inferior Officers**, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments. (Énfasis suplido). Art. II, Sec. 2, Const. EE.UU., LPRA, Tomo 1.

Al respecto, el Tribunal Supremo federal ha precisado

que la cláusula precitada establece dos (2) clases de

---

entender que el **propósito final** de la Convención Constituyente, al aprobar la disposición constitucional que examinamos, lo fue el de **incorporar a nuestra organización gubernamental el mecanismo completo del sistema de nombramientos que prevalece en el ámbito de la jurisdicción federal.** (Énfasis suplido). Op. Sec. Just. Núm. 1967-25, pág. 94.

[17]Op. Sec. Just. Núm. 1985-3, pág. 17. Véase, además, Luis Rivera Méndez, Chief Justice of Puerto Rico's Supreme Court: A Gubernatorial Appointment or a Court Election?, 84 Rev. Jur. UPR 1077, 1095 (2015).

funcionarios que pueden ser nombrados por el Presidente, a saber: (1) los "oficiales principales" (officers of the United States) y los "oficiales inferiores" (inferior officers). Morrison v. Olson, 487 US 654 (1988). La facultad de nombramiento de los primeros recae exclusivamente en el Presidente y está sujeta al consejo y el consentimiento del Senado federal. Por otra parte, los oficiales inferiores, si así es autorizado por ley, podrán ser nombrados por los tribunales, los jefes de departamento o el Presidente, sin que sea necesaria la intervención de otra de las ramas de gobierno.[18]

En Buckley v. Valeo, 424 US 1, 125 (1976) (Per Curiam), el Tribunal Supremo de los Estados Unidos estableció una línea divisoria entre lo que se consideran oficiales y aquellos que son sólo empleados. De esta forma, concluyó que el término oficiales tiene un significado sustantivo con respecto a aquellos funcionarios gubernamentales que "exercis[e] significant authority pursuant to the laws of

---

[18]Particularmente, el Tribunal Supremo federal en Morrison v. Olson, supra, concluyó lo siguiente:

> [T]he Constitution for purposes of appointment ... divides all its officers into two classes." As we stated in Buckley v. Valeo, 424 U.S. 1 [. . .]: "[P]rincipal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary". Íd., págs. 670-671. (Citas internas omitidas).

the United States". Íd., pág. 126. En ese sentido, **determinó que los miembros que componían la Comisión Federal de Elecciones eran oficiales principales de los Estados Unidos que ejercían una autoridad significativa vinculante proveniente de un deber estatutario, por lo que estaban sujetos exclusivamente a la nominación del Presidente y la confirmación del Senado.** Dado lo anterior, la Corte Suprema de los Estados Unidos invalidó variados métodos de selección para estos escaños, los cuales le conferían poder de nominación a los presidentes de la Cámara y el Senado o exigían la confirmación por ambos cuerpos legislativos, distanciándose así del estándar constitucional de nominación requerido. Íd., págs. 126-127.

Posteriormente, en Morrison v. Olson, supra, el Tribunal Supremo federal tuvo la oportunidad de discernir si determinado cargo era o no un funcionario inferior cuyo nombramiento no requería el consentimiento del Senado. Íd., pág. 671. Al analizar la controversia, consideró tres (3) factores para concluir que tal cargo debía ser categorizado como un oficial inferior, éstos fueron: (1) que la destitución estaba sujeta al control de un funcionario superior del poder ejecutivo, lo que demuestra que es inferior en rango y autoridad; (2) que la ley le facultaba para desempeñar sólo ciertas funciones limitadas, por lo que no ostentaba autoridad sobre la formulación de política pública para el gobierno o el poder ejecutivo,  y (3) que el cargo era de jurisdicción limitada y carácter temporal

hasta el cumplimiento de la tarea delegada. Íd., págs. 671-672.

De forma similar, en Edmond v. United States, 520 US 651 (1997), la Corte Suprema de los Estados Unidos proveyó unos criterios generales con el propósito de distinguir a un oficial principal de uno inferior. A esos efectos, estableció que:

> **[T]he term "inferior officer" connotes a relationship with some higher ranking officer or officers below the President: Whether one is an "inferior" officer depends on whether he has a superior.** It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude. If that were the intention, the Constitution might have used the phrase "lesser officer." **Rather, in the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.** (Énfasis suplido). Íd., págs. 662-663.

Según entendió el Foro Máximo federal en Edmond, tal interpretación se ajusta a la visión del primer Congreso, quien, a partir del 1789 creó los primeros departamentos del poder ejecutivo, entiéndase al Department of Foreign Affairs y el Department of War, y dispuso expresamente que el secretario del departamento sería considerado un oficial

principal y, en cambio, su subordinado sería un oficial inferior.[19] Íd. págs. 663-664.

Ahora bien, en cuanto a los méritos, el Foro federal concluyó que los jueces de la Corte de Apelaciones Penales de la Guardia Costera eran funcionarios inferiores, pues éstos eran supervisados por una combinación entre el Procurador General y la Corte de Apelaciones de las Fuerzas Armadas, ambos oficiales nominados por el Presidente sujetos a la confirmación del Senado. Íd., págs. 664-665. Un factor significante para llegar a tal conclusión fue que tales jueces no tenían poder para emitir una decisión final en nombre del Gobierno, a menos que otros oficiales ejecutivos así lo autorizaran. Íd., pág. 665.

Adviértase que los lineamientos establecidos y utilizados en Morrison v. Olson, supra, y Edmond v. United States, supra, para distinguir a un oficial principal de uno inferior, fueron validados recientemente por la Corte Suprema federal en United States v. Arthrex, Inc., 141 S. Ct. 1970 (2021).

Como puede apreciarse, ambos esquemas constitucionales establecen que la selección de cargos directivos en una entidad gubernamental, por ser considerados propiamente Secretarios de Gobierno u oficiales principales a cargo de

---

[19]En ese sentido, la corriente congresional categorizaba a los encargados de los departamentos ejecutivos como oficiales principales y, por consiguiente, dicho nombramiento estaba sujeto a la nominación del Presidente y al consejo y consentimiento del Senado federal.

un departamento de la Rama Ejecutiva, requieren que el nombramiento sea realizado por el Gobernador con sujeción al consejo y consentimiento del Senado.

**III**

Según adelanté, el debate aquí planteado se circunscribe a determinar la validez del Artículo 3.7(3) del Código Electoral, supra, mediante el cual se transfiere a este Tribunal Supremo la facultad para nombrar el Presidente y Presidente Alterno de la Comisión.

Por vía del recurso de certificación intrajurisdiccional, el Hon. José Luis Dalmau Santiago, Presidente del Senado de Puerto Rico, impugna la facultad de este Tribunal para realizar los nombramientos que nos ocupan, dado a que tal proceder violaría el principio de la separación de poderes.

A su vez, el Senado reconoce que el término de los actuales Presidente y Presidenta Alterna venció el pasado 30 de junio de 2021. Añade que, debido a la falta de consenso entre los comisionados electorales, se activó la segunda fase del Artículo 3.7(3) del Código Electoral, supra, por lo que, el 7 de septiembre de 2021, el Gobernador de Puerto Rico, Hon. Pedro Pierluisi Urrutia, refirió a la Asamblea Legislativa la nominación de dos (2) jueces para el consejo y consentimiento de ambas cámaras. Aduce que el término de quince (15) días dispuesto en el Código Electoral para obtener el consentimiento legislativo venció el pasado 22 de septiembre de 2021.

Así las cosas, expresa que se ha activado la tercera fase dispuesta en el Art. 3.7(3) del Código Electoral, supra, a saber: el nombramiento del Presidente y Presidente Alterno de la CEE por una mayoría de los miembros de esta Curia. No obstante, alega, correctamente, que tal proceder es inconstitucional puesto que el poder de nombramiento está reservado exclusivamente para el Gobernador de forma compartida con la Legislatura cuando se trata de cargos que ocupan los directivos de una entidad gubernamental.

**Conforme se indicó, la Constitución de Puerto Rico delega el poder de nombramiento en el Ejecutivo de forma compartida con el Poder Legislativo, no en el Poder Judicial.** De un análisis de las Secciones 5 y 6 del Artículo IV de nuestra Constitución, se desprende diáfanamente que los Secretarios de Gobierno de los departamentos ejecutivos establecidos constitucionalmente o creados por la Legislatura, tal y como lo es la CEE, exigen que el nombramiento del funcionario que dirigirá dicha entidad sea realizado por el Gobernador con el consejo y consentimiento legislativo.[20]

---

[20]Según surge del Informe de la Comisión de la Rama Ejecutiva contenido en el Diario de Sesiones de la Convención Constituyente, éstos entendieron que "la más adecuada designación para los funcionarios cuyos cargos se crean en el artículo 6 de la proposición sustituta es la de "Secretarios de Gobierno" pues al propio tiempo que **determina su condición de jefes de sus respectivos departamentos da la idea de que efectivamente son secretarios de gobierno**". (Énfasis suplido). Íd., pág. 3225 (versión digital).

A pesar del carácter <u>sui generis</u> con el cual podría enmarcarse a la CEE, es indudable que ésta es una "**agencia pública** en funcionamiento continuo y disponible para coordinar cualquier evento electoral. . ." creada por la Asamblea Legislativa. Exposición de Motivos, Código Electoral, <u>supra</u>, Ley Núm. 58-2020, 2020 LPR 1156.

La estructura institucional de esta agencia pública responde al mandato constitucional dirigido a la Asamblea Legislativa de reglamentar todo lo relacionado al proceso electoral.[21] <u>Rodríguez Ramos v. CEE et al.</u>, supra, pág. 24 (Estrella Martínez, J., Opinión de conformidad). Así pues, los funcionarios principales a cargo de esta entidad, a saber, el Presidente y el Presidente Alterno, están comprendidos bajo la facultad de nombramiento del Gobernador con el consejo y consentimiento legislativo, según exigido por nuestra Constitución.[22]

---

[21] Véanse, Art. 3.1(5)(b) ("[s]erá una agencia pública. . .) y Art. 13.1(2)(a) ("siendo esta la institución pública con mayor expertise. . .") del Código Electoral, <u>supra</u>. Véase, además, Art. 3.2 (Funciones, Deberes y Facultades de la Comisión) del Código Electoral, <u>supra</u>.

[22] Resáltese que, dado a que el Presidente Alterno ostenta la facultad de sustituir en toda su fuerza al Presidente, éste también debe ser clasificado como un Secretario de Gobierno. Ello es así, pues, el propio Código Electoral otorga a ambos cargos sustancial simetría en cuanto a sus facultades, deberes y prerrogativas. Véanse, a modo de ejemplo, las siguientes disposiciones del Código Electoral:

    a) Art. 2.3(91), 3.7(9) (afirmando que el Presidente Alterno se considerará como el sustituto del Presidente con todos sus deberes, facultades y prerrogativas);

A modo persuasivo, tal conclusión, además, encuentra apoyo en la jurisprudencia del Tribunal Supremo federal con respecto a la Sección 2 del Artículo II, conocida como la Cláusula de Nombramientos.

Según expresamos, a diferencia de la Constitución de Puerto Rico, la Constitución federal establece principalmente dos (2) métodos de nombramientos, dependiendo de si se trata de funcionarios principales o inferiores que ejercen una autoridad significativa vinculante proveniente de un deber estatutario. Buckley v. Valeo, supra, pág. 126.

Acorde a las pautas delineadas por la Corte Suprema de los Estados Unidos, el Presidente y Presidente Alterno de la CEE, serían catalogados como oficiales principales bajo el esquema de la Constitución federal, y, por consiguiente, sus nombramientos deberían ser realizados exclusivamente por el Presidente con el consejo y consentimiento del Senado federal.

Los cargos de Presidente y Presidente Alterno de la CEE constituyen la máxima autoridad de una de las agencias del

---

b) Art. 3.7 (1) (estableciéndose que ambos serán los representantes del interés público);

c) Art. 3.7(7)-(8) (designándose una remuneración similar para dichos cargos), y

d) Art. 3.7(10) (limitándose la ocupación por éstos de los cargos de comisionados electorales por el término de cuatro (4) años).

Ejecutivo, lo que, a su vez, implica que no están subordinados o supervisados por un funcionario de jerarquía mayor, además del Gobernador. Edmond v. United States, supra, págs. 662-663. Ello, en conjunto con el análisis de factores realizado en Morrison v. Olson, supra, nos lleva a concluir que tales cargos no corresponden a los de un oficial inferior, sino a los de un oficial principal debido a que: (1) la destitución no puede ser realizada por un funcionario superior del poder ejecutivo;[23] (2) la ley no restringe su desempeño sólo para ciertas funciones limitadas, pues brinda amplio espectro en las funciones administrativas y deberes electorales,[24] y (3) no cuenta con un ámbito jurisdiccional limitado ni de carácter temporal, ya que goza de la capacidad de regular todo el proceso electoral por un término prolongado.[25] Lo anterior denota claramente que los cargos de Presidente y Presidente Alterno se clasificarían como los de oficiales principales bajo la Constitución federal y, por consiguiente, únicamente podrían estar sujetos al nombramiento del Presidente con el consentimiento del Senado federal.

Ante ese cuadro y, máxime, al amparo de las disposiciones de nuestra Constitución, concluyo que el nombramiento del Presidente y Presidente Alterno, por ser

---

[23]Íd., Art. 3.9.

[24]Íd., Art. 3.8.

[25]Íd., Art. 3.7(2).

cargos delegados exclusivamente a los oficiales principales que dirigen una entidad pública de la Rama Ejecutiva, requieren que sean nombrados por el Gobernador con el consejo y consentimiento legislativo. Sólo con esta interpretación logramos brindar un sentido coherente y armonioso a las distintas fases de nombramiento contenidas en el Código Electoral. Asimismo, ello habilita que, una vez el Ejecutivo nomine a ciertos candidatos y transcurra el término del que goza la Rama Legislativa para actuar, el primero mantenga la facultad de referir nuevos nominados para la consideración de esta última. **De esta manera, se preserva el poder constitucional del Gobernador de continuar nominando <u>recurrentemente</u> a otros candidatos hasta alcanzar el consejo y consentimiento del Senado.**

Si bien reconozco cuán ingenioso puede ser el proceso de nombramiento delineado por el Artículo 3.7(3) del Código Electoral, <u>supra</u>, convertir a este Tribunal en el ente que, unilateralmente, nomina y confirma a un funcionario de la naturaleza del Presidente de la CEE y su alterno, es patentemente inconstitucional.

Como se aprecia, cualquier interpretación en contrario vulneraría la doctrina de separación de poderes, la cual tiene como propósito fungir como un sistema de pesos y contrapesos entre las tres (3) Ramas o Poderes, con el fin de que se garantice que cada una ejerza un ejercicio cabal, legítimo y adecuado de sus funciones. *Hernández Agosto v. Romero Barceló*, 112 DPR 407, 427-428 (1982).

El dictamen que emite este Tribunal protege el principio constitucional cardinal de la separación de poderes y descarta la potencial perturbación al equilibrio dinámico que debe imperar entre las Ramas del Gobierno para, de este modo, evitar que alguna de ellas amplíe su autoridad más allá de sus límites.

### IV

**En última instancia, hoy contestamos la pregunta que subyace el problema constitucional sobre en quién recae el poder de nombramiento para los cargos de Presidente y Presidente Alterno de la CEE y la respuesta es evidente: en las Ramas políticas y no en el Poder Judicial.**

Mantener el esquema de nombramientos contenido en el Código Electoral ignoraría el deber ministerial constitucional que tiene el Gobernador de nombrar a candidatos con el consejo y consentimiento legislativo. El Legislativo, por su parte, también tiene un deber ministerial constitucional en rechazar o confirmar esas nominaciones. Esos deberes ministeriales están impuestos por la Constitución de Puerto Rico, por lo que no son meros derechos renunciables por esas dos Ramas y, mucho menos, transferibles a la esfera judicial.

En consecuencia, a la luz de los fundamentos expuestos, estoy conforme con la Opinión mayoritaria.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Senado de Puerto Rico,
representado por su
Presidente, Hon. José
Luis Dalmau Santiago
                                        CT-2021-0012
     Peticionario

           v.

Tribunal Supremo de Puerto
Rico, por conducto de su
Jueza Presidenta, Hon. Maite
Oronoz Rodríguez; Gobierno
de Puerto Rico, por conducto
de su Secretario de Justicia,
Hon. Domingo Emanuelli
Hernández

     Recurridos

Opinión de Conformidad emitida por el Juez Asociado señor
COLÓN PÉREZ.

En San Juan, Puerto Rico, a 15 de octubre de 2021.

> **Hoy le correspondió a este Foro -- y así lo hicimos -- aportar sensatez a la gobernanza de este País, colocándonos a la altura de la convocatoria: defender por encima de todo, incluso de nosotros mismos, la democracia de Puerto Rico.**[1]

En un sistema republicano de gobierno como el que se erige en nuestro País, en virtud de la doctrina de separación de poderes, es en extremo clara aquella ecuación constitucional – históricamente validada en la

---

[1] Parafraseando, Editorial del periódico El Nuevo Día publicado el pasado 28 de septiembre. Véase, Editorial, *Proteger la democracia es deber del Tribunal Supremo*, El Nuevo Día (elnuevodia.com), 28 de septiembre de 2021, https://www.elnuevodia.com/opinion/editorial/proteger-la-democracia-es-deber-del-tribunal-supremo/_ (última visita, 14 de octubre de 2021).

jurisprudencia federal y estatal -- que postula que la facultad de nominar a determinados funcionarios de gobierno se le reservó exclusivamente al Poder Ejecutivo, y que la tarea de brindar consejo y consentimiento a tales designaciones es una responsabilidad única del Poder Legislativo. Un acercamiento cuidadoso a la anterior fórmula revela que ésta no admite -- mucho menos por *fiat judicial* -- la incorporación de actores ajenos a la mencionada ecuación, pues hacerlo derrotaría el sistema de pesos y contrapesos inmerso detrás de la doctrina constitucional a la que hemos hecho referencia. De eso, precisamente, se tratan las controversias ante nuestra consideración.

**En el presente caso, -- uno secuela del accidentado proceso que dio vida al Código Electoral de 2020, *infra*, disposición legal que ha suscitado innumerables litigios ante los tribunales de justicia del País --, estamos ante un sorprendente escenario donde, por primera vez en nuestra historia constitucional, se delega el poder de nominación de determinados funcionarios públicos, y el de brindarle el consejo y consentimiento a dichas designaciones, al Poder Judicial de Puerto Rico. Tal concentración de poder, peligrosa por demás, hiere los más nobles principios constitucionales que rigen nuestra vida como Pueblo. En un País que se hace llamar democrático, lo anterior no puede,**

**ni debe, tener espacio. Por ello, se impone la declaración de inconstitucionalidad de la referida disposición legislativa**. Veamos.

I.

Allá para el 20 de junio de 2020, la entonces Gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, firmó la Ley Núm. 58-2020, conocida como el *Código Electoral de Puerto Rico de 2020*, 16 LPRA sec. 4501 *et seq*. (en adelante, "Código Electoral de 2020"). Según se desprende de la declaración de propósito de la referida pieza legislativa, su aprobación respondió al interés de armonizar en nuestra jurisdicción "las disposiciones constitucionales estatales y federales; y los estándares legales para la administración de elecciones y votaciones ordenadas por ley, incluyendo su modernización e innovación". Véase, Art. 2.2 del Código Electoral de 2020, 16 LPRA sec. 4502. A esos fines, con la puesta en vigor del nuevo Código Electoral de 2020, *supra*, la entonces Gobernadora y la Asamblea Legislativa implementaron una serie de cambios al andamiaje electoral, entre los cuales figuraron aquellos relacionados a la estructura y administración de la Comisión Estatal de Elecciones (en adelante, "C.E.E."). Véase, Exposición de Motivos del Código Electoral de 2020, *supra*.

Así, y uno de los cambios que mayor polarización creó en el País -- tanto en la discusión legislativa como en la pública --, fue el proceso que ahora tendría que completarse para nombrar ciertos funcionarios de gobierno a los cargos de Presidente y Presidente Alterno de la C.E.E.[2] Dicho proceso quedó establecido en el Art. 3.7(3) del Código Electoral de 2020, 16 LPRA sec. 4517, para el cual se disponen tres (3) mecanismos de nombramiento, de los cuales los últimos dos (2) son supletorios en la medida en que fracase el que le antecede.

En esa dirección, el *primer mecanismo* para la selección de la Presidencia y Presidencia Alterna de la C.E.E., contempla que los Comisionados Electorales de los distintos partidos políticos (o partidos propietarios), mediante el voto unánime, serán quienes nombren las personas llamadas a ocupar los mencionados puestos. Ello, luego de que el Comisionado Electoral del Partido Estatal de Mayoría -- que, para efectos de esta ley, será el partido político que en la Elección General anterior haya obtenido la mayor cantidad de votos íntegros válidos en la Papeleta Estatal --, le proponga a los restantes Comisionados Electorales el o los nombres de

---

[2] Véase, por ejemplo, Carlos E. Ramos González, El Código Electoral y el Tribunal Supremo de Puerto Rico, El Nuevo Día (elnuevodia.com), 28 de febrero de 2020, https://www.elnuevodia.com/opinion/punto-de-vista/el-codigo-electoral-y-el-tribunal-supremo-de-puerto-rico/(última visita, 14 de octubre de 2021).

la o las personas candidatas a dichos puestos. Este primer mecanismo del proceso de nombramiento del Presidente y Presidente Alterno de la C.E.E. deberá ocurrir dentro del término de treinta (30) días naturales contados a partir de la vacante en uno u otro de los mencionados cargos ejecutivos. No obstante, y si el voto de los Comisionados Electorales no logra un consenso -- la unanimidad -- respecto a uno o varios de los candidatos propuestos por el Comisionado Electoral del Partido Estatal de Mayoría, según definido en ésta ley, deberá entonces activarse el próximo mecanismo.

De conformidad con lo dispuesto en el Art. 3.7(3) del Código Electoral de 2020, *supra*, el *segundo mecanismo* para la selección de la Presidencia y Presidencia Alterna de la C.E.E. establece que le corresponderá al Gobernador de turno someter a la consideración, tanto del Senado como de la Cámara de Representantes de Puerto Rico, los nombres de las personas que a su juicio cumplen con los requisitos para ocupar los mencionados cargos. Lo anterior, deberá realizarse no más tarde del término de quince (15) días naturales siguientes al vencimiento del término establecido en el primer mecanismo. Una vez sometido los nombres de la o de las personas nominadas por el Gobernador ante ambos cuerpos legislativos, éstos deberán actuar en el término de quince

(15) días para, mediante una votación de dos terceras partes (2/3) del total de sus miembros, brindar o no el consejo y consentimiento requerido para tales designaciones.

Ahora bien, el precitado Art. 3.7(3) del Código Electoral de 2020, *supra*, también dispone que "[e]n ausencia de los nombramientos del Gobernador y/o del consejo y consentimiento legislativo, el pleno de los miembros del Tribunal Supremo de Puerto Rico deberá elegir por mayoría de sus votos a un juez o jueza para ocupar el cargo de Presidente o Alterno del Presidente en la Comisión, según corresponda". *Íd*. Dicho de otro modo, ante la inacción del Gobernador o la ausencia del consejo y consentimiento de los cuerpos que componen la Asamblea Legislativa, el Art. 3.7(3) del Código Electoral de 2020, *supra*, provee para que se active un *tercer mecanismo* para la selección del Presidente y Presidente Alterno de la C.E.E., mediante el cual el Pleno de este Tribunal, por mayoría, deberá elegir la o las personas que ocuparán los mencionados puestos de gobierno en la C.E.E. Dicho trámite deberá realizarse no más tarde de los quince (15) días naturales a partir de uno de dos escenarios: 1) de la inacción del Gobernador en nominar, o 2) de la ausencia del consejo y consentimiento de las cámaras legislativas al cierre de la sesión ordinaria o extraordinaria en que recibieron el o los nombramientos. *Íd*.

Así las cosas, y en consideración al andamiaje electoral antes aludido, a inicios del pasado mes de agosto de 2021 comenzó en el País el proceso de nombramiento del nuevo Presidente y Presidente Alterno de la C.E.E. Específicamente, el 4 de agosto de 2020 se activó el primer mecanismo para la selección de los referidos puestos, según establecido en el aludido Art. 3.7(3) del Código Electoral de 2020, *supra*, luego de que la Lcda. Vanessa Santo Domingo Cruz, Comisionada Electoral del Partido Nuevo Progresista (PNP) -- el cual, para efectos del Código Electoral de 2020, *supra*, es el Partido Estatal de Mayoría --, sometiera un listado de cuatro (4) candidatos a la evaluación de los Comisionados Electorales de los restantes partidos políticos.[3] Con ese proceder, también inició el término de treinta (30) días dispuestos en el referido artículo.

Empero, y tras la disconformidad de los Comisionados Electorales de los restantes partidos políticos con las personas nominadas por la Comisionada Electoral del PNP, así como con el proceso mismo, el pasado 7 de septiembre de 2021 el Gobernador de Puerto Rico, Hon. Pedro Pierluisi Urrutia,

---

[3] Véase, por ejemplo, Arranca hoy el proceso para seleccionar la nueva jefatura de la Comisión Estatal de Elecciones, El Nuevo Día (elnuevodía.com), 4 de agosto de 2021, https://www.elnuevodia.com/noticias/politica/notas/arranca-hoy-el-proceso-para-seleccionar-la-nueva-jefatura-de-la-comision-estatal-de-elecciones/(última visita, 14 de octubre de 2021).

sometió al consejo y consentimiento de la Asamblea Legislativa dos (2) nombres de jueces -- el Hon. Jorge Rafael Rivera Ruedo y el Hon. Edgardo S. Figueroa Vázquez -- para que éstos ocupasen los cargos de Presidente y Presidente Alterno de la C.E.E., respetivamente.[4] Desde esa fecha, comenzó a decursar el término de quince (15) días para que ambos cuerpos legislativos consideraran los nombramientos hechos por el Gobernador. El referido término venció el 22 de septiembre de 2021 sin que la Asamblea Legislativa pasara juicio sobre los jueces nominados ante su consideración.

Ante ello, el pasado 23 de septiembre de 2021 el Senado de Puerto Rico, representado por su presidente, Hon. José L. Dalmau Santiago, instó ante el Tribunal de Primera Instancia, Sala de Recursos Extraordinarios, la demanda de epígrafe en contra del Tribunal Supremo de Puerto Rico y el Gobierno de Puerto Rico. En ésta, cuestionó la validez constitucional del Art. 3.7(3) del Código Electoral del 2020, *supra*, por considerar que éste violentaba la doctrina de separación de poderes fijada en nuestra Constitución, al concentrar el poder de nombramiento a determinados puestos ejecutivos -- y el de brindar consejo y consentimiento a los mismos --, en

---

[4] Véase, Senado Nombramientos (pr.gov) (última visita, 14 de octubre de 2021).

una sola rama de gobierno: la Judicial. Por todo ello, solicitó que se emitiera una sentencia declaratoria determinando la inconstitucionalidad de la mencionada disposición electoral, y un interdicto preliminar y permanente a los fines de que este Tribunal se abstuviera de realizar los nombramientos a los cargos de Presidente y Presidente Alterno de la C.E.E.

En igual fecha, el Senado de Puerto Rico también acudió ante nos mediante el recurso de *Certificación intrajurisdiccional*. En su escrito, peticionó que se expidiese el caso de autos toda vez que éste planteaba una controversia de derecho constitucional novel y de alto interés público.

Ante ese cuadro, -- y habiendo también recibido la posición del Procurador General en cuanto a este asunto -- el 24 de septiembre de 2021 este Tribunal notificó una *Resolución* mediante la cual certificamos el caso de marras y concedimos a las partes involucradas en el mismo hasta el viernes, 1 de octubre de 2021, para que presentaran sus respectivos alegatos. Ocasión en la cual también indicamos que intervendríamos en el presente litigio a través de la Regla de Necesidad.

Acto seguido, el Senado de Puerto Rico certificó haber notificado y emplazado a las partes demandadas, a saber, a

este Tribunal mediante su Jueza Presidenta, Hon. Maite Oronoz Rodríguez y al Estado Libre Asociado de Puerto Rico, por conducto de su Secretario de Justicia, Hon. Domingo Emanuelli Hernández. Ahora bien, cabe destacar que por esta Curia no poseer personalidad jurídica y, al Senado de Puerto Rico no haber emplazado a cada uno de sus jueces y juezas, la presente causa de acción continuó solamente en contra del gobierno de Puerto Rico.

Así las cosas, y en cumplimiento con lo ordenado, el pasado 1 de octubre de 2021 el Senado de Puerto Rico presentó su Alegato. Allí, reitera que es función compartida de los poderes políticos de gobierno la tarea de nombramiento de funcionarios de alto rango en el Poder Ejecutivo. Por lo que, insiste en que el Art. 3.7(3) del Código Electoral de 2020, *supra*, -- en la medida en que delega en un solo poder, el Judicial, la prerrogativa absoluta de nombrar y confirmar a los funcionarios que ostentarán los cargos ejecutivos de mayor jerarquía en la C.E.E. -- violenta la doctrina de separación de poderes que emana de nuestra Constitución. En consecuencia, solicita que dicha disposición legal se declare inconstitucional.

De otro lado, el Procurador General también radicó su Alegato. En síntesis, sostiene que la parte peticionaria carece de legitimación activa para instar el presente

litigio; que cualquier daño que haya sufrido el Senado de Puerto Rico es uno autoinfligido y que, en cualquier caso, del referido daño existir, es uno institucional que requiere la comparecencia de ambos cuerpos legislativos; y que el esquema de nombramiento dispuesto en el Art. 3.7(3) de Código Electoral de 2020, *supra*, que involucra este Alto Foro, no afecta la facultad de consejo y consentimiento del Senado, pues tanto el Presidente como el Presidente Alterno de la C.E.E. no son secretarios de gobierno que ameriten pasar por la aprobación de la Cámara Alta. Añade que, el sistema de pesos y contrapesos que caracteriza la separación de poderes de nuestra Constitución no se violenta con la aprobación de la disposición legal bajo estudio, toda vez que: 1) nuestra historia constitucional ha avalado que esta Curia tenga distintos roles en el contexto electoral, y 2) es constitucionalmente permisible que los tribunales nombren funcionarios gubernamentales. A tenor, solicita que se desestime la presente demanda o, en la alternativa, se declare la validez del Art. 3.7(3) del referido cuerpo legal, *supra*, así como la improcedencia del interdicto permanente solicitada por el Senado de Puerto Rico.

Por su parte, la Cámara de Represents de Puerto Rico compareció a este pleito como Amigo de la Corte. En específico, se une a la solicitud de que se declare

inconstitucional la precitada disposición legal del Código Electoral de 2020, *supra*.

En tono similar, también solicitó la intervención el Comisionado Electoral del Partido Popular Democrático (PPD), el licenciado Ramón A. Torres Cruz, y la Comisionada Electoral del Movimiento Victoria Ciudadana (MVC), la licenciada Lillian Aponte Dones, compareció como Amiga de la Corte. En apretado resumen, ambos, argumentan la inconstitucionalidad del Art. 3.7(3) del Código Electoral de 2020, *supra*, en aquello relacionado a que el nombramiento de los puestos de Presidente y Presidente Alterno de la C.E.E. recaiga únicamente en el Poder Judicial.

Por último, la Comisionada Electoral del PNP, la licenciada Vanessa Santo Domingo Cruz, también solicitó intervención y presentó sus alegatos. En esencia, ésta esboza argumentos dirigidos a sostener la constitucionalidad del estatuto en disputa.

Trabada así la controversia, y con el beneficio de la comparecencia de todas las partes en el litigio, de los interventores y de los amigos de la corte -- cuyos escritos acordamos aceptar --, atendemos el presente recurso sin trámites ulteriores. Véase, 4 LPRA AP. XXI-B, R.50. Así, y luego de un análisis detenido y cuidadoso del derecho aplicable, una mayoría de mis compañeros de estrado --

correctamente -- declaran inconstitucional la parte del Art. 3.7(3) del Código Electoral de 2020, *supra*, que dispone que el Pleno de este Tribunal deberá nombrar y confirmar, por mayoría, a los funcionarios de gobierno que ocuparán los puestos de Presidente y Presidente Alterno de la C.E.E. Con ese proceder, como ya adelantamos, estamos conforme. Ello, por entender que el *tercer mecanismo* del proceso de nombramiento a los referidos puestos, según dispuesto en el Art. 3.7 del Código Electoral de 2020, *supra*, viola -- a todas luces -- los más nobles principios de la doctrina de separación de poderes contemplada en nuestra Constitución y en la Constitución de Estados Unidos de América. Nos explicamos.[5]

## II.

## A.

Como es sabido, con la aprobación de la Constitución del Estado Libre Asociado de Puerto Rico allá para el 1952, adoptamos -- en nuestra jurisdicción -- un sistema republicano de gobierno compuesto por tres poderes distintos y separados: el Ejecutivo, el Legislativo y el Judicial. *Acevedo Vilá v. Meléndez*, 164 DPR 875, 882 (2005). Véase,

---

[5] Como cuestión de umbral, y respecto a los asuntos de índole procesal en el caso de autos, a grandes rasgos, estamos de acuerdo con lo sentenciado en la Opinión que hoy emite este Foro. Siendo ello así, en este escrito nos ceñimos a las controversias de naturaleza constitucional que nos convocan.

también, *Brau, Linares v. ELA*, 190 DPR 315, 340 (2014); *Córdova y Otros v. Cámara Representantes*, 171 DPR 789, 799 (2007); *Hernández Agosto v. López Nieves*, 114 DPR 601(1983). A esos efectos, el Art. I, Sec. 2, de nuestra ley suprema, dispone que "[e]l gobierno del Estado Libre Asociado de Puerto Rico tendrá forma republicana y sus Poderes Legislativo, Ejecutivo y Judicial, según se establecen por esta Constitución, estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico". Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1.

Al interpretar la cláusula constitucional de referencia, este Tribunal ha afirmado que de ella emana lo que en nuestro ordenamiento jurídico se conoce como la doctrina de separación de poderes, la cual responde a dos (2) importantes criterios, a saber: 1) proteger la libertad de los ciudadanos y las ciudadanas, pues el poder no se concentra en una sola rama de gobierno, y 2) salvaguardar la independencia de cada rama del gobierno, evitando que una de ellas domine o interfiera con el poder a las otras. *Acevedo Vilá v. Meléndez*, *supra*; *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 88-89 (1998); *Hernández Agosto v. López Nieves*, *supra*.[6]

---

[6] Para una discusión amplia y detenida sobre la doctrina de separación de poderes, véase, Aníbal Acevedo Vilá, *Separación de Poderes en Puerto Rico: Entre la teoría y la práctica*, 1era ed., Puerto Rico, Ed. SITUM, 2018.

Al respecto, el entonces miembro de la Asamblea Constituyente, el señor Víctor Gutiérrez Franqui, expresó que la doctrina de separación de poderes se refiere a que cada rama de gobierno debe operar en ajuste a aquellos asuntos de la organización política que le son de su incumbencia. 1 Diario de Secciones de la Convención Constituyente de Puerto Rico 591 (ed. 1961). Dicho de otro modo, la doctrina de separación de poderes descansa, precisamente, sobre la lógica del ámbito de poder que se le delegó en la Constitución a los Poderes Ejecutivo, Legislativo y Judicial. *Santana v. Gobernadora*, 165 DPR 28, 45 (2005); *Pueblo v. Santiago Feliciano*, 139 DPR 361, 420 (1995); *Hernández Agosto v. López Nieves*, *supra*, pág. 619.

Claro está, no se trata de que cada poder gubernamental tenga una independencia absoluta. Por el contrario, nuestra Constitución propende determinadas interacciones entre los tres poderes de gobierno, lo que persigue crear "un sistema de pesos y contrapesos con el propósito de generar un equilibro dinámico entre poderes coordinados y de igual rango, y evitar así que ninguno de éstos amplíe su autoridad a expensas de otro". *Misión Ind. P.R. v. J.P.*, *supra*, pág. 89. Véase, también, *Torres Montalvo v. Gobernador ELA*, *supra*; *Brau, Linares v. ELA*, *supra*; *Santana v. Gobernadora*, *supra*.

B.

Una de esas interacciones -- entre los poderes de gobierno -- en donde queda impresa, tanto la doctrina de separación de poderes, como el sistema de pesos y contrapesos, es aquella relacionada al ejercicio de nombramiento de los principales puestos ejecutivos del País. Cónsono con ello, el Art. IV, Sec. 4, de la Constitución del Estado Libre Asociado de Puerto Rico, le reserva al Gobernador -- expresa y exclusivamente -- el poder de nombramiento "en la forma que se disponga en esta constitución o por ley, a todos los funcionarios para cuyo nombramiento esté facultado". Art. IV, Sec. 4, Const. ELA, LPRA, Tomo 1. Véase, también, *Torres Montalvo v. Gobernador ELA*, *supra*; *Hernández Agosto v. López Nieves*, *supra*, pág. 621; *Hernández Agosto v. Romero Barceló*, 122 DPR 407, 419-420 (1982). Ahora bien, según se contempla en nuestra Carta Magna, dichos nombramientos deberán contar con el "consejo y consentimiento del Senado". Art. IV, Sec. 5, Const. ELA, LPRA, Tomo 1. Véase, también, *Hernández Agosto v. López Nieves*, *supra*, pág. 621; *Hernández Agosto v. Romero Barceló*, *supra*, pág. 419-420.[7]

---

[7] Sobre este particular, nos explica el profesor William Vázquez que las facultades y deberes del Gobernador no fueron materia de mayores discusiones en la Convención Constituyente, sino que el consenso fue amplio respecto "al rol central que tendría el Gobernador como cabeza de la rama ejecutiva y director de todos sus componentes". W. Vázquez

Obsérvese, pues, que la facultad -- y poder -- del Gobernador de nombrar determinados puestos ejecutivos queda necesariamente equilibrada en la medida en que, para que ello se concretice, éste necesita el consejo y consentimiento del Senado de Puerto Rico y, en ocasiones, de la Cámara de Representantes de Puerto Rico.[8] **Esta ecuación constitucional, que le impone al Ejecutivo el poder de nombrar con la anuencia de la Cámara Alta de la Asamblea Legislativa -- entiéndase el Senado --, es reflejo de la doctrina de separación de poderes, e integra un sistema de pesos y contrapesos que, como mencionamos, "sirve para evitar la concentración de autoridad en una sola rama, a la vez que le infunde un espíritu democrático al proceso de nombramientos, en la medida en que son las ramas políticas elegidas por el Pueblo**

---

Irizarry, *Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutiva*, 76 REV. JUR. UPR 951, 986 (2007).

[8] En cuanto a esto último, precisa señalar aquí que, las instancias en donde la Cámara Baja (entiéndase, la Cámara de Representantes de Puerto Rico) interviene en los procesos de nombramiento están expresamente dispuestas en nuestra Constitución. Véase, por ejemplo, Art. III, Sec. 22, Const. ELA, LPRA, Tomo 1; Art. IV., Sec. 5, Const. ELA, LPRA, Tomo 1. En ese sentido, y por igual, somos conscientes de que existe un número considerable de leyes que diluyen el poder de consejo y consentimiento del Senado -- entre ellas, la ley bajo estudio --, las cuales su constitucionalidad podría ser cuestionada en su día. Véase, A. Acevedo Vilá, *op. cit.*, págs. 124-133 (comentando los procesos de nombramiento establecidos en: la *Ley del Banco Gubernamental de Fomento para Puerto Rico*, Ley Núm. 17 de 23 de septiembre de 19487 LPRA sec. 552; *Ley de la Oficina del Panel sobre el Fiscal Especial Independiente*, Ley Núm. 2 de 23 de febrero de 1988, 3 LPRA sec. 99h-99aa; *Ley de Ética Gubernamental de Puerto Rico de 2011*, Ley Núm. 1 de 3 de enero de 2012, 3 LPRA sec. 1855a; entre otras).

**las que, trabajando interdependientemente, comparten esa obligación constitucional".** (Énfasis suplido). *Torres Montalvo v. Gobernador ELA*, 194 DPR 760, 770 (2016).[9]

Como se puede apreciar, lo anterior también es cónsono con la cláusula constitucional que establece que el Poder Legislativo "tendrá facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones". Art. IV, Sec. 4, Const. ELA, LPRA, Tomo 1. Sobre este particular, advierte el profesor José J. Álvarez González que el precepto constitucional antes citado, "no puede extenderse a la nominación de candidatos ni, mucho menos, a su nombramiento". José J. Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estado Unidos*, 1era ed., Bogotá, Ed. TEMIS, 2009, pág. 309. En ese sentido, quedó claro que la función del Senado y, en contadas ocasiones, de la Cámara de

---

[9] En palabras del entonces Juez Presidente de este Tribunal, don José Trías Monge:

> **La doctrina de separación de poderes y el sistema democrático mismo de gobierno presuponen, en lo que atañe a las facultades compartidas como es la de nombramiento, la búsqueda del consenso, el logro del equilibrio necesario para realizar las tareas del gobierno.** En lo que atañe a nombramientos, la Rama Ejecutiva no puede despojar a la Rama Legislativa del poder de confirmación que le confieren la Constitución y las leyes. Tampoco puede el Senado o la Rama Legislativa usurpar el poder de nominación del señor Gobernador […]. (Énfasis nuestro). *Hernández Agosto v. López Nieves*, *supra*, pág. 620.

Representantes de Puerto Rico, en lo relativo a nombramientos es, exclusivamente, la de brindar consejo y consentimiento a tales designaciones.

De otra parte, tras una lectura detenida y desapasionada de nuestra Constitución, notamos que -- dentro de esta interacción entre los tres poderes de gobierno -- las facultades delegadas al Poder Judicial se centran más bien en la administración del sistema de justicia del País, y en la adjudicación de casos y controversias en donde éste fungirá como "último intérprete de la Constitución y de las leyes". *Acevedo Vilá v. Meléndez*, *supra*, pág. 883. Véase, también, Art. V., Const. ELA, LPRA, Tomo 1. De ahí que, la responsabilidad de asegurar la perdurabilidad de las dinámicas entre los Poderes Ejecutivo y Legislativo recaiga en el Poder Judicial, al intervenir con prudencia y deferencia para aclarar los contornos de los preceptos constitucionales y facilitar la resolución de diferencias entre éstos. *Íd*.

Recuérdese que "nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos". *Silva v. Hernández Agosto*, 118 DPR 45, 55 (1986). Por eso, bajo este "sistema de gobierno[,] los tribunales deben mantenerse dentro de los ámbitos de la función judicial, estándole vedado

incursionarse [tanto] en la esfera legislativa" como en la ejecutiva. *Noriega v. Hernández Colón*, 135 DPR 406, 468 (1994).

C.

Lo anterior no podría ser distinto, pues, tal y como ha manifestado esta Curia en innumerables ocasiones, las doctrinas constitucionales referentes al proceso de nombramiento por parte del Poder Ejecutivo, y de consejo y consentimiento a través del Poder Legislativo, "se apoyan en [los] textos norteamericanos", por lo que éstos nos sirven de guía; sin perjuicio, claro está, de que ello necesariamente rija el significado de los nuestros. *Hernández Agosto v. López Nieves*, *supra*, pág. 612; *Hernández Agosto v. Romero Barceló*, *supra*, págs. 421-422 (citando al delegado Gutiérrez Franqui, 3 Diario de Sesiones de la Convención Constituyente 2270 (ed. 1961)). Convirtiéndose, así, en una excelente herramienta de trabajo en nuestro ejercicio de interpretación.

En ese ejercicio, nos recuerda don José Trías Monge que en la Constitución de los Estados Unidos -- similar a como ocurre en nuestro País --, se acordó evitar la concentración de poder "al dividir la facultad de nombramiento entre la Rama Ejecutiva y la Legislativa, estructurando un delicado sistema de pesos y contrapesos entre los dos poderes". *Íd.*,

pág. 617.[10] A tenor con ello, el Art. II, Sec. 2, de la Constitución de Estados Unidos dispone que el Presidente tendrá el poder de nominar los principales funcionarios de gobierno, mediando el consejo y consentimiento del Senado. Art. II, Sec. 2, Const. EE.UU., LPRA, Tomo 1. En lo pertinente, la referida cláusula constitucional establece que:

> El Presidente [podrá nombrar] con el consejo y consentimiento del Senado, […] todos los demás funcionarios de los Estados Unidos cuyos cargos se establezcan por ley y cuyos nombramientos esta Constitución no prescriba. Pero el Congreso podrá por ley, confiar el nombramiento de aquellos funcionarios subalternos que creyere prudente, al presidente únicamente, a los tribunales de justicia o a los jefes de departamentos. *Íd*.[11]

Al enfrentarse al aludido precepto constitucional, hace ya varias décadas, la Alta Curia federal reiteró que el esquema constitucional de separación de poderes, así como el sistema de pesos y contrapesos, están inmersos en la

---

[10] Para una discusión pausada sobre el proceso de redacción e intercambio de los Padres de la Constitución de los Estados Unidos sobre la cláusula de nombramiento, véase, *Hernández Agosto v. López Nieves*, *supra*, págs. 617-618.

[11] [The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments. *Íd.*

precitada cláusula de nombramiento. Al respecto, el Máximo

Foro Judicial federal señaló que:

> [T]he Appointments Clause of Article II is more than a matter of "etiquette or protocol"; it is among the significant structural safeguards of the constitutional scheme. By vesting the President with the exclusive power to select the principal (noninferior) officers of the United States, the Appointments Clause prevents congressional encroachment upon the Executive and Judicial Branches. […] This disposition was also designed to assure a higher quality of appointments: The Framers anticipated that the President would be less vulnerable to interest-group pressure and personal favoritism than would a collective body. "The sole and undivided responsibility of one man will naturally beget a livelier sense of duty, and a more exact regard to reputation." The Federalist No. 76, p. 387 (M. Beloff ed. 1987) (A. Hamilton); accord, 3 J. Story, Commentaries on the Constitution of the United States 374-375 (1833). The President's power to select principal officers of the United States was not left unguarded, however, as Article II further requires the "Advice and Consent of the Senate." This serves both to curb Executive abuses of the appointment power […], and "to promote a judicious choice of [persons] for filling the offices of the union," The Federalist No. 76, at 386-387. By requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one. Hamilton observed:
>
> > The blame of a bad nomination would fall upon the president singly and absolutely. The censure of rejecting a good one would lie entirely at the door of the senate; aggravated by the consideration of their having counteracted the good intentions of the executive. If an ill appointment should be made, the executive for nominating, and the senate for approving, would

> participate, though in different degrees, in the opprobrium and disgrace. (Énfasis nuestro). *Íd. Edmond v. United States*, 520 U.S. 651, 650-660 (1997) (citando, The Federalist No. 77, pág. 392).

Es decir, y según se desprende de la anterior cita, para el Tribunal Supremo de los Estados Unidos, la cláusula de nombramiento federal es mucho más que un asunto de protocolos. Ello, pues, ésta disposición constitucional encierra una estructura de salvaguardas que -- al igual que otros esquemas constitucionales -- aseguran la rendición de cuentas de los distintos poderes políticos de gobierno que, como en este caso, tienen la tarea compartida de aprobar o rechazar la persona a ocupar el cargo de un *Oficial Principal*.

**En esa dirección, del precitado texto jurisprudencial también se desprende que el Máximo Foro Judicial federal, de cierta manera, limitó el alcance de lo dispuesto en la cláusula de nombramiento, solo a aquellos escenarios en que se trate de *Oficiales Principales* (*Officers of the United States*), no así de *Oficiales Inferiores* (*Inferior Officers*).** *Morrison v. Olson*, 487 US 654 (1988); *Buckley v. Valeo*, 424 US 1 (1976); *US v. Germaine*, 99 US 508 (1879). Véase, también, A. Acevedo Vilá, *Separación de Poderes en Puerto Rico: Entre la teoría y la práctica*, 1era ed., Puerto Rico, Ed. SITUM,

2018, págs. 112- 113. **Entendiéndose por *Oficiales Principales* aquellos que ejercen *autoridad significativa* del gobierno, por lo cual no se le pueden añadir requisitos adicionales de confirmación a los ya establecidos en la Constitución.** *Buckley v. Valeo*, 424 U.S. 1, 125-126 (1976);[12] *United States v. Arthrex*, Inc., 141 S.Ct. 1970 (2021).

Por otro lado, el Tribunal Supremo de los Estados Unidos ha determinado que un oficial es *inferior* si éste tiene un superior adicional al Presidente. *Edmond v. United States*, *supra.* Dicho de otro modo, un *Oficial Inferior*, para efectos

---

[12] Desde *Buckley v. Valeo*, 424 U.S. 1 (1976), la Alta Curia federal consideró que:

> the term "Officers of the United States" as used in Art. II, defined to include "all persons who can be said to **hold an office under the government**" […], is a term intended to have substantive meaning. We think its fair import is that any appointee **exercising significant authority** pursuant to the laws of the United States is an "Officer of the United States," and must, therefore, be appointed in the manner prescribed by s 2, cl. 2, of that Article. (Énfasis nuestro). *Íd.*, pág. 125-126. Véase, también, A. Acevedo Vilá, *op cit.*, pág. 124.

En este caso se cuestionó el método de nombramiento de los miembros de cierta Comisión Federal de Elecciones. Según la ley orgánica de ésta última, dos (2) miembros debían ser nombrados por el Senado; dos (2) miembros por la Cámara; y dos (2) miembros por el Presidente. Todos los nombrados debían ser confirmados por el Senado y la Cámara de Representantes. Al estudiar la controversia, el Máximo Foro Judicial federal determinó que éstos miembros eran *Oficiales Principales*. Por tanto, su nominación y confirmación debían adherirse a la cláusula de nombramiento. Es decir, no podía la ley en cuestión delegar al Congreso el nominar miembros a la Comisión de referencia. Tampoco podía requerir el consejo y consentimiento de la Cámara de Representantes. Bajo esos fundamentos, el Tribunal Supremo federal declaró inconstitucional este esquema de nominación y de consejo y consentimiento. Así, resolvió que el esquema bajo estudio violaba la doctrina de separación de poderes, en la medida en que la Rama Legislativa usurpaba y limitaba poderes de la Rama Ejecutiva.

de la cláusula de nombramiento federal, es aquel que está dirigido y/o supervisado "by others who were appointed by Presidential nomination with the advice and consent of the Senate." *United States v. Arthrex*, Inc., *supra*, (citando a *Edmond v. United States*, *supra*).[13]

En fin, y como hemos podido apreciar, de lo antes esbozado puede colegirse que la cláusula de nombramiento federal contempla un ejercicio compartido entre el Poder Ejecutivo y el Legislativo, el cual se extiende a los puestos de los oficiales o funcionarios principales, toda vez que éstos ejercen una autoridad significativa de gobierno. En consecuencia, y por nuestra cláusula de nombramiento tener su origen en la federal, tales principios deben servirnos de guía en nuestra jurisdicción.[14]

III.

Por último, y para la correcta disposición de los asuntos ante nuestra consideración, es menester realizar aquí un breve análisis histórico de los distintos estatutos electorales -- particularmente en lo relacionado al proceso

---

[13] Véase, por ejemplo, *Freytag v. CIR*, 501 US 868 (1991), caso mediante el cual la Alta Curia federal validó el poder de la Rama Judicial federal para nombrar *Oficiales Inferiores*, tales como un *special trial judge* en los tribunales de impuestos (*Tax Courts*).

[14] Así lo señaló hace décadas el entonces Secretario de Justicia de Puerto Rico al opinar que la autoridad de nombrar conferida en nuestra Constitución al Gobernador es, en efecto, análoga a la delegada en la Constitución federal al Presidente. Op. Sec. Just. Núm. 3-1985, págs. 3-4.

de nombramiento del Presidente o Presidente Alterno -- que, por décadas, han regulado la agencia gubernamental que hoy conocemos como la Comisión Estatal de Elecciones. Entidad que, como sabemos, ha sido la custodia del derecho al voto sobre el cual descansa la democracia y, con ello, la libertad de un Pueblo. Véase, por ejemplo, Art. 3.1 del Código Electoral de 2020, 16 LPRA sec. 4511.

En esa línea, conviene comenzar señalando que, a principios del Siglo XX, se aprobó en nuestra jurisdicción la Ley Núm. 79 de 25 de junio de 1919, conocida como la *Ley Electoral*, según enmendada, 16 LPRA sec. 1 *et seq.* (ed. 1955). Con ella, se estableció en el País la *Junta Insular de Elecciones* compuesta por un Superintendente General de Elecciones, como Presidente, el cual era "designado por el Gobernador, con el consejo y consentimiento del Senado de Puerto Rico", además, de un miembro propietario y un miembro sustituto en representación de cada uno de los partidos principales, los cuales también eran nombrados por el Gobernador "a petición del organismo mismo directivo central de dichos partidos". 16 LPRA sec. 1 (ed. 1955). Véase, también, *Rivera Lacourt v. J.E.E.*, 100 DPR 1039 (1972); *Archilla v. Tugwell, Gobernador*, 63 DPR 413 (1944); *Partido Socialista v. Towner*, 35 DPR 187 (1926). Si surgía una vacante en el puesto del Superintendente General, la misma

debía ser ocupada interinamente por el Funcionario Ejecutivo II. 16 LPRA sec. 2 (ed. 1955).

Vale la pena aclarar que, eventualmente, el nombre del organismo a cargo de los comicios electorales que se celebraban en la Isla se sustituyó por *Junta Estatal de Elecciones*. Véase, Ley Núm. 9 de 5 de mayo de 1953 (derogada). Para ese entonces, la *Ley Electoral*, *supra*, no requería que el Superintendente General fuera juez, aunque, en el 1955 -- mediante enmienda a la legislación de referencia -- sí se reconoció la posibilidad de que éste fuera juez del Tribunal Superior. 16 LPRA sec. 1 (ed. 1961). Véase, también, Ley Núm. 56 de 10 de junio de 1955 (derogada).

Posteriormente, se aprobó la Ley Núm. 1 de 13 de febrero de 1974, conocida como el *Código Electoral de Puerto Rico*, a los fines de derogar la *Ley Electoral*, *supra*, y establecer un *Tribunal Electoral de Puerto Rico*. 16 LPRA sec. 2001 *et seq.* (Supl. 1975). Dicho foro estaría compuesto por un (1) Presidente y dos (2) miembros asociados nombrados por el Gobernador de Puerto Rico, con el consejo y consentimiento del Senado y de la Cámara de Representantes.[15] 16 LPRA sec.

---

[15] Es de interés señalar que, un año antes de la aprobación del *Código Electoral de Puerto Rico* de 1974, *supra*, el Secretario de Justicia para ese entonces emitió una opinión en donde resolvía que, en ausencia de limitaciones de carácter constitucional -- a su modo de ver -- no existía impedimento para que se aprobase una ley que dispusiera que los miembros de la *Junta Estatal de Elecciones* serían nombrados por el Gobernador con

2021 (Supl. 1975). El *Tribunal Electoral*, entre otras tareas, tenía a su cargo la organización, dirección y supervisión de todos los procedimientos relacionados con las elecciones. 16 LPRA ant. sec. 2027 (Supl. 1975).

A su vez, toda persona miembro del mencionado foro debía estar admitido al ejercicio de la abogacía en Puerto Rico, por lo menos, cinco (5) años antes de su nombramiento. 16 LPRA sec. 2023 (Supl. 1975). En caso de ausencia temporal del Presidente del *Tribunal Electoral*, el miembro nombrado por el término mayor o el de mayor antigüedad le sustituiría hasta que cesara la vacante o fuera ocupada. 16 LPRA sec. 2021 (Supl. 1975). Con el *Código Electoral de Puerto Rico* de 1974, *supra*, también se creó una *Junta Consultiva* compuesta por exjueces del Tribunal Supremo de Puerto Rico "quienes [debían] recomendar, por acuerdo de dos terceras partes de sus miembros, al Gobernador del Estado Libre Asociado de Puerto Rico, los nombres de por al menos diez (10) personas para los cargos de miembros del Tribunal Electoral". 16 LPRA sec. 2024 (Supl. 1975). El Gobernador podía luego elegir entre los recomendados por esta Junta Consultiva u otros. *Íd.*

---

el consejo y consentimiento de *ambas* cámaras legislativas. Véase, Op. Sec. Just. Núm. 35 de 1973.

Sin embargo, la vigencia del *Código Electoral de Puerto Rico* de 1974 y su *Tribunal Electoral* escasamente duraron un cuatrienio, pues fue el 20 de diciembre de 1977 la fecha en la que entró en vigor la Ley Núm. 4, conocida como la *Ley Electoral de Puerto Rico*, 16 LPRA sec. 3001 *et seq.* (Supl. 1980). Según se desprende del historial legislativo de la ley de referencia, su aprobación respondió a cierto malestar entre los partidos políticos por la ausencia de éstos en la estructura operacional que se había diseñado en el *Código Electoral de Puerto Rico* de 1974, *supra*, a saber, el *Tribunal Electoral*.[16]

Con ello, la *Ley Electoral de Puerto Rico* de 1977, *supra*, creó lo que hoy conocemos como la *Comisión Estatal de Elecciones*, la cual estaría integrada por un Administrador General de Elecciones, el cual sería su Presidente, y un Comisionado Electoral en representación de cada uno de los

---

[16] Con relación a este particular, el Senado Puerto Rico para esa fecha señaló lo siguiente:

> Con la aprobación de la vigente Ley Electoral en el año 1974, se echó a un lado nuestro sistema político contencioso y se le sustituyó por uno jurídico contencioso, totalmente ajeno a nuestra tradición electoral y política. El sistema que implantó el Código Electoral de 1974 privó a los partidos políticos de participar efectivamente en el proceso electoral, al dejar de garantizarle su representación en el Tribunal Electoral que entonces se creó. Informe Positivo sobre P. de la C. 446, Comisión de Gobierno, Senado de Puerto Rico, 7 de diciembre de 1977, 2da Sesión Extraordinaria, 8va Asamblea Legislativa, pág. 15.

partidos políticos principales; devolviéndole, a estos últimos, la administración de dicho organismo electoral. *Íd*., pág. 10. Véase, también, 16 LPRA sec. 3004 (Supl. 1980). El Administrador General era, igualmente, "nombrado por el Gobernador de Puerto Rico, con el consejo y consentimiento de una mayoría de los miembros que componen cada Cámara de la Asamblea Legislativa, por un término de diez (10) años y hasta que su sucesor [fuera] nombrado y [tomara] posesión del cargo". 16 LPRA sec. 3005 (Supl. 1980).

Un tanto similar a su antecesora, la *Ley Electoral de Puerto Rico* de 1977, *supra*, creó dos (2) *Juntas Consultivas de Nombramientos* a los efectos de que estas sometieran o presentaran al Gobernador una lista de personas para los cargos de Administrador General y los miembros de cierta Junta Revisora Electoral. 16 LPRA sec. 3032 (Supl. 1980). La primera junta estaba integrada por exjueces del Tribunal Supremo de Puerto Rico, mientras que la segunda estaba compuesta por los Comisionados Electorales. *Íd*. Las recomendaciones de ambas Juntas debían ser unánimes y el Gobernador *podía* nominar de entre los nombres referidos por éstas. *Íd*. Si las *Juntas Consultivas de Nombramientos* no sometían nombres, el Gobernador podía nombrar sin sujeción al procedimiento previamente dispuesto. *Íd*.

En cuanto a la gestión de estas *Juntas Consultivas de Nombramiento*, y según surge del trámite legislativo, es menester mencionar que los legisladores consideraron novel permitir la participación de los partidos políticos -- a través de sus Comisionados Electorales --, en el proceso de nombramiento de los funcionarios de mayor jerarquía en la estructura electoral. Véase, Informe Positivo sobre P. de la C. 446, *supra*, pág. 22. No obstante, señalaron que "**la responsabilidad final de efectuar estos nombramientos correspond[ía] al Gobernador de Puerto Rico**". *Íd*. Sobre el particular, el exgobernador Rafael Hernández Colón ilustró a las Comisiones Legislativas expresando que la prerrogativa de nombrar a estos funcionarios, en efecto, era "facultad inherente" del Poder Ejecutivo, el cual no podía limitarse mediante legislación. *Íd*.

Asimismo, en la aludida pieza legislativa, se consignó que el Administrador General devengaría un sueldo anual "equivalente al de un Secretario de los Departamentos Ejecutivos del Gobierno". 16 LPRA sec. 3005 (Supl. 1980). De ésta ley, no surge que el referido puesto ejecutivo debía ser ocupado por un juez o abogado admitido al ejercicio de la profesión en Puerto Rico. *Íd*.

Ahora bien, para inicio de la década de 1980 la *Ley Electoral de Puerto Rico* de 1977, *supra*, sufrió varias

enmiendas sustanciales. En particular, se eliminaron las *Juntas Consultivas de Nombramientos* y, por primera vez, se depositó -- exclusivamente -- en los Comisionados Electorales la tarea de nombrar los funcionarios con autoridad máxima en la estructura electoral del País. Véase, Ley Núm. 3 de 10 de enero de 1983 (derogada).

Con ese proceder, se le eliminó al Gobernador la prerrogativa de nominar al Presidente de la C.E.E., reduciendo de esta forma, a un segundo plano, el histórico poder de nombramiento delegado al Poder Ejecutivo, con el consejo y consentimiento de la Asamblea Legislativa. *Íd*. Se estableció, sin embargo, que a raíz de una vacante en el cargo del Presidente, y en caso que los Comisionados Electorales no seleccionasen un Presidente en un término de treinta (30) días, entonces sería el Gobernador quien tendría un nuevo término de treinta (30) días para designar a la persona que ocuparía dicho cargo, con el consejo y consentimiento de tres cuartas (3/4) partes de los miembros que componen cada Cámara Legislativa. *Íd*.

De un examen cuidadoso del historial legislativo de la Ley Núm. 3 de 10 de enero de 1983 (derogada) -- la cual, como ya mencionamos, dio paso a las mencionadas enmiendas --, surge que éstas modificaciones fueron preparadas a la luz del *Informe para la Revisión de Proceso Electoral de Puerto*

*Rico de 1983,* creado al amparo de la *Resolución Conjunta* Núm. 21 de 21 de julio de 1981. Véase, Informe Positivo sobre P. del S. 719, Comisión de Gobierno, Jurídico Civil y Jurídico Penal, Senado de Puerto Rico, 9 de diciembre de 1982, 5ta Sesión Extraordinaria, 9na Asamblea Legislativa, pág. 1. Entre los propósitos fundamentales para la creación de la referida Comisión revisora, se encontraba el de proveer una propuesta para el proceso de nombramiento de los principales funcionarios electorales. *Íd.,* pág. 2. La recomendación emitida por dicha Comisión, y acogida por la Asamblea Legislativa, fue que los Comisionados Electorales fueran quienes, mediante votación unánime, nombraran el Presidente y el Presidente Alterno de la C.E.E. *Íd.,* págs. 6-7. No obstante, ni del *Informe* emitido por la Comisión revisora ni del *Informe Positivo* sobre P. del S. 719, *supra*, surge discusión alguna referente al alcance constitucional de este tipo de nombramiento. Asunto que tampoco se impugnó en los tribunales.

Fue, pues, ese el ordenamiento electoral que perduró por años. Tanto así que, tras la aprobación de la Ley Núm. 78 de 1 de junio de 2011, conocida como el *Código Electoral del Siglo XXI*, 16 LPRA sec. 4001 *et seq.* (ed. 2012), el mecanismo de nombramiento a los puestos de Presidente y Presidente Alterno de la C.E.E. antes descrito, se mantuvo

inalterado. A tenor con ello, el Art. 3.007 del *Código*

*Electoral del Siglo XXI*, rezaba de la siguiente manera:

> Los(as) Comisionados(as) Electorales nombrarán un Presidente y un Alterno al Presidente, conforme a esta Ley, quienes actuarán como representantes del interés público en la Comisión. Se requerirá la participación de todos los(as) Comisionados(as) Electorales y el voto unánime de éstos para hacer los nombramientos de los cargos de Presidente, Alterno al Presidente y Vicepresidentes.
>
> […]
>
> Corresponderá al Comisionado Electoral del partido principal de mayoría cuyo candidato a Gobernador hubiere obtenido el mayor número de votos en la elección inmediatamente precedente, proponer a los restantes Comisionados el o los nombres de los candidatos a los cargos de Presidente y de Alterno al Presidente. 16 LPRA sec. 4017 (ed. 2012).

Por igual, se contemplaba que si el nombramiento del

Presidente recayera sobre una persona que estuviera ocupando

un cargo de juez o jueza en el Tribunal General de Justicia

de Puerto Rico, tal designación conllevaría el relevo

absoluto del correspondiente cargo judicial. *Íd*.

Empero, y como adelantamos, el pasado año entró en vigor

el Código Electoral de 2020, *supra*, el cual alteró -- en

extremo -- el proceso mediante el cual históricamente se

nombraba el puesto a Presidente y Presidente Alterno de la

C.E.E., o sus análogos. **Sin ánimo de repetirnos, el proceso**

**para nombrar los mencionados puestos ejecutivos ahora está**

**compuesto por tres (3) mecanismos desglosados en el Art.**

**3.7(3) del referido cuerpo legal, *supra*. De los cuales los primeros dos -- por el voto unánime de los Comisionados Electorales o tras el proceso de nominación del Gobernador con la anuencia de *ambas* cámaras legislativas --, son una suma de los mecanismos dispuestos en los distintos estatutos electorales, mientras que el tercero, se impone como uno novel y sin precedente. Lo anterior, toda vez que este último transfiere al Poder Judicial tanto el poder de nominar como el de brindar consejo y consentimiento para el nombramiento de los principales ejecutivos de la C.E.E.**[17]**

Además, e igualmente novel, desde que se inicie el proceso de nombramiento dispuesto en el mencionado artículo, tanto el Comisionado Electoral del Partido Estatal de Mayoría, el Gobernador o el Pleno de esta Curia, según corresponda, solo podrá nominar a aquella persona o personas que cumplan con los siguientes requisitos: 1) mayoría de

---

[17] Del trámite legislativo del Código Electoral de 2020, *supra*, surge que la **versión original del P. del S. 1314 proponía que el proceso de nombramiento del Presidente y Presidente Alterno de la C.E.E. se realizaría, únicamente, mediante el voto de la mayoría del Pleno de este Tribunal.** Dicho nombramiento debía hacerlo esta Curia, luego de elegir un juez o jueza en funciones dentro de la Rama Judicial. No obstante, ello se modificó tras el revuelo que causó dicho mecanismo, lo cual se recoge en los informes positivos que presentaron ambos cuerpos legislativos. Véase, Informe Positivo sobre el P. del S. 1314, Comisión Especial para la Evaluación del Sistema Electoral de Puerto Rico, Senado de Puerto Rico, 13 de noviembre de 2019, 6ta Sesión Ordinaria, 18va Asamblea Legislativa, págs. 4-5, 7, 9, 13, 21, 23-29; Informe Positivo sobre el P. del S. 1314, Comisión de Gobierno, Cámara de Representantes de Puerto Rico, 6ta Sesión Ordinaria, 18va Asamblea Legislativa, págs. 12, 14-19, 28-30, 43, 50-51, 59, 64.

edad; 2) sea juez o jueza del Tribunal de Primera Instancia del Tribunal General de Justicia; 3) esté domiciliado en Puerto Rico a la fecha de su nombramiento; 4) sea un elector o electora calificado, 5) de reconocida capacidad profesional; 6) tenga probidad moral; y 7) posea conocimiento en los asuntos de naturaleza electoral. Véase, Art. 3.7(4) del Código Electoral de 2020, *supra*. **A su vez, también se dispone que el designado Presidente -- y en ausencia de éste, el Presidente Alterno – "<u>será la máxima autoridad ejecutiva y administrativa</u>" de la C.E.E., por lo que es responsable de supervisar los servicios, procesos y eventos electorales en el País**. Véase, Arts. 3.7(4) y 3.8 del Código Electoral de 2020, 16 LPRA secs. 4517-4518.

Asimismo, el Art. 3.9 del Código Electoral de 2020, 16 LPRA sec. 4519, establece la forma mediante la cual el Presidente o Presidente Alterno de la C.E.E. podrá ser destituido. En lo que nos concierne, el precitado artículo dispone que, una vez se presente una querella en contra de uno de éstos dos funcionarios ante el Secretario de la Comisión, con alguna o varias de las causas de destitución allí enumeradas, la misma "será referida y atendida por un panel de tres (3) jueces del Tribunal de Apelaciones, designados por el pleno del Tribunal Supremo de Puerto Rico". *Íd*. La determinación que emita dicho panel podrá ser revisado

judicialmente al amparo del proceso establecido en el Capítulo XIII del Código Electoral de 2020, *supra*. Véase, por ejemplo, el Art. 13.3. (*Revisiones en el Tribunal de Apelaciones y el Tribunal Supremo*) del Código Electoral de 2020, 16 LPRA sec.4843.

Por último, es necesario mencionar que el Código Electoral de 2020, *supra*, deja meridianamente claro que la C.E.E es una agencia pública. Por ello, y aunque con determinada autonomía o grado de relación con respecto a la figura del Gobernador, ésta entidad gubernamental forma parte del Poder Ejecutivo. Véase, W. Vázquez Irizarry, *op. cit.*, págs. 992-993.

En resumen, de un análisis histórico de las distintas disposiciones electorales relacionadas al proceso de nombramiento de los funcionarios de mayor jerarquía en la principal agencia electoral del País, queda claro que -- por primera vez en nuestra historia constitucional -- mediante legislación se pretende dejar en manos de ésta rama de gobierno, entiéndase el Poder Judicial, la facultad para nombrar, y brindar consejo y consentimiento, a las personas llamadas a ocupar dichos puestos. Rama de gobierno que, en el caso de una revisión judicial de la suspensión del Presidente o Presidente Alterno de la C.E.E., también podrá intervenir para adjudicar si la persona o personas que nombró

deben ser o no destituidas de dichos puestos. **Sobre esa concentración de poder -- nominar, brindar consejo y consentimiento, y destituir -- en un solo poder de gobierno es que, precisamente, trata el caso de marras.**

Es, pues, a la luz de la normativa antes esbozada que procedía -- y una mayoría de este Tribunal así lo hizo -- disponer de la controversia ante nuestra consideración.

IV.

Conforme mencionamos al inicio de este escrito, en el presente caso el Senado de Puerto Rico, representado por su presidente, Hon. José L. Dalmau Santiago, señala que cierta disposición del inciso 3 del Art. 3.7 del Código Electoral de 2020, *supra*, es inconstitucional. A su modo de ver, las facultades que allí se le delegan al Poder Judicial -- la de nominar y brindar consejo y consentimiento al nuevo Presidente y Presidente Alterno de la C.E.E. --, violenta la doctrina de separación de poderes consagrada tanto en la Constitución del Estado Libre Asociado de Puerto Rico como en la Constitución de los Estados Unidos de América. Le asiste la razón.

Y es que, como quedó claramente demostrado a lo largo de este escrito, nuestra Constitución -- y en igual dirección, la Constitución de los Estados Unidos de América, que es de donde proviene nuestra cláusula de nombramiento -

- no guarda silencio en lo que a nominación de los principales puestos ejecutivos respecta, sino que de forma diáfana dispone que será el Gobernador quien tendrá el poder de nombrar, con el consejo y consentimiento del Senado y, en contadas ocasiones, con el de la Cámara de Representantes. **Es decir, y en lo relacionado al caso de marras, el sistema democrático de gobierno que impera en nuestro País exige que los poderes políticos -- a saber, el Ejecutivo junto con la anuencia del Poder Legislativo -- sean los encargados de realizar los nombramientos de los funcionarios que serán la máxima autoridad ejecutiva y administrativa de la C.E.E., como lo es su Presidente y Presidente Alterno.** Concentrar tales facultades en una sola rama de gobierno, el Poder Judicial, como aquí se pretendió hacer, chocaría con la doctrina de separación de poderes y diluiría el delicado equilibrio que procura el sistema de pesos y contrapesos inmerso en nuestra Constitución y en la federal.

Ante esa realidad, reiteramos que el "[e]l hecho de que la falta de dirección en un departamento del gobierno pued[a] resultar altamente perjudicial para el [P]aís, no es sino razón para el ejercicio responsable de los deberes que la Constitución impone a los poderes políticos con relación a estos nombramientos". *Hernández Agosto v. López Nieves*, *supra*, pág. 622. En consecuencia, al Pleno de este Tribunal

le está vedado suplir las insuficiencias manifestadas por las ramas políticas de gobierno. Por eso, el *tercer mecanismo* de nombramiento dispuesto en el Art. 3.7(3) del Código Electoral de 2020, *supra*, es inconstitucional.

**Establecida la inconstitucionalidad de la disposición legislativa objeto del presente litigio, urge que los poderes políticos se sienten a explorar aquellas alternativas que gocen de un consenso de País para atender lo relacionado a los nombramientos del nuevo Presidente y Presidente Alterno de la C.E.E., institución que al final del día está en precario y en serios cuestionamientos, como nunca antes en su historia.**

V.

Es, pues, por todo la anterior que estamos conforme con el curso de acción seguido hoy por una mayoría de esta Curia.

Ángel Colón Pérez<br>Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Senado de Puerto Rico, representado por su Presidente, Hon. José Luis Dalmau Santiago<br><br>Peticionario<br><br>v.<br><br>Tribunal Supremo de Puerto Rico, por conducto de su Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez; Gobierno de Puerto Rico, por conducto de su Secretario de Justicia, Hon. Domingo Emanuelli Hernández<br><br>Recurridos | CT-2021-0012 | |

Opinión Disidente emitida por el Juez Asociado señor Kolthoff Caraballo a la cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Rivera García

En San Juan, Puerto Rico, a 15 de octubre de 2021.

> Cuando se cuestione la validez de una ley, aun cuando se suscite una duda seria sobre su constitucionalidad, el tribunal primero decidirá si hay una interpretación razonable que permita soslayar la cuestión constitucional. Brau Linares v. ELA, *et als*, 190 DPR 315, 337 (2014) (citando a ELA v. Aguayo, 80 DPR 552, 596 (1958)).

Sobre la hoy declarada inconstitucionalidad de la disposición que facultaba la intervención del Tribunal Supremo en el proceso del nombramiento del Presidente de la Comisión Estatal de Elecciones (CEE) y su alterno, muy

respetuosamente, me veo obligado a disentir de la Opinión de la mayoría. Tras un análisis concienzudo del derecho aplicable y luego de una reflexión honesta de la controversia ante nuestra consideración, no logro discernir la alegada inconstitucionalidad del mandato de ley establecido por las demás ramas constitucionales hacia esta Curia. Máxime, cuando ante la ausencia de una clara acción inconstitucional, la correcta hermenéutica nos obliga a buscar la forma, en la medida posible, de sostener la constitucionalidad del mandato del resto de los poderes constitucionales.

Sin embargo, reconozco que tal mandato era peculiar y poco ortodoxo, el cual terminaba delegándonos en última instancia una tarea que para mí resultaría algo incómoda. No obstante, nuestra responsabilidad es resolver correctamente en derecho, independientemente del carácter antipático de la controversia ante nuestra consideración. De eso se trata en parte nuestra función como más alto Foro.

**I**

Los hechos medulares que originan el asunto que nos atañe no se disputan. En particular, nos corresponde pasar juicio sobre la validez del Art.3.7 (3) del Código Electoral de 2020, 16 LPRA sec. 4517(3). Esbozada la cuestión planteada, pasemos a examinar el derecho aplicable a la controversia ante nuestra consideración.

**II**

A. <u>La Comisión Estatal de Elecciones y su naturaleza *sui géneris*</u>

El Gobernador tiene el deber de nombrar a todos los funcionarios para cuyo nombramiento esté facultado, según se disponga por la propia Constitución o mediante ley.[1] En particular, la Constitución especifica que, para lograr el ejercicio del Poder Ejecutivo, el Gobernador estará asistido por los Secretarios de Gobierno, quienes requerirán el consejo y el consentimiento del Senado.[2] Asimismo, existen nombramientos que requerirán el consejo y el consentimiento tanto del Senado como la Cámara.[3] El consejo y consentimiento ya sea del Senado o de ambas cámaras estriba en que estos funcionarios pertenecen a departamentos ejecutivos y asisten al gobernador en la implementación de la política pública.

Sobre el proceso electoral, nótese que en nuestra Constitución el sistema quedó reducido a los siguientes asuntos, a saber: (1) crear la Junta Revisora de los distritos senatoriales y representativos integrada por el Juez o Jueza Presidenta del Tribunal Supremo y dos miembros nombrados por el Gobernador con el consejo y consentimiento

---

[1] Art. IV, Sec. 4, Const. PR, LPRA, Tomo I.

[2] Art. IV, Sec. 5, Const. PR, LPRA, Tomo I. En particular, la Constitución enumera varios departamentos ejecutivos cuyos Secretarios requieren el consejo y consentimiento del Senado. Estos son los Secretarios de: Estado, Justicia, Instrucción Pública, Salud, Hacienda, Trabajo, Agricultura y Obras Públicas. Art. IV, Sec. 6, Const. PR, LPRA, Tomo I.

[3] Entre estos, se encuentra el Secretario de Estado. Art. IV, Sec. 5, Const. PR, LPRA, Tomo I.

del Senado y (2) establecer la fecha en que se llevarán a cabo las elecciones; los requisitos para ser elector y el mecanismo de elección de funcionarios de elección popular.[4] Vemos que la Constitución fue clara en delimitar los contornos electorales y dejó en manos de la Rama Legislativa "todo lo concerniente al proceso electoral".[5]

A tenor con lo anterior, la Rama Legislativa creó estatutariamente la CEE. Específicamente, fue creada a través de la derogada Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977.[6] Entre las funciones, deberes y facultades de la CEE, a esta se le responsabilizó por "planificar, organizar, estructurar, dirigir y supervisar el organismo electoral y todos los procedimientos de naturaleza electoral, que conforme a [la propia] ley y reglamento rijan en cualquier elección a celebrarse en Puerto Rico".[7] Además, le confirió poderes cuasi-legislativos y cuasi-judiciales para atender los asuntos de índole electoral.[8] Así pues, de lo anterior se coligió la clara intención de la Asamblea Legislativa en garantizar la pureza procesal e independencia de fuentes externas en los procesos electorales. En ese sentido,

---

[4] Art. III, Sec. 4, Const. PR, LPRA, Tomo I, ed. 2017, págs. 396-397 y Art. VI, Sec.4, *supra*, pág. 440.

[5] Art. VI, Sec.4, *supra*, pág. 440.

[6] Ley Núm. 4 de 20 de diciembre de 1977, 16 LPRA sec. 3001 *et seq.* (derogada).

[7] Art. 1.005 de la Ley Núm. 78-2011, 16 LPRA sec. 3013 (derogada).

[8] Íd., sec. 3013.

mediante su creación, la CEE contrastó con el resto de las agencias del Ejecutivo.

Entre las distinciones que denotan que la CEE es un organismo separado de las demás agencias de la Rama Ejecutiva resaltamos que la CEE tiene sus propios procedimientos para la revisión judicial, la administración del personal, los asuntos contractuales y, además, goza de independencia presupuestaria.[9] Al respecto y sobre una consulta de contratación y nombramientos de personal, el Secretario de Justicia señaló que la CEE no se debe enmarcar dentro de las agencias del Ejecutivo. En específico, expresó que:

> [L]a naturaleza ***sui géneris*** de la CEE la convierten en un organismo que no puede ser ubicado como parte del poder ejecutivo de manera absoluta, en toda su extensión y significado. Sin duda alguna, la CEE no puede considerarse como una agencia gubernamental ordinaria de la Rama Ejecutiva. Véase Opinión del Secretario de Justicia, Núm.2010-9, de 22 de abril de 2010, pág. 4.

A pesar de que la Ley Núm. 4, *supra*, fue derogada por la Ley Núm.78-2011,[10] y esta última por la Ley Núm.58-2020, conocida como el Código Electoral de Puerto Rico 2020,[11] se

---

[9] Íd., sec. 3004. Además, como puntos adicionales que apoyan el carácter su carácter *sui géneris*, la CEE también fue excluida de varias leyes que aplican generalmente a las agencias del Ejecutivo, a saber: (1) Ley de Procedimiento Administrativo Uniforme de 1988; (2) la Ley Núm. 5 de 14 de octubre de 1975, conocida como "Ley de Personal de Servicio Público", pues, se le concedió la facultad de "pone[r] en vigor todas aquellas normas y reglamentos que son necesarios para la administración de su personal"; (3) la Ley Núm. 145 de 29 de abril de 1949, conocida como "Ley de Compras y Suministros", y (4) la Ley Núm. 164 de 23 de julio de 1974, conocida corno "Ley de la Administración de Servicios Generales". Íd., Sec. 3004.

[10] Ley Núm. 78-2011, 16 LPRA sec. 4001 *et seq.* (derogada).

[11] Ley Núm. 58-2020, 16 LPRA sec. 4501 *et seq.*

mantuvieron inalteradas las particularidades antes esbozadas que otorgan cierto grado de autonomía y distinguen a la CEE. Como se puede observar, la CEE no es un organismo que pueda identificarse como un "departamento ejecutivo" bajo el entendido constitucional. De igual modo, tampoco es una agencia propiamente del Poder Ejecutivo, pues, los distintos estatutos electorales le han reconocido un gran grado de independencia para administrar sus asuntos internos.

Cónsono con la naturaleza *sui géneris* de la CEE y sus componentes, más la controversia que atendemos hoy, considero que era necesario una evaluación de sus funciones para determinar si la limitación al poder de nombramiento del Gobernador que surge de la ley realmente infringe de manera irracional e impermisible su deber constitucional de cumplir y hacer cumplir las leyes y, por ende, el principio político de separación de poderes. Este Tribunal ha atendido controversias relacionadas al poder de destitución que posee el Gobernador y hemos reconocido que esa autoridad está intrínsecamente relacionada con la facultad constitucional del Gobernador para realizar nombramientos. Veamos.

En Guzmán v. Calderón, 164 DPR 220, (2005) el Tribunal Federal para el Distrito de Puerto Rico nos solicitó que contestáramos "si el requisito de justa causa para la destitución por el Gobernador de un miembro de la Junta de Directores de la Corporación de Puerto Rico para la Difusión

Pública, contenido en la ley orgánica de la referida corporación, infring[í]a las facultades constitucionales que tiene el Gobernador de remover funcionarios públicos nombrados por éste".[12]

En este caso aconteció que la Gobernadora, Hon. Sila M. Calderón, destituyó al Sr. Arturo Guzmán Vargas por insubordinación y, en desacuerdo, éste presentó una demanda por violación de derechos civiles. Luego de un análisis minucioso de la ley habilitadora de la Corporación de Puerto Rico para la Difusión Pública en conjunto con la jurisprudencia federal sobre la autoridad del Presidente para destituir más la discusión sostenida en nuestra Convención Constituyente,[13] determinamos que los funcionarios de esa corporación pública no realizaban tareas "puramente ejecutivas". Lo anterior implicó que el requisito de justa causa exigido para restringir la facultad del Gobernador para destituir a un miembro de la Junta de Directores no infringía sus funciones

---

[12] Guzmán v. Calderón, 164 DPR 220, 225 (2005).

[13] Como bien resumimos en Díaz Carrasquillo v. García Padilla, 191 DPR 97, 112-115 (2014), nuestra constitución no abundaba sobre la capacidad del Gobernador para destituir. Sin embargo, en la Convención Constituyente reconoció la jurisprudencia federal de cómo analizar el asunto a través de Myers v. United States, 272 US 52 (1926), y Humphrey's Executor v. US, 295 US 602 (1935). No es hasta el 2005 cuando atendimos a Guzmán que atemperamos la normativa federal al recurrir a lo establecido tanto en Wiener v. United States, 357 US 349 (1958) y la adopción de la dotrina en Morrison v. Olson, 487 US 654 (1988). En esencia el test es el siguiente: tomando como punto de partida el análisis de la totalidad de las circunstancias, en primera instancia, se evalúan las tareas que el funcionario público realiza y "si las restricciones que impuso la Asamblea Legislativa inciden en la capacidad del [Gobernador] de cumplir y hacer cumplir las leyes. Es decir, es imperativo que la determinación no violente la separación de poderes que caracteriza nuestro sistema de gobierno."

constitucionales de cumplir y hacer cumplir las leyes. En otras palabras, no violentaba la separación de poderes de nuestro sistema de gobierno.

En ese mismo año, en Santana v. Gobernadora, 165 DPR 28 (2005), la Gobernadora removió a la Sra. Janet Santana del cargo de Directora Ejecutiva del Consejo de Desarrollo Ocupacional y Recursos Humanos (Consejo) que, conforme al Art. 5 de la Ley Núm. 97 de 18 de diciembre de 1991, el nombramiento era por un término de cuatro años.[14] Allí concluimos que el Director Ejecutivo del Consejo era un funcionario con el deber de dirigir las operaciones del Departamento del Trabajo, departamento adscrito al Poder Ejecutivo y de rango constitucional. Tanto el Consejo como su Director Ejecutivo estaban llamados a formular, participar e implementar la política pública gubernamental del Gobernador de turno.[15] En otras palabras, con funciones "puramente ejecutivas" y, al ser así, la Gobernadora tenía la facultad de destituir a la señora Santana del cargo.

En cuanto a la autoridad constitucional del Gobernador, expresamos que:

> La esencia del concepto *poner en vigor la ley* 'no es la mera interpretación e implementación del mandato legislativo, sino es determinar *quién ejerce la última autoridad sobre los oficiales que implementan la ley*'. […] Como secuela de la obligación de cumplir y de hacer cumplir la ley que impone la Constitución, está el poder de ejercer 'la última autoridad sobre ... [los] oficiales' que asisten al Gobernador en el descargo de esa responsabilidad, lo que implica

---

[14] Ley Núm. 97 de 18 de diciembre de 1991, según enmendada, 18 LPRA sec. 1584 creó la Administración de Desarrollo Laboral.

[15] Santana v. Gobernadora, 165 DPR 28, 60 (2005).

necesariamente el poder de remoción de quienes incumplan con esa responsabilidad.[16]

Obsérvese que, si bien reconocimos que la autoridad del Primer Mandatario **para nombrar es concomitante al poder de destituir**, y lo describimos como una facultad absoluta,[17] ello está sujeto a que "cualquier determinación relacionada con la constitucionalidad de una limitación estatutaria al poder de **nombramiento** y de destitución del gobernante requiere un análisis caso a caso, en el cual es imprescindible identificar si el funcionario realiza funciones de naturaleza 'puramente ejecutiva', cuasi legislativa o cuasi judicial."[18] En lo concerniente a esa evaluación inicial de las responsabilidades de un funcionario público a ser destituido -o nombrado-, pautamos que:

> Cuando se trate de un funcionario con facultades "puramente ejecutivas", la facultad de la Rama Legislativa para imponer requisitos para [nombrar o] destituir a dicho funcionario es mínima debido a que se trata, en la mayoría de los casos, de funcionarios que colaboran directamente en la implantación de la política pública y en la ejecución de aquellas funciones asignadas por la Constitución a la Rama Ejecutiva.
>
> El criterio principal para determinar la validez del estatuto consiste en que la limitación legislativa al poder de [nombramiento o] destitución del Gobernador de Puerto Rico no interfiera en forma impermisible e irrazonable con su facultad constitucional de hacer cumplir y poner en vigor las leyes, y de formular e implantar la política pública. El examen al estatuto exige que la limitación legislativa a dicha facultad no limite impermisiblemente los poderes de la Rama

---

[16] Santana v. Gobernadora, *supra*, pág. 48 (Énfasis en el original, citando Noriega v. Hernández Colón, 135 DPR 406, 463 (1994)).

[17] Santana v. Gobernadora, *supra*, pág. 45 (citando a *Gelpí v. Leahy, Gobernador*, 56 DPR 925, 926 (1940)).

[18] Guzmán v. Calderón, *supra*, pág. 238.

Ejecutiva ni lesione el balance que debe existir entre las ramas del Gobierno.

**Distinto es el caso de aquellos funcionarios que desempeñan tareas cuasi legislativas y cuasi judiciales.** A este tipo de funcionario la Asamblea Legislativa puede garantizar un grado de independencia mayor, que le permita cumplir con sus funciones, libre de cualquier interferencia de otras ramas de gobierno. Por ende, en ese caso, cualquier restricción razonable al poder de [nombramiento o] destitución del Gobernador sería válida, claro está, a menos que incida sobre la facultad del gobernante de cumplir con sus poderes constitucionales.[19]

Posteriormente, atendimos Díaz Carrasquillo v. García Padilla, 191 DPR 97 (2014). El Sr. Iván Díaz Carrasquillo juramentó como Procurador de la Oficina de las Personas con Impedimentos (OPPI) el 15 de noviembre de 2011. Conforme al Plan de Reorganización Núm. 1-2011, conocido como el Plan de Reorganización de las Procuradurías, 3 LPRA Ap. XVII, el nombramiento fue por un término de diez años cuyo vencimiento se extendía hasta noviembre de 2021. Mediante la Ley Núm. 75-2013, el entonces Gobernador, Hon. Alejandro García Padilla, derogó el Plan de Reorganización y aprobó la Ley Núm. 78-2013 para crear la Oficina del Procurador de las Personas con Impedimentos del Estado Libre Asociado de Puerto Rico. En agosto de 2013 el señor Díaz Carrasquillo fue destituido del cargo sin una vista previa. Tras una evaluación de las funciones del señor Díaz Carrasquillo, concluimos que éstas eran híbridas, aun así no incidían en la facultad del Gobernador de cumplir y hacer cumplir las leyes. En otras palabras, a pesar de que colaboraba con el

---

[19] Guzmán v. Calderón, *supra*, págs. 238-239.

Ejecutivo, la OPPI se creó como un ente fiscalizador para velar por los derechos de las personas con impedimentos.

Por otro lado, la Sec. 4 del Art. VI de la Constitución de Puerto Rico establece que "[s]e dispondrá por ley **todo lo concerniente al proceso electoral** y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas".[20] En aras de cumplir con el mandato constitucional, la Asamblea Legislativa ha promulgado legislación conducente a la dirección, administración y regulación de los procesos electorales mediante los cuales los puertorriqueños podrán ejercer el derecho al sufragio universal. Lo cierto es que los principios generales de la política pública electoral emanan de la Constitución y éstos han sido recogidos en la legislación relacionada los procesos electorales.

El Artículo 3.8 del Código Electoral de 2020 formula un listado de las facultades y deberes del Presidente de la CEE, entre los cuales se encuentran:

> El Presidente será la máxima autoridad ejecutiva y administrativa de la Comisión y **será responsable de supervisar los servicios, los procesos y los eventos electorales** en un ambiente de absoluta pureza e imparcialidad. En el desempeño de esta encomienda, tendrá las siguientes facultades y deberes que adelante se detallan, sin que estos se entiendan como una limitación.
>
> (1) **Cumplir y hacer cumplir las disposiciones y los propósitos de esta Ley, la Constitución de Puerto Rico y de Estados Unidos de América, de las leyes que ordenen o instrumenten cualquier tipo de proceso electoral o Votación y de los reglamentos electorales que, por virtud de ley, sean aprobados por la Comisión y los acuerdos unánimes de los Comisionados Electorales.**

---

[20] Art. VI, Sec. 4, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 440.

(2) Representar a la Comisión ante cualquier foro o entidad pública y privada; y ser su **principal portavoz institucional**.

(3) Aprobar las reglas, los reglamentos y los planes que sean necesarios para la administración y las oficinas administrativas de la Comisión. Estos reglamentos administrativos deberán publicarse en la página cibernética de la Comisión.

(4) Administrar, restructurar, consolidar o eliminar, al máximo posible, las oficinas y dependencias de la Comisión para que sean eficientes y lo más compactas posibles en sus recursos humanos, instalaciones, equipos y materiales, para así promover la costo-eficiencia y la razonabilidad presupuestaria, sin sacrificar la Misión de la Comisión y la política pública electoral.[21]

A su vez, como un cuerpo, la CEE tiene funciones, deberes y facultades que tiene que ejecutar. En lo pertinente, el Artículo 3.2 del Código Electoral de 2020 establece lo siguiente:

> La Comisión será responsable de planificar, organizar, dirigir y supervisar el organismo electoral y los procedimientos de naturaleza electoral que, conforme a esta Ley, y a leyes federales aplicables, rijan en cualquier Votación a realizarse en Puerto Rico. En el desempeño de tal función tendrá, además, de cualesquiera otras dispuestas en esta Ley, los siguientes deberes:
>
> (1) Cumplir y hacer cumplir las disposiciones y los propósitos de esta Ley.
>
> .   .   .   .   .   .   .   .
>
> (3) Aprobar las reglas y los reglamentos que sean necesarios para implementar las disposiciones de esta Ley.
>
> .   .   .   .   .   .   .   .
>
> (19) Atender, investigar y resolver los asuntos o controversias bajo su jurisdicción por virtud de esta Ley y que se presenten a su consideración por cualquier parte interesada.
>
> (20) Citar personas o testigos y requerir documentos, datos o información sobre asuntos de naturaleza específicamente electoral.

---

[21] 16 LPRA sec. 4518.

(21) Cuando se trate de asuntos de naturaleza específicamente electoral, la Comisión podrá designar mediante acuerdo unánime Oficiales Examinadores cuyas funciones y procedimientos serán establecidas por reglamento. Los Oficiales Examinadores presentarán sus informes y recomendaciones a la Comisión.

(22) Interponer cualesquiera remedios y recursos legales que estime necesarios para hacer cumplir los propósitos de esta Ley y, principalmente, proteger los derechos de los electores.[22]

De una lectura a algunas de las funciones medulares tanto de la CEE como de su ejecutor -**el Presidente**- denotan que la misión y política pública electoral que éstos deben implementar responde al mandato constitucional y estatutario sobre los asuntos electorales, por lo que **sus funciones no interfieren en forma impermisible e irrazonable con la facultad constitucional del Gobernador de cumplir y hacer cumplir las leyes ni de formular e implantar la política pública del gobierno de turno**. Según la legislación electoral vigente, tanto el Presidente como el Presidente Alterno tienen que cumplir con los acuerdos aprobados por los comisionados electorales que representan a los partidos políticos, no al Gobernador ni a la Legislatura. Finalmente, la legislación limitó al Gobernador en cuanto a su autoridad para destituir a los dos funcionarios en cuestión. De manera que en caso de que el Presidente de la CEE no ejecute o incumpla con el deber de implementar la misión y política pública electoral, la autoridad última sobre este funcionario – su destitución- se delegó a la Rama Judicial. Esto último, por unas causas

---

[22] 16 LPRA sec. 4512.

específicas establecidas en la ley (justa causa) y enmarcado en un debido proceso que garantiza que la destitución o retención final de tales funcionarios en sus puestos no descanse en la plena discreción de este foro.[23]

Lo antes señalado implica que, conforme a la norma pautada en *Guzmán*, y reiterado en *Santana* y en *Díaz Carrasquillo*, las funciones de la CEE y del Presidente no tienen carácter de ser "puramente ejecutivas" *per se*. Si bien el Presidente de la CEE tiene tareas administrativas dirigidas al funcionamiento de la CEE, éstas no están encaminadas a establecer la política pública tradicional. Las responsabilidades relacionadas a los procesos electorales que predominan son cuasilegislativas y cuasijudiciales. Así surge del deber de cumplir y hacer cumplir nuestra Constitución, el Código Electoral de 2020

---

[23] El Art. 3.9 del Código Electoral 2020, 16 LPRA sec. 4519, establece lo siguiente:

> El Presidente y el Presidente Alterno podrán ser destituidos por las siguientes causas:
> (1) parcialidad manifiesta en perjuicio de un Partido Político, Candidato, Candidato Independiente, Aspirante, comité o Agrupación de Ciudadanos;
> (2) condena por delito grave;
> (3) condena por delito menos grave que implique depravación moral o de naturaleza electoral;
> (4) negligencia crasa en el desempeño de sus funciones;
> (5) incapacidad total y permanente para el desempeño de su cargo;
> (6) incumplimiento de esta Ley y de las decisiones unánimes de la Comisión y/o
> (7) desaforo o suspensión de forma temporal o permanente por el Tribunal Supremo de Puerto Rico.
> Las querellas por las causas de destitución mencionadas serán presentadas en la Secretaría de la Comisión y serán referidas y atendidas por un panel de tres (3) jueces del Tribunal de Apelaciones, designados por el pleno del Tribunal Supremo de Puerto Rico. Cualquier determinación final realizada por el panel de jueces podrá ser revisada conforme al proceso establecido en el Capítulo XIII de esta Ley.

aprobado por la Asamblea Legislativa y los reglamentos aprobados de manera unánime por los comisionados electorales, ejecutados por el Presidente de la CEE, para los procesos inherentemente electorales.

Recuérdese que hemos expresado que en las funciones cuasilegislativas o cuasijudiciales, la Asamblea Legislativa puede garantizar un grado de independencia mayor que le permita a este tipo de funcionario cumplir con sus responsabilidades, libre de cualquier interferencia de otras ramas de gobierno en la ejecución.[24] Por lo tanto, tal como lo hizo con los comisionados electorales, la Asamblea Legislativa podía limitar el poder del Gobernador para nombrar y, así, como última alternativa, delegar en la Rama Judicial la designación de jueces del Tribunal de Primera Instancia al cargo del Presidente y del Presidente Alterno de la CEE.

A fin de cuentas, recalco que la Legislatura es la rama de gobierno facultada constitucionalmente para regular todo lo concerniente a los procesos electorales, partidos políticos y candidaturas. Por lo tanto, ante las funciones predominantes de la CEE, del Presidente y el Presidente Alterno y los comisionados electorales, la delegación del nombramiento a la Rama Judicial no interfiere de manera impermisible e irrazonable con la facultad constitucional del Gobernador en cumplir y poner en vigor las leyes,

---

[24] Guzmán v. Calderón, supra, págs. 238-239.

tampoco con su autoridad de formular e implantar la política pública.[25] Evidentemente, la legislación no violenta el principio político de separación de poderes.

En ese sentido es oportuno pronunciarnos sobre la decisión de <u>Buckley v. Valeo</u>, 424 US 1 (1976). La Opinión mayoritaria recoge acertadamente que, entre las controversias atendidas, el Tribunal Supremo federal declaró inconstitucional la disposición de la *Federal Election Campaign Act of 1971* (FECA)[26] en lo concerniente a que la composición de la Federal Election Commission (FEC) violentaba la cláusula de nombramientos de la Constitución federal y, por ende, la separación de poderes. La FECA, además de crear la FEC y de reconocerle a ésta extensas facultades reglamentarias, adjudicativas y de ejecución de la ley, su estructura requería que el nombramiento de sus miembros debía contar con la confirmación de ambas cámaras. Lo medular de esta controversia era que, conforme a la FECA, el Presidente de Estados Unidos, el Presidente *pro tempore* del Senado y el de la Cámara de Representantes, cada uno de éstos, podían nombrar a dos miembros para ser parte de la FEC y, por esto, se impugnó la facultad que el Congreso se impuso para nombrar a cuatro funcionarios en la FEC.

En el análisis, el Tribunal Supremo federal evaluó la amplitud de los poderes delegados a la FEC en conjunto con la jurisprudencia federal respecto a la cláusula de

---

[25] Íd.

[26] 8 Stat. 3.

nombramientos de la Constitución de Estados Unidos para concluir que el tipo de funciones delegadas a la FEC solo pueden ser ejecutadas por personas que son "Officers of the United States" u oficiales principales. Es decir, los deberes extendidos a la FEC en la FECA, equiparaba a este organismo como una agencia del Poder Ejecutivo. Por lo tanto, el Presidente, y no el Congreso, tenía el poder exclusivo para nombrar a los miembros de la FEC. Con este análisis se declaró inconstitucional la autoridad de nombramiento que se otorgó el Congreso en la FECA.[27]

En cuanto a esta conclusión, debemos puntualizar que, contrario a nuestra Ley Suprema, la cláusula de nombramientos de la Constitución de Estados Unidos "establece dos clases de funcionarios que puede nombrar el Presidente. Los llamados 'oficiales principales', cuyos nombramientos recaen exclusivamente en el Primer Ejecutivo, y los llamados 'oficiales inferiores', los cuales pueden ser nombrados por el Presidente, los tribunales de justicia o los jefes de departamentos, conforme se disponga en ley".[28] Esto nos remonta a que, luego de *Buckley*, el Tribunal

---

[27] <u>Buckley v. Valeo</u>, 424 US 1, 140-141 (1976). Destacamos que en este caso el Tribunal Supremo de Estados Unidos discutió el alcance y los contornos del poder de nombramiento del Presidente y la facultad de destitución resueltos en *Myers v. United States*, 272 US 52 (1926), *Humphrey's Executor v. U.S.,* 295 US 602 (1935) y *Wiener v. United States*, 357 US 349 (1958). En estos casos se discutió los parámetros de la cláusula de nombramiento de la Constitución de Estados Unidos y las limitaciones que le impone al ejercicio del poder del Congreso.

[28] Art. II, Sec. 2, Cl. 2 de la Constitución de Estados Unidos, LPRA, Tomo 1, <u>Santana v. Gobernadora</u>, *supra*, pág. 52.

Supremo federal atendió <u>Morrison v. Olson</u>, 487 US 654 (1988).[29]

Como bien resumimos en *Santana*, en *Morrison* aconteció que, a raíz del escándalo de Watergate, el Congreso aprobó el *Ethics in Government Act*.[30] La legislación creó la figura del Fiscal Especial Independiente quien sería nombrado por un panel especial de jueces y su destitución la ejecutaría el Secretario de Justicia por justa causa o incapacidad mental o física. El fiscal especial Archival Cox investigaba los incidentes de Watergate cuando el Presidente Richard Nixon lo destituyó del cargo. Así, el Tribunal Supremo federal debía determinar "si el Fiscal Independiente era un 'oficial principal' cuyo nombramiento le correspondía al Presidente exclusivamente, o si, por el contrario, era un 'oficial inferior' que podía ser nombrado no sólo por el Presidente, sino también por la Rama Judicial".[31]

Para concluir que este funcionario era un oficial inferior, el Tribunal Supremo federal consideró cuatro criterios:

> [P]orque [el fiscal independiente] podía ser destituido por un funcionario de alta jerarquía en la Rama Ejecutiva como lo era el Secretario de Justicia; solamente se le delegaban facultades limitadas de procesamiento criminal y no tenía autoridad para

---

[29] <u>Morrison v. Olson</u>, 487 US 654, 670 (1988) citando a <u>Buckley v. Valeo</u>, 424 US 1, 132 (1976). ("[P]rincipal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary.").

[30] <u>Santana v. Gobernadora</u>, *supra*, pág. 56, 28 U.S.C.A. secs. 591– 599.

[31] <u>Santana v. Gobernadora</u>, *supra*, pág. 56.

formular política pública; su jurisdicción se limitaba a algunos altos funcionarios federales que se alegaba habían incurrido en violaciones a ciertos delitos de naturaleza grave, y el término de nombramiento era limitado, pues concluía una vez finalizada su encomienda.[32]

Superada la clasificación del funcionario involucrado, era necesario evaluar si la restricción al poder de destitución del Presidente impuesta por el Congreso interfería de manera impermisible con su autoridad constitucional de cumplir y hacer cumplir las leyes. Sobre el particular, el Tribunal Supremo federal concluyó:

> Here, as with the provision of the Act conferring the appointment authority of the independent counsel on the special court, the congressional determination to limit the removal power of the Attorney General was essential, in the view of Congress, to establish the necessary independence of the office. We do not think that this limitation as it presently stands sufficiently deprives the President of control over the independent counsel to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws.[33]

Como señalamos, *Buckley* se resolvió antes de *Morrison.* Así, este Tribunal adoptó el *test* de *Morrison* relacionado al poder de destitución -concomitante al de nombramiento- en *García*, y lo reiteramos en *Santana* y en *Díaz Carrasquillo.* En ese contexto es meritorio reproducir el *test* según lo expresamos en el último caso que atendimos:

> [R]econociendo que hay cierta tensión entre lo resuelto en *Humphrey's Executor v. U.S.*, supra, y en *Morrison v. Olson*, supra, al momento de evaluar el poder de destitución del primer ejecutivo se tendrá que considerar un híbrido de

---

[32] Santana v. Gobernadora, supra, págs. 56-57 (citas omitidas, citando a *Morrison v. Olson*, *supra*, págs. 671-672.

[33] Morrison v. Olson, *supra*, págs. 692-693.

lo resuelto en ambos casos. Es decir, en primer lugar, se deberá determinar caso a caso la naturaleza de las funciones que realiza el empleado que va a ser destituido de su cargo. Al determinar si las funciones de un empleado son ejecutivas, cuasilegislativas o cuasijudiciales, estamos atendiendo la normativa propuesta en *Humphrey's Executor v. U.S.*, supra.

Esto implica que únicamente cuando un empleado gubernamental realiza funciones ejecutivas, es de libre remoción por el Gobernador. Es decir, cuando el empleado interviene en la formulación de política pública, que es una función de la Rama Ejecutiva, el Gobernador lo puede remover. Empero, en caso de que un empleado realice funciones primordialmente cuasilegislativas o cuasijudiciales, al gobernador se le podrá requerir que demuestre justa causa para destituirlo. De lo contrario, estaríamos permitiendo una violación del principio político de separación de poderes. Así, en estos casos, la Asamblea Legislativa le podrá imponer restricciones al Gobernador para poder destituir a estos empleados. Sin embargo, este análisis por sí solo no es suficiente. Corresponde analizar la totalidad de las circunstancias para determinar si, además, independientemente de las funciones que realiza el funcionario, las restricciones que haya impuesto la Asamblea Legislativa inciden en la facultad del gobernador para descargar sus funciones ejecutivas.[34]

Por lo tanto, la Opinión mayoritaria está considerando la decisión de *Buckley* **sin evaluar o añadir, repito, el test de *Morrison* adoptado por este Tribunal** en *García*, *Santana* y *Díaz Carrasquillo*. De haberlo considerado, este Tribunal debía concluir que, conforme a **las funciones que la CEE y las que ejecuta su alta gerencia, éstas no formulan ni impulsan la política pública del Poder Ejecutivo**, por lo que su deber de cumplir y hacer cumplir las leyes no se infringe de manera impermisible al delegar en la Rama

---

[34] Díaz Carrasquillo v. García Padilla, *supra*, págs. 114-116.

Judicial, como remedio auxiliar, el nombramiento de jueces para los cargos de Presidente y Presidente Alterno.

Por otro lado, traigo a la atención otros dos asuntos con relación a la utilización de *Buckley* por la Opinión mayoritaria, que ameritan señalarse y que no puedo pasar por alto. La controversia de *Buckley* respecto la impugnación del nombramiento de funcionarios del gobierno federal en la FEC, la infracción de la cláusula de nombramientos de la Constitución de los Estados Unidos y el principio de separación de poderes es persuasiva en nuestra jurisdicción y no vinculante. Según estableció el Tribunal Supremo federal, leer las restricciones de la cláusula de nombramientos como vinculantes a los funcionarios puertorriqueños con deberes principalmente locales causaría estragos en los métodos democráticos de Puerto Rico (ratificados por el gobierno federal) para seleccionar a muchos de sus funcionarios.[35]

Por último, si *Buckley* -sin el *test* de *Morrison*- fuera un precedente obligatorio, como sugiere el Senado, tendríamos que también declarar inconstitucional el nombramiento de los comisionados electorales de la CEE

---

[35] <u>Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment</u>, LLC, 140 S.Ct. 1649, 1661 (2020). (Sometimes Congress has specified the use of methods that would satisfy the Appointments Clause, other times it has specified methods that would not satisfy the Appointments Clause, **including elections and appointment by local officials**. Officials with primarily local duties have often fallen into the latter categories. We know of no case endorsing an Appointments Clause based challenge to such selection methods. Indeed, to read Appointments Clause constraints as binding Puerto Rican officials with primarily local duties would work havoc with Puerto Rico's (federally ratified) democratic methods for selecting many of its officials.). (Énfasis suplido y traducción nuestra).

quienes, por virtud de la ley en cuestión, son nombrados por el Presidente del partido político al que pertenecen y no por el Gobernador.[36] Los comisionados son los actores principales de ese organismo llamado Comisión Estatal de Elecciones. Éstos, junto con el Presidente que unánimemente nombran, comparten "la responsabilidad de dirigir y supervisar los trabajos de naturaleza específicamente electoral para garantizar el máximo cumplimiento de la política pública [electoral] y la Misión de la Comisión. Los Comisionados Electorales propietarios podrán hacer recomendaciones administrativas al Presidente o requerirle información sobre las operaciones de las Oficinas Administrativas." [37] Igualmente, bajo este análisis, tendría que declararse inconstitucional la facultad de los comisionados electorales para nombrar al Presidente y Presidente Alterno.

B. El principio de separación de poderes

La Constitución de Puerto Rico recoge el principio de la separación de poderes.[38] Este principio dispone que el Gobierno de Puerto Rico tendrá una composición republicana y los poderes Legislativo, Ejecutivo y Judicial "estarán igualmente subordinados a la soberanía del pueblo de Puerto Rico".[39] La división tripartita tiene como propósito

---

[36] Artículo 3.10 del Código Electoral de 2020, 16 LPRA sec. 4520.

[37] Íd.

[38] Art. I, Sec. 2, Const. PR, LPRA, Tomo I.

[39] Íd.

"asegurar la libertad del individuo contra la opresión de cualquier rama".[40] De esta manera, se pretende evitar que se ejerza un poder arbitrario.[41]

Ahora bien, "la separación absoluta nunca ha existido y nunca se pretendió que existiera".[42] Entiéndase que "[n]unca se pretendió que cada una de las ramas gubernamentales funcionara en un vacío, completamente independiente y alejada de las otras".[43] Adviértase que el principio de separación de poderes no requiere la independencia absoluta de los poderes entre sí.[44] Así, se ha reconocido que tanto la Rama Legislativa como la Ejecutiva pueden designar al Poder Judicial funciones administrativas, siempre que estas sean razonablemente incidentales al desempeño de sus poderes judiciales.[45] Al respecto, en Misretts v. US, 408 US 361, 388 (1988), el Tribunal Supremo federal señaló que, en consonancia con la separación de poderes, el Congreso podrá delegar en el Poder Judicial funciones no judiciales que no socaven las prerrogativas de las otras ramas y que correspondan a la misión central del Poder Judicial.  De conformidad con lo

---

[40] Banco Popular de Puerto Rico, Liquidador v. Corte, 63 DPR 66, 71 (1944).

[41] Íd.

[42] Íd.

[43] Íd.

[44] Nogueras v. Hernández Colón (2), 127 DPR 638, 658 (1991) (citando a 3 Diario de Sesiones de la Convención Constituyente 1918-1919 (1952)).

[45] Banco Popular de Puerto Rico, Liquidador v. Corte, supra, pág. 76.

anterior, se adelanta un criterio flexible y pragmático adoptado a la hora de evaluar dicho principio.[46] La médula es que exista equilibrio dinámico.[47]

C. <u>El procedimiento establecido en el Código Electoral para el nombramiento del Presidente de la CEE y su alterno y la intervención del Tribunal Supremo</u>

En específico, el Artículo 3.7 del Código Electoral de 2020, *supra*, postula el procedimiento para el nombramiento de estos funcionarios de la manera siguiente:

> (1) **Los Comisionados Electorales propietarios nombrarán un Presidente y un Alterno al Presidente conforme a esta Ley, quienes actuarán como representantes del interés público en la Comisión. Se requerirá la participación de todos los Comisionados Electorales propietarios y el <u>voto unánime</u> de [é]stos para hacer los nombramientos de los cargos de Presidente y Alterno al Presidente.**
>
> .    .    .    .    .    .    .    .
>
> (3) **Corresponderá al Comisionado Electoral del Partido Estatal de Mayoría,** cuyo partido hubiere obtenido en la anterior Elección General la mayor cantidad de votos íntegros en la Papeleta Estatal del total de votos válidos emitidos en esa papeleta, **proponer a los restantes Comisionados propietarios el o los nombres de los candidatos a los cargos de Presidente y de Alterno al Presidente.** Si al término de treinta (30) días naturales de haber surgido una vacante en el cargo de Presidente y/o del Alterno del Presidente no se lograra la unanimidad de los comisionados electorales propietarios para cubrir la vacante, entonces el Gobernador deberá hacer el nombramiento del o los candidatos para cubrir el o los cargos vacantes. El Gobernador deberá hacer estos nombramientos no más tarde de los quince (15) días naturales a partir del vencimiento del término anterior. Tales nombramientos requerirán el consejo y consentimiento de dos terceras partes (2/3) del total de los miembros de ambas cámaras en la Asamblea Legislativa, no más tarde de los quince (15) días naturales a partir del recibo del o los nombramientos otorgados por el Gobernador, según corresponda. **En

---

[46] <u>Misión Ind. PR v. JP</u>, 146 DPR 64, 88-89 (1998).

[47] <u>Banco Popular de Puerto Rico, Liquidador v. Corte</u>, *supra*, pág. 72.

**ausencia de los nombramientos del Gobernador y/o del consejo y consentimiento legislativo, el pleno de los miembros del Tribunal Supremo de Puerto Rico deberá elegir por mayoría de sus votos a un juez o jueza para ocupar el cargo de Presidente o Alterno del Presidente en la Comisión, según corresponda.** Esta votación del pleno del Tribunal Supremo deberá realizarse no más tarde de los quince (15) días naturales a partir de la ausencia de los nombramientos por parte del Gobernador o de la ausencia del consejo y consentimiento de las cámaras legislativas al cierre de la sesión ordinaria o extraordinaria en que recibieron el o los nombramientos. Dentro de los ciento (120) veinte días previos a una Elección General, plebiscito, referéndum o primaria, todos los anteriores términos se reducirán a la mitad.

(4) Tanto el Presidente como el Alterno al Presidente deberán ser mayores de edad, jueces del Tribunal de Primera Instancia del Tribunal General de Justicia, domiciliados en Puerto Rico a la fecha de su nombramiento, electores calificados, de reconocida capacidad profesional, tener probidad moral y conocimiento en los asuntos de naturaleza electoral.

Del referido articulado surge claramente un orden de prelación para el nombramiento del Presidente de la CEE y del Presidente Alterno. En primera instancia, el estatuto autoriza a que los comisionados electorales nombren mediante el voto unánime al Presidente de la CEE y Presidente Alterno. Estos funcionarios serán jueces del Tribunal de Primera Instancia. Ahora bien, si en treinta días desde que surgió la vacante los comisionados electorales no logran un acuerdo, y vencido el término anterior, el Gobernador tiene quince días para nombrar los candidatos para ocupar dichos cargos. Una vez la Asamblea Legislativa reciba los nombramientos, tendrá quince días para actuar sobre ellos, requiriéndose para la aprobación dos terceras partes de los miembros que componen ambos

cuerpos legislativos. Finalmente, si en quince días desde la ausencia de nombramiento del Gobernador o éste no logra el consejo y consentimiento de dos terceras partes del total de los miembros de la Asamblea Legislativa o la Legislatura no ejerza su prerrogativa estatutaria, la mayoría del Pleno de este Tribunal seleccionará a un juez para ocupar el cargo de Presidente y del Presidente Alterno de la CEE.

En realidad, esta disposición no resulta ajena al desarrollo histórico legislativo de nuestro ordenamiento electoral. Sin remontarnos a todas las etapas de evolución del sistema comicial puertorriqueño, el Tribunal Supremo e incluso exmiembros de este honroso cuerpo han formado parte integral de este sistema por encomienda de la Asamblea Legislativa. En específico, mediante Ley Núm. 1 de 13 de febrero de 1974 la Legislatura aprobó el Código Electoral de Puerto Rico, (Código Electoral de 1974) a través del cual se creó el Tribunal Electoral.[48] En lo concerniente al nombramiento del presidente y los dos miembros asociados, éste lo realizaba el Gobernador con el consejo y consentimiento de la Legislatura.[49] No obstante, correspondía a la Junta Consultiva, compuesta por exjueces del Tribunal Supremo, "recomendar, por acuerdo de dos terceras partes de sus miembros, al Gobernador del Estado

---

[48] El Tribunal Electoral realizaba funciones propiamente administrativas y era un organismo cuasi-judicial. P.N.P. v. Tribunal Electoral, 104 DPR 1, 5, (1975).

[49] Artículo 2-001 del Código Electoral de Puerto Rico, Ley Núm. 1 de 13 de febrero de 1974, 16 LPRA ant. sec. 2021 (Código Electoral de 1974).

Libre Asociado de Puerto Rico, los nombres de por lo menos diez (10) personas para los cargos de miembros del Tribunal Electoral. El Gobernador podrá nombrar de entre ellos los miembros del Tribunal Electoral."[50] Es menester señalar que, para ese entonces, los miembros del Tribunal Electoral tenían que residir en Puerto Rico, ser elector inscrito, abogado admitido al ejercicio de la profesión, todo lo anterior con por lo menos cinco años previos a su nombramiento.[51] Nótese que el orden que establecía el estatuto especificaba que exjueces del Tribunal Supremo le ofrecían al Gobernador al menos diez candidatos -abogados- para que éste escogiera a tres para ser nombrados al Tribunal Electoral y luego éstos debían contar con el aval de los cuerpos legislativos. Esta modalidad de nombramiento le impartió "al sistema electoral de Puerto Rico […] un sistema controlado por jueces independientes y no por el

---

[50] Artículo 2-004 del Código Electoral de 1974, 16 LPRA ant. sec. 2024. En específico, el referido articulado exponía lo siguiente:

> Por la presente se crea una Junta Consultiva, compuesta por los ex-jueces del Tribunal Supremo de Puerto Rico, quienes deberán, no más tarde de un mes después de regir este Código, recomendar, por acuerdo de dos terceras partes de sus miembros, al Gobernador del Estado Libre Asociado de Puerto Rico, los nombres de por lo menos diez (10) personas para los cargos de miembros de Tribunal Electoral. El Gobernador podrá nombrar de entre ellos los miembros del Tribunal Electoral.

> Cuando ocurra una vacante de entre los miembros del Tribunal Electoral, la Junta Consultiva deberá recomendar para dicha vacante los nombres de por lo menos cinco (5) personas, y la misma deberá ser notificada al Gobernador de Puerto Rico dentro del mes de ocurrida la vacante.

> El Presidente de la Junta Consultiva será el miembro que mayor número de años haya prestado en el servicio público.

[51] Art. 2-002 del Código Electoral de 1974, 16 LPRA ant. sec. 2022.

ente político".[52]   Asimismo, en este código se implementó, a solicitud del Tribunal Electoral, que el Juez Presidente del Tribunal Supremo tenía a su cargo la designación de jueces de distrito o de paz para presidir las Juntas Locales[53] y que, además, éstos fungían como oficiales de revisión de las inscripciones y las recusaciones de los precintos electorales.[54] Mientras estuvo vigente este esquema de nombramientos, nunca se cuestionó la constitucionalidad de este estatuto. Al contrario, según el profesor Héctor Luis Acevedo "las actuaciones del Tribunal Electoral de 1974 a 1976 fueron intachables".[55]

Posteriormente, el Código Electoral de 1974 quedó derogado con la aprobación de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977 (Código Electoral de 1977). Este código cambió el mecanismo que disponía el Código Electoral de 1974 respecto al orden y el mecanismo para los nombramientos de los funcionarios que requerían el consejo y consentimiento de la Asamblea Legislativa e incluso los requisitos para ocupar el cargo

---

[52] Apéndice 5, Ponencia del Dr. Fernando Bayrón Toro, Recuento histórico del sistema electoral de Puerto Rico, Informe de la Comisión para la revisión del proceso electoral de Puerto Rico, pág. 153 (1982).

[53] Art. 4-013 del Código Electoral de 1974, 16 LPRA ant. sec. 2143. A partir de este ordenamiento electoral, la Rama Judicial designó jueces para presidir las Juntas Locales (hoy conocida como Comisión Local de Elecciones).

[54] Arts. 1-003(23), 5-026 y 5-030 del Código Electoral de 1974, 16 LPRA ant. secs. 2003, 2206, 2230.

[55] H.L. Acevedo, La democracia puertorriqueña y su sistema electoral, Puerto Rico y su gobierno: estructura, retos y dinámicas, Puerto Rico, Ed. SM, 2016, pág. 303.

de Presidente y Presidente Alterno de la CEE.[56] El Art.

1.009 del Código Electoral de 1977 disponía el

procedimiento de nombramiento:

La Comisión nombrará por unanimidad de todos los comisionados un presidente, un alterno al presidente para los casos descritos en esta ley y un primer, un segundo y un tercer vicepresidente, por un término de cuatro (4) años y hasta que sus sucesores sean nombrados, y tomen posesión de su cargo.

Corresponderá al Comisionado Electoral del partido cuyo candidato a Gobernador hubiere obtenido el mayor número de votos en la elección inmediatamente precedente, proponer a los restantes comisionados los nombres de los candidatos a los cargos de presidente y de alterno al presidente.

.     .     .     .     .     .     .     .

Tanto el presidente, como el alterno al presidente y los tres vicepresidentes deberán ser mayores de edad, residentes de Puerto Rico a la fecha de su nombramiento, debidamente calificados como electores, de reconocida capacidad profesional, probidad moral, conocimientos o interés, en los asuntos de naturaleza electoral.

.     .     .     .     .     .     .     .

Si el nombramiento de presidente recayera en una persona que estuviere ocupando un cargo como juez de Puerto Rico, tal designación conllevará un relevo total y absoluto y un impedimento en la realización de cualesquiera funciones judiciales o de otra índole, que emanen de la condición de Juez. Durante el período que fuera nombrado como Presidente de la Comisión Estatal de Elecciones, devengará el sueldo correspondiente, conforme [con] esta ley, al cargo de presidente o aquel correspondiente a su cargo de juez, de los dos el mayor. Una vez cese el cargo en la Comisión Estatal, por renuncia o por haber transcurrido el término por el cual fuere nombrado, reincorporado al cargo de juez, recibirá aquel sueldo que, de haber continuado ininterrumpidamente en dicho cargo, le hubiere correspondido. Su designación como presidente no tendrá el efecto de interrumpir el transcurso del término de nombramiento correspondiente al cargo de juez que ostente.

---

[56] Destacamos que la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977 (Código Electoral de 1977), 16 LPRA 3001 *et. seq.* (derogado) expresamente concentró en la figura del Presidente de la Comisión Estatal de Elecciones (CEE) las funciones administrativas que ejercía el Director Ejecutivo del Tribunal Electoral en el Código Electoral de 1974.

El ordenamiento electoral de 1977 introdujo que tanto el Presidente como el Presidente Alterno de la CEE fueran nombrados por votación unánime de los comisionados electorales. El comisionado electoral del partido en cuya elección precedente hubiese ganado la candidatura de gobernación era el responsable de ofrecer al resto de los comisionados electorales en propiedad los candidatos a ocupar ambos cargos. Esto era así porque, distinto al Código Electoral de 1974,[57] el nombramiento de estos funcionarios era por cuatro años y duraría hasta que los sucesores fuesen nombrados y tomaran posesión del cargo.[58]

Por otro lado, ante el surgimiento de una vacante en el cargo del Presidente, el Artículo 1.010 del Código Electoral de 1977 disponía lo siguiente:

> El Presidente y los Vicepresidentes podrán ser destituidos mediante querella y previa notificación de y vista ante un panel de tres (3) Jueces del Tribunal de Primera Instancia, debidamente designados por el Juez Presidente del Tribunal Supremo para tal efecto, por las siguientes causas: (1) […]

.   .   .   .   .   .   .   .

---

[57] El Artículo 2-003 del Código Electoral de 1974, establecía el término del cargo de los miembros del Tribunal Electoral. En específico, éste postulaba lo siguiente:

> Cada miembro del Tribunal Electoral desempeñará su cargo por el término de doce (12) años y hasta que su sucesor sea confirmado y tome posesión. Inicialmente el Presidente será nombrado por un término de doce (12) años y los miembros asociados por términos de diez (10) años y ocho (8) años, respectivamente. Si antes de expirar el término de cualesquiera de dichos miembros ocurriere una vacante, la persona nombrada para cubrir la misma desempeñará dicho cargo por el resto del término sin expirar.

[58] Artículo 1.009 del Código Electoral de 1977, 16 LPRA ant. sec. 3005.

> Cuando por cualquier causa se vacare el cargo de Presidente en forma total y permanente el alterno del Presidente ocupará la Presidencia hasta que se nombre y asuma la posición el Presidente en propiedad de la Comisión Estatal de Elecciones. La Comisión tendrá un término de treinta (30) días para seleccionar al nuevo Presidente, por el término restante del antecesor. Si transcurrido dicho término la Comisión no hubiere nombrado a la persona que ocupará la vacante, el alterno del Presidente continuará actuando como Presidente interino y el Gobernador tendrá treinta (30) días para designar a la persona que ocupará dicho cargo y este nombramiento deberá contar con el consejo y consentimiento de tres cuartas (3/4) partes de los miembros que componen cada Cámara Legislativa. Hasta que el Presidente en propiedad no tome posesión de su cargo, el alterno del Presidente continuará actuando como Presidente interino.[59]

Al amparo de este articulado, si por cualquier motivo hubiese surgido una vacante en el cargo del Presidente de la CEE que por ley requiere el nombramiento de un candidato, y los comisionados electorales no estuviesen de acuerdo con el nombramiento propuesto, entonces le correspondía al Gobernador designarlo en el término dispuesto con el consejo y consentimiento de la mayoría de los miembros que componía la Legislatura.

En cuanto a los requisitos para ser Presidente y Presidente Alterno, era innecesario que fuese abogado -tal cual lo exigía el Código de 1974-, bastaba que fueran mayores de edad, calificados como electores, de capacidad profesional, probidad moral y conocimientos o interés en los asuntos de naturaleza electoral.[60] Ahora bien, el Código Electoral de 1977 permitía que el nombramiento del

---

[59] Artículo 1.010 del Código Electoral de 1977, 16 LPRA ant. Sec. 3006.

[60] Íd.

Presidente de la CEE recayera sobre un juez en funciones. De ser ese el caso, la designación implicaba el relevo total de sus funciones judiciales y una vez concluido el término para la Presidencia de la CEE, el juez se reincorporaría a su cargo en el Tribunal General de Justicia. Nótese que este código eliminó la Junta Consultiva que requería que exjueces de este Tribunal seleccionaran al menos diez abogados para que el Gobernador escogiera tres con el fin de dirigir los nombramientos para el consejo y consentimiento de la Legislatura. Sin embargo, mediante este ordenamiento electoral, el elemento judicial, es decir, la figura del juez comenzó a interrelacionarse con el proceso del nombramiento del Presidente de la Comisión.

Luego de varios años, la Legislatura aprobó la Ley Núm. 78-2011, conocido como Código Electoral de Puerto Rico para el Siglo XXI, (Código Electoral de 2011). En lo pertinente, este código mantuvo el procedimiento para el nombramiento y los requisitos para el cargo de Presidente y Presidente Alterno de la CEE que imperó en el Código Electoral de 1977.[61] En otras palabras, los Comisionados Electorales nombraban por votación unánime a estos funcionarios, y ante el surgimiento de una vacante sin que éstos lograran un acuerdo, el Gobernador designaba un

---

[61] Véase Art. 3.007 de la Ley Núm. 78-2011, conocido como Código Electoral de Puerto Rico para el Siglo XXI, 16 LPRA ant. sec. 4017.

candidato que tenía que contar con el aval de la Asamblea

Legislativa.[62]

---

[62] Art. 3.008 del Código Electoral de 2011, 16 LPRA ant. sec. 4018,
dispone lo siguiente:

El Presidente, Alterno al Presidente y los Vicepresidentes
podrán ser destituidos por las siguientes causas:

1.[…]

.    .    .    .    .    .    .    .

Cuando por cualquier causa quedara vacante el cargo de
Presidente, el Alterno al Presidente o en su defecto el
Primer Vicepresidente ocupará la presidencia hasta que se
nombre el sucesor y éste tome posesión de dicho cargo por
el término inconcluso del predecesor. Los Comisionados
Electorales tendrán un término de treinta (30) días para
seleccionar al nuevo Presidente. Si transcurrido dicho
término, los Comisionados Electorales no hubieran nombrado
a la persona que ocupará la vacante, el Alterno al
Presidente o en su defecto el Primer Vicepresidente
continuará actuando, como Presidente Interino y el
Gobernador tendrá treinta (30) días para designar un nuevo
Presidente previo consejo y consentimiento de la mayoría
de los legisladores que componen cada cámara legislativa.
El Alterno al Presidente o en su defecto el Primer
Vicepresidente continuará actuando como Presidente
interino hasta que el Presidente confirmado tome posesión
de su cargo.

Si dentro de los ciento ochenta (180) días previos a la
celebración de una elección general el cargo de Presidente
quedare vacante o éste se ausentare por las razones antes
mencionadas, el Alterno al Presidente o en su defecto el
Primer Vicepresidente ocupará la presidencia hasta que haya
finalizado el proceso de elección y escrutinio general o
el Presidente se reincorpore en sus funciones.

El Alterno al Presidente no estará impedido de ejercer su
profesión u oficio excepto según disponga esta Ley. Cuando
sea necesaria la activación de sus servicios, este no podrá
tener o mantener relación alguna con otra entidad pública
o privada.

Cuando por cualquier causa quedara vacante el cargo de
Presidente, el Alterno al Presidente ocupará la presidencia
hasta que se nombre el sucesor y éste tome posesión de
dicho cargo por el término inconcluso del predecesor. Los
(las) Comisionados (as) Electorales tendrán un término de
treinta (30) días para seleccionar al nuevo Presidente. Si
transcurrido dicho término, los (las) Comisionados (as)
Electorales no hubieran nombrado a la persona que ocupará
la vacante, el Alterno al Presidente continuará actuando
como Presidente Interino y el Gobernador tendrá treinta
(30) días para designar un nuevo Presidente previo consejo
y consentimiento de la mayoría de los legisladores que
componen cada cámara legislativa. El Alterno al Presidente
continuará actuando como Presidente interino hasta que el
Presidente confirmado tome posesión de su cargo.

La inclusión de la figura del Gobernador y la concurrencia de la Legislatura para nombrar el Presidente de la CEE se fundamentó en las recomendaciones que realizó la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico (Comisión Especial) que la Asamblea Legislativa creó en 1981. Mediante esta Comisión Especial se pretendió estimular a los partidos políticos a llegar a un consenso sobre las enmiendas necesarias a nuestro sistema electoral.[63] De manera que la encomienda de la Comisión Especial era formularle al Gobernador y a la Legislatura "propuestas concretas […], después de estudiar y evaluar en forma cuidadosa y abarcadora el sistema electoral puertorriqueño existente" para adaptarlo a los adelantos conforme a la experiencia adquirida en las últimas elecciones.[64] Es decir, los comicios de 1980. En cuanto a la estructura de la CEE, la Comisión Especial recomendó que, siguiendo el modelo de Venezuela, "los principales funcionarios electorales [fueran] nombrados por un cuerpo legislativo por el voto de tres cuartas partes de sus miembros".[65] A pesar de esta recomendación, la comisión reconoció que ese esquema requería una enmienda a nuestra Ley Suprema. Por esto afirmó que "era necesario elaborar otras alternativas que estuviesen al alcance del poder

---

[63] Resolución conjunta Núm. 21 de 2 de julio de 1981. Exposición de Motivos.

[64] Art. 2 de la Resolución conjunta 21 de 2 de julio de 1981.

[65] Informe de la Comisión para la revisión del proceso electoral de Puerto Rico, pág. 13 (1982).

legislativo según delegado en nuestra Constitución".[66] Así que, para cumplir con lo anterior, la Comisión Especial "elaboró un diseño de participación integral tanto en la designación de las estructuras principales como en las intermedias y en las locales".[67] En lo concerniente al nombramiento del Presidente, se continuaría como hasta el momento, es decir, con el voto unánime de los miembros de la CEE, pero la propuesta añadiría que:

> el Gobernador nombrará al Presidente con el concurso de tres cuartas partes de los cuerpos legislativos. […] Con este mecanismo de nombramiento se garantiza un mínimo de confianza en el Presidente al requerirse su aprobación por los partidos participantes o al menos por los dos partidos principales de conformidad con la composición de la Legislatura dispuesta por nuestra Constitución.[68]

Recalcamos que, según la Comisión Especial, este esquema evitaría la necesidad de enmendar nuestra Constitución. A raíz de esta propuesta, se enmendó el Código Electoral de 1977 -mediante la Ley Núm.3 de 10 de enero de 1983- y, como observamos, esta redacción continuó en el ordenamiento electoral de 2011 y se encontraba en las

---

[66] Íd.

[67] Íd.

[68] Véase Informe de la Comisión para la revisión del proceso electoral de Puerto Rico, pág. 14, (1982). Hubo, además, la recomendación de regresar al sistema de nombramiento por parte de exjueces de este Tribunal que existía en el Código Electoral de 1974. Asimismo, se sugirió que la estructura de la CEE debía estar en manos de los jueces y no de los partidos. Finalmente, el Colegio de Abogados de Puerto Rico propuso colocar el proceso electoral dentro del sistema judicial. Íd., 153, 112 y 114 (1982). Véase además F. Bayrón Toro, En defensa de un sistema electoral jurídico e independiente, 48 (4) Rev. Col. Abog. PR 35, 41 (1987). En el referido artículo el autor abunda sobre las recomendaciones que realizó en su ponencia ante la Comisión Especial para la revisión del proceso electoral de Puerto Rico respecto al beneficio de la intervención de la judicatura en los procesos electorales.

disposiciones relacionadas a las destituciones y vacantes de sus cargos.

Cuando se adoptó en el Código Electoral de 2020 de que, en ausencia de acuerdo de los comisionados electorales, el Gobernador nombraría al Presidente y el Presidente Alterno de la CEE, cambió que el consejo y consentimiento de la Asamblea Legislativa será de dos terceras partes. Solo que ahora se incluyó nuestra intervención directa en el proceso de selección del Presidente y Presidente Alterno de la CEE, esto **únicamente en ausencia de que las otras ramas de gobierno ejecuten sin éxito o declinen ejercer su deber estatutario**. Obsérvese que, al menos, la idea o el concepto de nuestra intervención en cuanto al nombramiento de la alta gerencia de la CEE era indispensable en el Código Electoral de 1974.

**III**

Como vimos, la CEE no es una agencia de la Rama Ejecutiva tradicional. Contrario a ello, **su naturaleza es *sui géneris* y así lo hemos reconocido históricamente**. Al no ser una agencia ejecutiva bajo la concepción constitucional ni por virtud de ley no podemos darle el mismo trato que se le da al resto de las agencias que responden al Ejecutivo. Entiéndase que la CEE es un organismo que se aleja de fungir como un departamento ejecutivo para propósitos constitucionales. A esos efectos, nótese que el Presidente de la CEE y su alterno no son funcionarios con la encomienda de asistir al Gobernador en el ejercicio de su poder

ejecutivo. Tampoco son jefes del gabinete constitucional y, consecuentemente no implementan política pública. Es evidente que la Constitución mantuvo en manos de la Rama Legislativa reglamentar los asuntos de índole electoral. Así, la Asamblea Legislativa podía disponer de todo lo concerniente al proceso electoral y, consecuentemente, la forma de nombrar al Presidente y al Presidente alterno de la CEE, según dispuso y viabilizó el Art.3.7 del Código Electoral del Puerto Rico, *supra*.

De esta manera, como la CEE no es un departamento del Ejecutivo bajo el entendido constitucional, el nombramiento del Presidente de la CEE y su alterno no podría ser considerado como un Secretario de Gobierno. Por esta razón, históricamente los nombramientos en cuestión no han recaído en el Gobernador ni en el legislador. Todo lo contrario, los Códigos Electorales han establecido un sistema de nombramiento donde los Comisionados Electorales son los encargados de seleccionar al Presidente y su alterno. Dicho sea de paso, los Comisionados Electorales también son nombrados sin la intervención de la Rama Ejecutiva y Legislativa. Por esto, pretender descartar la autonomía de la CEE, como proscribe la Opinión mayoritaria, nos obliga a inferir que los Presidentes de la CEE recientes ocuparon sus cargos sin eficacia constitucional por no haber sido nombrados por el Ejecutivo. Peor aún, nos obliga a colegir -bajo el análisis de la mayoría- que los Comisionados Electorales actuales no podrían ocupar válidamente sus

puestos. Esto, porque según concluye la Opinión mayoritaria, la CEE es una agencia independiente que forma parte de la Rama Ejecutiva, por lo que los Comisionados Electorales tendrían también que estar sujetos, como figuras centrales en la interpretación y determinación de la política electoral, al nombramiento a sus cargos por el Ejecutivo.

Además, en los últimos dos Códigos Electorales derogados se consideraba que el cargo de Presidente podría recaer en un funcionario con ocupación de Juez, mientras que en el Código Electoral vigente forma parte de los requisitos del cargo, siendo lo anterior particularidades indicativas de que siempre se ha reconocido una interrelación entre el proceso de nombramiento y la Rama Judicial.

En la actualidad, el Código Electoral de 2020 mantuvo el mismo mecanismo de selección del Presidente y su alterno, pero estableció un procedimiento remedial en la eventualidad de que los Comisionados Electorales no lograran seleccionar por unanimidad al Presidente y su alterno. Como veremos, este mecanismo integra las tres ramas de gobierno.

La facultad encomendada al Tribunal Supremo para seleccionar al Presidente de la CEE y su alterno no trastoca el esquema de separación de poderes. Recuérdese que lo que busca el principio de separación de poderes es evitar la interferencia indebida entre las ramas de gobierno y que se

concentre el poder en una sola Rama. Sin embargo, el mecanismo provisto por el Código Electoral 2020 se aparta de esa prohibición. Esto pues, la facultad del Tribunal Supremo nace en el momento en que la Rama Legislativa no logra concretar su encomienda de carácter preferente a la hora de aprobar el nombramiento propuesto por el Ejecutivo. Es decir, la intervención del Tribunal Supremo se activa sí y solo sí la Rama Legislativa no concreta su facultad de brindar consejo y consentimiento a la propuesta del Ejecutivo. Precisamente, eso fue lo que ocurrió. La Rama Legislativa, lamentablemente, optó por no considerar los nombramientos, a pesar de que la ley los ubicaba como próximos en la prelación.

Entiéndase que no se trata de que el Tribunal Supremo lleve las riendas del nombramiento del Presidente de la CEE y su alterno en sí, sino que su función nace y opera de forma remedial cuando la CEE y las ramas políticas no logran concretar su función, como en efecto sucedió. Así, en la medida en que conforme a la disposición en controversia este Foro solo podría ejercer el poder de nombramiento estatuido en ley cuando las ramas políticas hubiesen fallado en conseguir aprobar los nombramientos no estaríamos ante una delegación de poderes *per se*, sino ante la creación de un remedio alterno con prelación de los Comisionados Electorales y de las propias ramas políticas y en auxilio de estas. Consecuentemente, no cabe hablar de centralización ni aumento de poder a la Rama Judicial a

expensas de las ramas políticas, cuando el Tribunal Supremo se activa en defecto de su intervención.

En otras palabras, no nos encontramos ante una delegación indebida de la Rama Legislativa de sus prerrogativas o de las del Ejecutivo, sino de un mecanismo auxiliar encomendado a la Rama Judicial por su característica de independencia y confiabilidad, ante la situación extraordinaria de que no pueda llegarse a un acuerdo para tales nombramientos en ninguno de los dos procesos previos a la intervención de este Tribunal. No le corresponde al Tribunal Supremo sin más y de primera intención nombrar los cargos en controversia. Nótese que en el proceso estatuido en Ley las tres ramas de gobierno interactúan. Por consiguiente, la acción del Tribunal Supremo es un remedio y únicamente era posible ante la falta de acuerdo necesario de los demás poderes constitucionales.

Lo anterior, guarda armonía con el balance adecuado entre las tres ramas de gobierno y la distribución tripartita. De esta manera, la facultad delegada por la Rama Legislativa al Poder Judicial no altera el sistema de separación de poderes, sino que facilita la estabilidad y el funcionamiento del sistema electoral democrático. Así, queda claro que la facultad conferida en ley no socava las prerrogativas de las demás ramas.

Vemos que no existe tal 'poder absoluto' ni 'unilateral' en el proceso de nombrar por parte de este Foro como señala la Opinión mayoritaria. Contrario a ello,

ese 'poder absoluto' lo ostentan los Comisionados Electorales propietarios porque nadie puede interferir con sus nombramientos si estos actúan de forma unánime en el cumplimiento de su deber. Adviértase que el 'poder absoluto' es aquel que se ejerce sin que ningún otro poder pueda intervenir. Concluir que el Art. 3.7(3) del Código Electoral 2020, *supra*, estatuye un 'poder absoluto' a esta Curia para nominar y confirmar a un funcionario de otra Rama saca de contexto el procedimiento en sí y obvia la prelación establecida por la Asamblea Legislativa. Es decir, según el texto claro de la Ley, ni el Ejecutivo, ni la Asamblea Legislativa, ni el Tribunal Supremo pueden ejercer poder alguno sobre los nombramientos a menos que los Comisionados Electorales así consientan al no actuar unánimemente. Entiéndase que los tres poderes constitucionales están impedidos de actuar sobre el nombramiento del Presidente de la CEE y su alterno hasta que los Comisionados Electorales en su poder absoluto actúen. Esto último, sí es poder absoluto.

De otra parte, vemos que la Rama Judicial siempre ha sido partícipe de nuestro andamiaje electoral. Nótese que, como mencionáramos, la propia Constitución designa al Juez Presidente como parte de la Junta Revisora de los Distritos Senatoriales y Representativos, siendo esto un ejemplo clave de como la Rama Judicial se desvía de su función principal de adjudicar casos y controversias y se mueve a una función de índole administrativo en el proceso

electoral. Además, vemos que los Códigos Electorales han provisto favorablemente para que la Rama Judicial realice distintas tareas. A modo de ejemplo, recuérdese que cada una de las Comisiones Locales de elecciones en cada precinto electoral tendrán por Presidente a un juez del Tribunal de Primera Instancia o su alterno quienes serán nombrados por el Tribunal Supremo.[69] De igual manera, el Tribunal Supremo participa en el proceso de destitución del Presidente de la CEE y su alterno.[70]

Habiendo esbozado todo lo anterior es forzoso concluir que, si los Comisionados Electorales tienen el aval para nombrar al Presidente de la CEE y su alterno sin el consejo y consentimiento de la Legislatura y dicho ejercicio es constitucional, se sostiene también la validez constitucional cuando se trata del Tribunal Supremo. De lo contrario, se permitiría un esquema de selección del Presidente de la CEE y su alterno por parte de los Comisionados Electorales sin más, mientras que se invalidaría lo establecido por ley a favor del Poder Judicial, siendo esta una Rama Constitucional limitado por normas de imparcialidad e independencia de cualquier influencia política.

---

[69] Véanse: Art.1.020 del Código Electoral de 1977, 16 LPRA sec. 3029 (derogado); Art. 5.002 del Código Electoral de 2011, 16 LPRA sec. (derogado) y Art. 4.2 del Código Electoral de 2020, 16 LPRA sec. 4542.

[70] Véanse: Art.1.01 del Código Electoral de 1977, 16 LPRA sec. 3006(derogado); Art. 3.008 del Código Electoral de 2011, 16 LPRA sec. (derogado) y Art. 3.9 del Código Electoral de 2020, 16 LPRA sec. 4519.

Además, concluir que el ejercicio del remedio estatuido en ley no encuentra cabida en la misión central del Poder Judicial es desacertado, toda vez que el Poder Judicial lleva nombrando los presidentes de las Comisiones Locales por más de treinta años.

En fin, luego del análisis sobre la legislación electoral, debemos cuestionarnos si realmente el texto en cuestión infringía el principio constitucional de separación de poderes. En otras palabras ¿podía la Rama Legislativa delegar a la Rama Judicial funciones no judiciales sin coartar las prerrogativas de la Rama Ejecutiva? Al inicio adelanté que tengo la obligación, como miembro del Poder Judicial de, aun cuando en ocasiones resulte incómodo, reafirmarme en el "postulado fundamental de hermenéutica constitucional que establece que al examinar un estatuto, 'el Poder Judicial --en abono de una deferencia hacia el Poder Legislativo-- debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley'".[71]

La integración del Poder Judicial como parte del mecanismo de selección del Presidente de la CEE y su alterno lo único que pretendía era que -como medida remedial- el Tribunal Supremo tuviese la encomienda de lograr concretar el mandato estatuido en Ley y, consecuentemente, viabilizar

---

[71] Nogueras v. Hernández Colón I, 127 DPR 405, 412 (1990) citando Banco Popular v. Mun. de Mayagüez, 126 DPR 653 (1990); P.R.P. v. E.L.A., 115 DPR 631, 642 (1984); Milán Rodríguez v. Muñoz, 110 DPR 610, 618 (1981); Pueblo ex rel. M.G.G., 99 DPR 925, 927 (1971).

la intención legislativa sobre los nombramientos. Por entender que el Art. 3.7 del Código Electoral, *supra*, se sostenía, muy respetuosamente reitero que disiento.


                                    Erick V. Kolthoff Caraballo
                                          Juez Asociado